UNITED STATES DISTRICT COURT
~~JUDGE FURMAN~~
SOUTHERN DISTRICT OF NEW YORK

19 CV 5065

---

ADVANTAGE SKY SHIPPING LLC, and
M/T "ADVANTAGE SKY",

Plaintiffs,

- against -

ICON EQUIPMENT AND CORPORATE
INFRASTRUCTURE FUND FOURTEEN
LIQUIDATING TRUST

Defendant.

---

19 CV

**VERIFIED COMPLAINT**

Plaintiffs, ADVANTAGE SKY SHIPPING LLC ("Advantage Sky") and M/T ADVANTAGE SKY (the "Vessel" and, jointly with Advantage Sky, "Plaintiffs"), by and through their attorneys, Watson Farley & Williams LLP, as and for their Verified Complaint against Defendant ICON EQUIPMENT AND CORPORATE INFRASTRUCTURE FUND FOURTEEN LIQUIDATING TRUST (the "Trust") allege upon information and belief as follows:

**Subject Matter Jurisdiction**

1. This is an admiralty or maritime claim within the meaning of Federal Rule of Civil Procedure ("F.R.Civ.P.") 9(h) and 28 U.S.C. § 1333.

**Parties**

2. At all times relevant to this action, Plaintiff Advantage Sky was, and still is, a foreign corporation duly organized and operating under the laws of the Marshall Islands, with a registered address of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Republic of the Marshall Islands, MH 96960, and is the registered owner of Plaintiff *in rem* M/T ADVANTAGE SKY, an oil tanker flagged in the Republic of the Marshall Islands.

3.     Defendant Trust is a statutory trust established under the laws of Delaware, with a registered office at c/o NRAI Services, 160 Greentree Drive, Suite 101, Dover Delaware 19904.

## FACTS

**The Charter**

4.     On or about August 30, 2018, Defendant, acting through its wholly-owned and controlled subsidiaries ICON AMAZING, LLC, ICON FANTASTIC, LLC, AND ICON OCTAVIAN CENTER, LLC, ("Subsidiaries") caused the Vessel to be arrested in the territorial waters of South Africa (the "Arrest").

5.     The basis for the Arrest involved a claim for security by the Subsidiaries in respect of their legal disputes in New York State Court and High Court in London England involving the Vessel's prior owner.

6.     Plaintiffs have now filed a counter-claim in South Africa against the Subsidiaries alleging that the arrest of the Vessel was wrongful and are seeking security for their claim.

7.     In support of the wrongful arrest claim, Plaintiffs have filed a Further Supplementary Affidavit in the Arrest action (the "Supplementary Affidavit") before the High Court of South Africa that details each aspect of Plaintiffs' claim for damages.   Attached hereto as Exhibit 1 is a true and correct copy of the Supplementary Affidavit, the contents of which are hereby incorporated as though fully laid out herein.

8.     Plaintiffs' wrongful arrest claim, as near as it may now be calculated, is $10,314,636.65, exclusive of interest, costs and attorneys' fees.

9.      The South African Court has granted Plaintiffs' request for security for Plaintiffs' wrongful arrest claim in South Africa.  However, the Subsidiaries aver that they cannot supply such security.

10.     The Subsidiaries instead provided a parent company guarantee to secure the Plaintiffs' wrongful arrest and related claims.

11.     The parent company guarantee is given by Defendant ICON EQUIPMENT AND CORPORATE INFRASTRUCTURE FUND FOURTEEN LIQUIDATING TRUST, a Delaware statutory liquidating trust which is the successor to the previous parent of the Subsidiaries, ICON EQUIPMENT AND CORPORATE INFRASTRUCTURE FUND FOURTEEN, L.P. (the "Company").

**The Trust**

12.     Defendant Trust is controlled by a Liquidating Trust Agreement dated as of December 21, 2018 (the "Trust Agreement").  A true and correct copy of the Trust Agreement is attached hereto as Exhibit 2.

13.     The Trust Agreement provides:

WHEREAS, the General Partner believes it to be in the best interest of the Company[1] to complete the liquidation of the Company by transferring all remaining assets of the Company (the "Retained Assets"), including cash reserves set aside for the contingent and existing obligations of the Company (the "Company Cash Reserves"), to a liquidating trust (the "Liquidating Trust" or the "Trust") with ICON Capital, LLC, the Company's investment manager (the "Investment Manager"), serving as its initial Managing Trustee, including cash reserves set aside for the contingent and existing obligations of the Liquidating Trust (the "Liquidating Trust Cash Reserves," and together with the Company Cash Reserves, the "Cash Reserves").

(Ex. 2, Trust Agreement, Recitals, page 4, emphasis added).).

---

[1]    The "Company" is ICON Equipment and Corporate Infrastructure Fund Fourteen, L.P., the previous parent of the Subsidiaries.

3

14.     The Trust Agreement further states:

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, <u>the Company hereby agrees to grant, release, assign, convey and deliver unto the Managing Trustee for the benefit of the Beneficiaries (as hereinafter defined), all of the right, title and interest of the Company in and to the Retained Assets and Company Cash Reserves</u> for the uses and purposes stated herein on the Effective Date, subject to the terms and provisions set out below, and the Managing Trustee hereby agrees to accept such Retained Assets and Company Cash Reserves and such Trust, subject to the following terms and provisions.

(Ex. 2, Trust Agreement, Recitals, page 4, <u>emphasis</u> added).

15.     The Trust Agreement further provides that the Trust is prohibited from engaging in business:

**2.2 Prohibited Activities.**

<u>The Trust shall not continue or engage in the conduct of any trade or business</u>, and the Managing Trustee is expressly prohibited from continuing or engaging, and shall have no power or authority to continue or engage in the conduct of any trade or business on behalf of the Trust or the Beneficiaries, and all of the terms and conditions hereof shall be construed accordingly.

(Ex. 2, Trust Agreement, Paragraph 2.2, <u>emphasis</u> added).

16.     Accordingly, while the Trust is organized in Delaware and has a statutory trustee in that jurisdiction, it is managed in New York by proposed garnishee Icon Capital, LLC, but does no business anywhere.

**The Guarantee**

17.     By a written letter of undertaking dated May 14, 2019, Defendant Trust has guaranteed Plaintiffs' wrongful arrest claim against the Subsidiaries.  A true and correct copy of the guarantee is attached hereto as Exhibit 3.

18.     In the United States, a wrongful arrest claim is a maritime claim.

19.     In South Africa, a wrongful arrest claim is a maritime claim.

20.     When the Trust guaranteed the obligations of the Subsidiaries stemming from Plaintiffs' wrongful arrest claim, it became a party to the underlying maritime transaction and hence is subject to maritime jurisdiction.

21.     Since Icon Capital, LLC, holds "all of the right, title and interest" to the assets of the Trust so that it can manage said assets, it is an appropriate garnishee.

22.     Upon information and belief, the Trust also has a bank account in New York, but the location is currently unknown.

**The Rule B Allegations**

23.     After a diligent enquiry, an office for the Defendant could not be located in this District. *See* Affidavit of Neil A. Quartaro Pursuant To Rule B(1) And In Support Of Order Appointing Person To Serve Process Pursuant To F.R.Civ.P 4(C) & Directing Scope Of Service dated May 30, 2019 ("Quartaro Affidavit") at ¶¶ 4-5.

24.     After a diligent search, including internet searches utilizing the Google search engine, and consulting the website maintained by the New York State Secretary of State, Division of Corporations website, Defendant Trust does not appear to have an agent for the service of process in this District or in New York State. Id. at ¶ 4(a).

25.     According to the website maintained by the New York State Secretary of State, Division of Corporations, the Defendant Trust has not registered as a foreign corporation registered to do business in the State of New York. Id. at ¶ 4(b).

26.     A call to 411 and a request to search for "Icon Equipment and Corporate Infrastructure Fund Fourteen Liquidating Trust" did not reveal a telephone number or other contact details for Defendant. Id. at ¶ 4(c).

27.     Accordingly, Defendant Trust cannot be "found" within the District for the purpose of an attachment pursuant to the Supplemental Rules for Admiralty or Maritime Claims, Rule B ("Rule B") and Plaintiffs seek an Order of Attachment against such property, tangible or intangible, of the Defendant as may be found within the District, up to and including $10,314,636.65.

**Defendant's Assets in the District**

28.     Upon information and belief, Defendant's assets are all in the possession, constructive possession, and/or control of proposed garnishee Icon Capital, LLC, which is located in this District at 3 Park Avenue, 36th Floor, New York, NY 10016.  Quartaro Affidavit at ¶ 6.

29.     Upon information and belief, Defendant maintains a bank account in this District, under the control of the Managing Trustee Icon Capital, LLC, which contains assets belonging to Defendant.  Id. at ¶ 7.

30.     Upon information and belief, the Managing Trustee Icon Capital, LLC also controls other assets of Defendant, including but not limited to accounts receivable and litigation claims.  Id. at ¶ 8.

31.     Accordingly, Plaintiffs respectfully seeks (1) an order of attachment directed to Icon Capital, LLC attaching all assets of the Trust up to the amount sought herein; and (2) a limited discovery order allowing Plaintiffs to serve limited discovery on Icon Capital, LLC seeking the location of the New York bank account believed to contain assets belonging to the Trust.

## AS AND FOR A FIRST CAUSE OF ACTION – ATTACHMENT OF ICON EQUIPMENT AND CORPORATE INFRASTRUCTURE FUND FOURTEEN LIQUIDATING TRUST ASSETS

32.     Defendant Trust is obligated under the Guarantee to pay Plaintiffs' damages should the wrongful arrest claim be successful.

33.   The Guarantee secures a maritime claim and is a maritime contract.

34.   In the South African wrongful arrest case, Plaintiffs are entitled to recover no less than $10,314,636.65.

35.   Defendant Trust cannot be found in this District within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime Claims.

36.   Defendant Trust has property in this District, consisting of, *inter alia*, its assets, including cash, under the exclusive control of the Managing Trustee and proposed garnishee Icon Capital, LLC and other garnishees whose identity is as yet unknown.

37.   Plaintiffs are accordingly entitled to attach Defendant Trust's property within the District.

## PRAYER FOR RELIEF

38.   Upon information and belief, Defendant has assets in the District in the possession and control of its Managing Trustee, Icon Capital, LLC.

39.   Plaintiffs seek an Order from this Court directing the Clerk of the Court to issue a Process of Maritime Attachment and Garnishment pursuant to F.R.Civ.P. Rule B attaching any and all assets of Defendant up to the amount of **$10,314,636.65** for the purpose of obtaining personal jurisdiction over Defendant and to secure the South African wrongful Arrest claim.

40.   Plaintiffs also seek limited discovery, to be served on the Managing Trustee, to identify the bank at which Defendant is believed to maintain its cash.

*-remainder of page intentionally blank-*

**WHEREFORE**, Plaintiffs pray:

That process in due form of law issue against Defendant ICON EQUIPMENT AND CORPORATE INFRASTRUCTURE FUND FOURTEEN LIQUIDATING TRUST citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

(A)      That, since Defendant cannot be found within this District pursuant to F.R.Civ.P. Rule B, this Court issue an Order directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B attaching all property, tangible or intangible, in whatever form, in the Amount of $10,314,636.65 to secure Plaintiffs' claims, and that all persons claiming any interest in the same be cited to appear and, pursuant to F.R.Civ.P. Supplemental Rules B and E, Answer the matters alleged in the Verified Complaint;

(B)      The Plaintiffs be authorized to serve limited discovery on the Managing Trustee to identify the location of Defendant's New York bank account;

(C)      That this Court retain jurisdiction over this matter through the entry of any judgment or further award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof; and

(D)      That Plaintiffs have such other, further and different relief as the Court may deem just and proper in law and equity.

*-remainder of page intentionally blank-*

Dated:   New York, New York
May 30, 2019

By:   _____

Neil A. Quartaro
Zachary Farley
Watson Farley & Williams LLP
250 West 55th Street
New York, New York 10019
(212) 922-2200
nquartaro@wfw.com
zfarley@wfw.com

Attorneys for Plaintiffs

<u>Verification</u>

I, <u>TUGRUL TOKGÖZ</u>, a duly authorized representative of Plaintiffs, have read the foregoing complaint and, under penalty of perjury, verify the same to be true to the best of my knowledge and belief and following a review of the documents and correspondence related to this matter, except for (i) those matters alleged to be upon information and belief, and those matters I believe to be true based on the foregoing documents and correspondence; and (ii) those allegations supported by the accompanying affidavit of Plaintiff's counsel.

Dated: Istanbul, Turkey
      May 30, 2019

Name: TUGRUL TOKGÖZ
Title: DIRECTOR

10

# EXHIBIT

# 1

155

IN THE HIGH COURT OF SOUTH AFRICA

KWAZULU-NATAL LOCAL DIVISION, DURBAN

(Exercising its admiralty jurisdiction)

CASE NO: A50/2018

NAME OF SHIP: VLCC "ADVANTAGE SKY"

In the matter between:

**ADVANTAGE SKY SHIPPING LLC**                     First Applicant

**VLCC "ADVANTAGE SKY"**                                Second Applicant

and

**ICON AMAZING, LLC**                                       First Respondent

**ICON FANTASTIC, LLC**                                    Second Respondent

**ICON OCTAVIAN CENTER, LLC**                      Third Respondent

*In the application for security for a counter-claim for the wrongful arrest of the Second Applicant pursuant to an order of this Court granted on 30 August 2018, in terms of Section 5(3) of the Admiralty Jurisdiction Regulation Act, 105 of 1983.*

---

## FURTHER SUPPLEMENTARY AFFIDAVIT

---

I, the undersigned,

**ANDREW CRAIG CLARK**

do hereby make oath and say that:



1.

I am an attorney of this Honourable Court and practise as such as a partner of Cox Yeats at 21 Richefond Circle, Ridgeside Office Park, Umhlanga Ridge, Durban, KwaZulu-Natal.

2.

Cox Yeats are the attorneys of record for the Applicants in South Africa.

3.

I am authorised to depose to this Further Supplementary Affidavit on behalf of the Applicants in this Counter-Security Application.

4.

The facts contained herein are, save where the context indicates to the contrary, within my personal knowledge and belief and are true and correct.

5.

Those facts not within my personal knowledge have been conveyed to me through correspondence and communication with Mr Michael Lax, a solicitor qualified in England and Wales and a partner in the firm Lax & Co of 78 Cornhill, London, United Kingdom.

6.

I am informed by Mr Michael Lax that he has received information directly from Mr Ali Tugrul Tokgöz who is a minority shareholder in Forward Holdings LLC ("Forwarding Holdings"), the ultimate holding company in Advantage Sky



Shipping LLC ("Advantage Sky Shipping") and who is also a director of Advantage Tankers LLC ("Advantage Tankers") (and who is ergo a director of Advantage Sky Shipping), as well as Forward Holdings.

7.

In regard to the facts that have been conveyed to me, I verily believe such facts to be true and correct.

8.

The Applicants seek leave to file this Supplementary Affidavit in the Counter-Security Application in order to update the quantum of the counter-security sought by the Applicants from the Respondents. This is necessary because of the actual hearing date allocated and charter hire rates for the relevant period having been obtained.

**<u>Revised Capital Claim</u>**

9.

The initial anticipated capital claim in respect of the Applicants' claim for wrongful arrest was calculated over a period of 62 days (i.e. 30 August 2018 to 31 October 2018) at a daily off hire rate of USD17,500. This amounted to a total capital claim of USD1,085,000 (one million and eighty-five thousand United States Dollars).

10.

On 29 November 2018 the Applicants filed a Supplementary Affidavit, in which the quantum of their capital claim was revised. This was set out on two bases:



10.1  in the event that the Set Aside and Counter Security Applications be heard by 21 December 2018, the Applicants' loss anticipated loss was calculated at USD2,513,918.31; and

10.2  in the event that the Set Aside and Counter Security Applications be heard by 28 February 2019, the Applicants' loss anticipated loss was calculated at USD4,413,204.00.

11.

At the time of filing the Supplementary Affidavit, the Applicants were not in possession of the rates as published by the Baltic Exchange and Galbraiths for the agreed route, the TD20 for the period November 2018 to February 2019.

12.

The quantum calculations set forth in the Applicants' Supplementary Affidavit therefore represented an estimate of the capital claim for the period November 2018 to February 2019.

13.

Having subsequently obtained such rates, it is therefore necessary for the Applicants to update their quantum calculations accordingly.



14.

In addition, the quantum calculation in the Applicants' Supplementary Affidavit was calculated inclusive of damages suffered in February 2019. The date for the hearing of the Set Aside and Counter-Security Applications having been set for 27 March 2019, it is necessary for the Applicants to update their quantum calculations to include the damages suffered up to and including, at least, 27 March 2019.

15.

The basis upon which the Applicants make these calculations has been set out in the Applicants' Supplementary Affidavit, filed of record on 29 November 2018.

**Loss of Hire**

16.

The hire rates, as calculated per clause 8, in respect of the period 30 August 2018 up to and including 28 February 2019 are as follows:

16.1    September and October 2018:

USD17,500 (the base rate for these months was USD12,458, which is below the base rate of USD17,500, therefore the latter rate will apply);

16.2    November 2018:

USD17,500 + [(USD22,727.91 – USD17,500) / 2] = USD20,113.92;

16.3    December 2018:

USD17,500 + [(USD36,627.96 – USD17,500) / 2] = USD27,063.98

16.4    January 2019:

USD17,500 + [(USD34,757.94 – USD17,500) / 2] = USD26,128.97;

16.5    February 2019:

USD17,500 + [(USD26,235.92 – USD17,500) / 2] = USD21,867.96; and

16.6    March 2019:

USD17,500 (the base rate for this month was USD17,262.44, which is below the base rate of USD17,500, therefore the latter rate will apply) = US17,500.

17.

The Applicants have previously indicated that the *Advantage Sky* had completed discharge operations and was ready to sail on 24 September 2018.

18.

Assuming that the Set Aside Application is heard, and judgment is delivered therein in favour of the Applicants by 27 March 2019, or shortly thereafter, the anticipated claim for loss of hire will be the following:



18.1    September and October 2018:

      61 days x USD17,500 = USD1,067,500;

18.2    November 2018:

      30 days x USD20,113.96 = USD603,418.80;

18.3    December 2018:

      31 days x USD27,063.98 = USD838,983.38;

18.4    January 2019:

      31 days x USD26,128.97 = USD809,998.07;

18.5    February 2019:

      28 days x USD21,867.96 = USD612,302.88; and

18.6    March 2019:

      27 days x USD175,500 = USD472,500.00.

19.

The Applicants' total anticipated claim for loss of hire in these circumstances will



be in the sum of USD4,404,703.13 (four million, four hundred and four thousand seven hundred and three United States Dollars and thirteen United States Cents).

**Additional Bunker Consumption**

20.

The Applicants' updated claim in respect of bunkers up to and including 27 March 2019 is calculated as follows:

20.1    208 days x USD5,261.00 = USD1,094,288.00.

**Total Capital Claim**

21.

The Applicants' total capital claim in respect of loss of hire and bunker consumption will be, in the event that judgment is granted in favour of the Applicants in the set aside application by 27 March 2019, the sum of USD5,498,991.13.

**Interest**

22.

It is necessary to update the calculations in respect of interest having regard to the increased capital claims referred to above. These calculations are done in accordance with the usual practice in security negotiations in this division of the High Court, namely a provision for interest on the anticipated capital claims for a

period of three years at 10% per annum.

23.

This translates into the following interest calculation:

23.1    USD1,649,697.34   in   respect   of   its   anticipated   claim   of
        USD5,498,991.13.

24.

In the premises the total security sought in respect of each capital claim and
interest is USD7,148,688.47.

25.

**WHEREFORE** the Applicants request:

25.1    that they be granted leave to file this Supplementary Affidavit;

25.2    that in the event that the Set Aside Application be heard, and judgment
        therein be granted in favour of the Applicants by 27 March 2019, the
        Applicants be awarded counter-security in respect of their capital claim,
        inclusive of interest, in the sum of USD7,148,688.47; and

25.3    that the Applicants be awarded counter-security for costs in the sum of
        ZAR1,250,000.00.

_____
ANDREW CRAIG CLARK



164

I hereby certify that the deponent this affidavit has acknowledged to me that he has read, knows and understands the contents of this affidavit and that in compliance with the Regulations Governing the Administering of an Oath or Affirmation published under GN R1258 of 21 July 1972, as amended by GN R1648 of 19 August 1977, GN R1428 of 11 July 1980 and GN R774 of 23 April 1982, was signed to and before me at Durban      on this the 26th    day of March 2019.

_____

COMMISSIONER OF OATHS

1552721

NICHOLAS KASSIER
COMMISSIONER OF OATHS
PRACTISING ATTORNEY
24 RICHEFOND CIRCLE, RIDGESIDE OFFICE PARK
UMHLANGA ROCKS 4319



165

IN THE HIGH COURT OF SOUTH AFRICA

KWAZULU-NATAL LOCAL DIVISION, DURBAN

(Exercising its admiralty jurisdiction)

CASE NO: A50/2018

NAME OF SHIP: VLCC "ADVANTAGE SKY"

In the matter between:

**ADVANTAGE SKY SHIPPING LLC**              First Applicant

**VLCC "ADVANTAGE SKY"**                    Second Applicant

and

**ICON AMAZING, LLC**                       First Respondent

**ICON FANTASTIC, LLC**                     Second Respondent

**ICON OCTAVIAN CENTER, LLC**               Third Respondent

> *In the application for security for a counter-claim for the*
> *wrongful arrest of the Second Applicant pursuant to an*
> *order of this Court granted on 30 August 2018, in terms*
> *of Section 5(3) of the Admiralty Jurisdiction Regulation*
> *Act, 105 of 1983.*

---

## SECOND FURTHER SUPPLEMENTARY AFFIDAVIT

---

I, the undersigned,

**ANDREW CRAIG CLARK**

do hereby make oath and say that:

### 1.

I am an attorney of this Honourable Court and practise as such as a partner of Cox Yeats at 21 Richefond Circle, Ridgeside Office Park, Umhlanga Ridge, Durban, KwaZulu-Natal.

### 2.

Cox Yeats are the attorneys of record for the Applicants in South Africa.

### 3.

I am authorised to depose to this Second Further Supplementary Affidavit on behalf of the Applicants in this Counter-Security Application.

### 4.

The facts contained herein are, save where the context indicates to the contrary, within my personal knowledge and belief and are true and correct.

### 5.

Those facts not within my personal knowledge have been conveyed to me through correspondence and communication with Mr Michael Lax, a solicitor qualified in England and Wales and a partner in the firm Lax & Co of 78 Cornhill, London, United Kingdom.



6.

I am informed by Mr Michael Lax that he has received information directly from Mr Ali Tugrul Tokgöz who is a minority shareholder in Forward Holdings LLC ("Forwarding Holdings"), the ultimate holding company in Advantage Sky Shipping LLC ("Advantage Sky Shipping") and who is also a director of Advantage Tankers LLC ("Advantage Tankers") (and who is ergo a director of Advantage Sky Shipping), as well as Forward Holdings.

7.

In regard to the facts that have been conveyed to me, I verily believe such facts to be true and correct.

8.

The First Applicant files this Second Further Supplementary Affidavit in the Counter-Security Application in order to update the quantum of the counter-security sought by the First Applicant from the Respondents in view of the developments at Court on 27 March 2019.

**Court Order – 27 March 2019**

9.

A copy of the Order of this Honourable Court dated 27 March 2019 is annexed marked "**AC9**" ("the Court Order"). In terms of the Court Order,

9.1      the Set Aside Application was referred to trial (paragraph 1);

9.2     the Counter-Security Application was adjourned to 5 April 2019 and the parties were given leave to supplement their affidavits in that respect (paragraph 3);

9.3     a timetable was set for the filing of pleadings and discovery affidavits (paragraph 4);

9.4     Ms Williams and Mr Tokgöz were directed to be available for examination and cross-examination (paragraph 5); and

9.5     it was recorded that the parties would take all steps within their control to obtain a trial date in June 2019, failing which, in September 2019 (paragraph 8).

10.

This affidavit is accordingly filed in terms of the leave granted by this Honourable Court in paragraph 3 of the Court Order.

Revised Capital Claim

11.

The initial anticipated capital claim in respect of the First Applicant's claim for wrongful arrest was calculated over a period of 62 days (i.e. 30 August 2018 to 31 October 2018) at a daily off hire rate of USD17,500. This amounted to a total



capital claim of USD1,085,000.

12.

On 26 March 2019, the First Applicant served a Further Supplementary Affidavit on the Respondents' attorneys in which the quantum of the First Applicant's claim was revised as at 27 March 2019. The quantum therein was calculated over a period of 208 days on the presumption that the Set Aside Application would be heard on 27 March 2019 and determined shortly thereafter. The capital claim, inclusive of loss of hire and bunker consumption as at that date amounted to USD5,498,991.13.

13.

It was the intention of the First Applicant to hand up the Further Supplementary Affidavit upon the hearing of the matter on 27 March 2019. However, in view of developments at the hearing, this did not occur. In the circumstances, the Further Supplementary Affidavit will be filed simultaneously with this affidavit.

14.

Having regard to the contents of paragraph 8 of the Court Order, it presently appears that there are two possible months within which the trial will run, namely June 2019 or September 2019.

15.

It is submitted that the First Applicant is entitled to security to the level of its best



arguable case. In order to obtain such security, it is further submitted that the correct approach is to calculate the First Applicant's security as at 30 September 2019.

16.

The Respondents should accordingly be directed to furnish security to the First Applicant at a level calculated as at 30 September 2019. In the event that the trial is concluded in June 2019, or on any other date earlier than 30 September 2019, the First Applicant undertakes to liaise with the Respondents, through their attorneys, with a view to reaching agreement on a commensurate reduction in the security provided. In the event that the parties are unable to reach such agreement, the Respondents shall be entitled to approach this Honourable Court for appropriate relief.

17.

For the sake of convenience, the First Applicant sets out below quantum calculations up to and including 30 June 2019 and up to and including 30 September 2019.

18.

The basis upon which the First Applicant has prepared its calculations is set out in the First Applicant's Supplementary Affidavit, filed of record on 29 November 2018.



### Loss of Hire

**19.**

The *Advantage Sky* was placed off hire with effect from the arrest of the vessel on 30 August 2018. This is the date from which the First Applicant's damages claim has been calculated.

**20.**

However, whilst the *Advantage Sky* was discharging cargo, which occurred on two separate occasions in September 2018, the vessel was not off-hire. This is referred to in paragraph 57 of my Replying Affidavit in this application (page 106, Volume 2, Counter-Security Application, Part C). The net effect is a deduction of approximately 1,5 days in respect of the loss of hire claim. This has been taken into consideration in the calculations set out below.

**21.**

The hire rates, as calculated per clause 8 of the time charter party between the First Applicant and Shell Western Supply and Trading, in respect of the period 30 August 2018 up to and including 30 September 2018 are as follows:

| MONTH | BASE RATE | CALCULATION OF APPLICABLE RATE | APPLICABLE RATE |
|---|---|---|---|
| September 2018 | USD12,458 | As the base rate is less than USD17,500.00, the applicable | USD17,500.00 |



| | | | |
|---|---|---|---|
| | | rate is USD17,500.00. | |
| October 2018 | USD12,458 | As the base rate is less than USD17,500.00, the applicable rate is USD17,500.00. | USD17,500.00 |
| November 2018 | USD22,727.91 | USD17,500 + [(USD22,727.91 – USD17,500) / 2] | USD20,113.92 |
| December 2018 | USD36,627.96 | USD17,500 + [(USD36,627.96 – USD17,500) / 2] | USD27,063.98 |
| January 2019 | USD34,757.94 | USD17,500 + [(USD34,757.94 – USD17,500) / 2] | USD26,128.97 |
| February 2019 | USD26,235.92 | USD17,500 + [(USD26,235.92 – USD17,500) / 2] | USD21,867.96 |
| March 2019 | USD17,262.44 | As the base rate is less than USD17,500.00, the applicable rate is USD17,500.00. | USD17,500.00 |
| April 2019 | USD12,14023 | As the base rate is less than USD17,500.00, the applicable rate is USD17,500.00. | USD17,500.00 |
| May 2019 | USD15,784.19 | As the base rate is less than USD17,500.00, the applicable rate is USD17,500.00. | USD17,500.00 |
| June 2019 | USD12,660.79 | As the base rate is less than USD17,500.00, the applicable rate is USD17,500.00. | USD17,500.00 |
| July 2019 | USD14,222.49 | As the base rate is less than USD17,500.00, the applicable | USD17,500.00 |



| | | rate is USD17,500.00. | |
|---|---|---|---|
| August 2019 | USD14,743.06 | As the base rate is less than USD17,500.00, the applicable rate is USD17,500.00. | USD17,500.00 |
| September 2019 | USD12,140.23 | As the base rate is less than USD17,500.00, the applicable rate is USD17,500.00. | USD17,500.00 |

22.

Assuming that the Set Aside Application is heard, and judgment is delivered therein in favour of the Applicants in June 2019, or shortly thereafter, the anticipated claim for loss of hire will be the following:

| MONTH | DAYS | RATE | TOTAL |
|---|---|---|---|
| September 2018 | 28.5 days | USD17,500.00 | USD498,500.00 |
| October 2018 | 31 days | USD17,500.00 | USD542,500.00 |
| November 2018 | 30 days | USD20,113.96 | USD603,418.80 |
| December 2018 | 31 days | USD27,063.98 | USD838,983.38 |
| January 2019 | 31 days | USD26,128.97 | USD809,998.07 |
| February 2019 | 28 days | USD21,867.96 | USD612,302.88 |
| March 2019 | 27 days | USD17,500.00 | USD472,500.00 |



| April 2019 | 30 days | USD17,500.00 | USD525,000.00 |
| May 2019 | 31 days | USD17,500.00 | USD542,500.00 |
| June 2019 | 30 days | USD17,500.00 | USD525,000.00 |
| September 2018 – June 2019 Total loss of hire: | | | USD5,970,703.13 |

23.

The First Applicant's total anticipated claim for loss of hire in these circumstances will be in the sum of USD5,970,703.13.

24.

Assuming that the Set Aside Application is heard, and judgment is delivered therein in favour of the Applicants in September 2019, or shortly thereafter, the anticipated claim for loss of hire will be as follows:

| MONTH | DAYS | RATE | TOTAL |
|---|---|---|---|
| September 2018 – June 2019 Total loss of hire: | | | USD5,970,703.13 |
| July 2019 | 31 days | USD17,500.00 | USD542,500.00 |
| August 2019 | 31 days | USD17,500.00 | USD542,500.00 |
| September 2019 | 30 days | USD17,500.00 | USD525,000.00 |



| | |
|---|---|
| **Subtotal:** | USD1,610,000.00 |
| **September 2018 – September 2019** | |
| **Total loss of hire:** | USD7,580,703.13 |

25.

The First Applicant's total anticipated claim for loss of hire in these circumstances will be in the sum of USD7,580,703.13.

**Bunker Consumption**

26.

The First Applicant's claim in respect of bunkers up to and including 30 June 2019 is calculated as follows:

26.1    303 days x USD5,261.00 = USD1,594,083.00.

27.

The First Applicant's claim in respect of bunkers up to and including 30 September 2019 is calculated as follows:

27.1    395 days x USD5,261.00 = USD2,078,095.00.

**Underwater cleaning and inspection**

### 28.

As the *Advantage Sky* has been under arrest since 30 August 2018 and therefore has largely been stationary, it will be necessary for her to undergo an underwater cleaning and inspection at the Port of Durban prior to her sailing in the event that the arrest is uplifted.

### 29.

Set out hereunder are the estimated costs for such cleaning and inspection:

| | | |
|---|---|---|
| 29.1 | Underwater photo inspection: | USD2,800.00 |
| 29.2 | Underwater hull cleaning and propeller polish: | USD42,034.00 |
| 29.3 | Port expenses: | USD36,842.00 |

**TOTAL:   USD81,676.00**

**Total Capital Claim**

### 30.

In the premises, the First Applicant's total capital claim in respect of loss of hire,

bunker consumption and underwater inspection and cleaning will be –

30.1   in the event that judgment is granted in favour of the Applicants in the Set Aside Application by 30 June 2019, the sum of USD7,646,462.13; and

30.2   in the event that judgment is granted in favour of the Applicants in the Set Aside Application by 30 September 2019, the sum of USD9,740,474.13.

**Interest**

31.

It is necessary to update the calculations in respect of interest having regard to the increased capital claims referred to above. These calculations are done in accordance with the usual practice in security negotiations in this division of the High Court, namely a provision for interest on the anticipated capital claims at 10% per annum calculated from 30 August 2018.

32.

Interest is calculated as follows:

32.1   in the event that the trial is held in June 2019, USD79,013.42 in respect of its anticipated claim of USD7,646,462.13; and

32.2    in the event that the trial is held in September 2019, USD81,170.59 in respect of its anticipated claim of USD9,740,474.13.

### 33.

In the premises the total security sought in respect of each capital claim and interest is:

33.1    in the event of a trial date in June 2019, USD7,725,475.55; and

33.2    in the event of a trial date in September 2019, USD9,821,644.72.

### 34.

In regard to security for costs, this was dealt with in paragraphs 100 to 103 of my Founding Affidavit dated 18 September 2018. It is submitted for the reasons expressed therein that it would be appropriate for security for costs to be furnished R1,250,000.00.

### 35.

**WHEREFORE** the First Applicant requests that:

35.1    the First Applicant be awarded counter–security in respect of its capital claim, inclusive of interest, in the sum of USD9,821,644.72; and

35.2    the First Applicant be awarded security for costs in respect of its

counter-claim in the sum of R1,250,000.00.

ANDREW CRAIG CLARK

I hereby certify that the deponent this affidavit has acknowledged to me that he has read, knows and understands the contents of this affidavit and that in compliance with the Regulations Governing the Administering of an Oath or Affirmation published under GN R1258 of 21 July 1972, as amended by GN R1648 of 19 August 1977, GN R1428 of 11 July 1980 and GN R774 of 23 April 1982, was signed to and before me at ___UMHLANGA___ on this 3ᴿᴰ day of ___APRIL___ 2019.

COMMISSIONER OF OATHS

ANTHONY BERNARD EDWARDS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY
24 RICHEFOND CIRCLE, RIDGESIDE OFFICE PARK
UMHLANGA ROCKS  4319

(Doc ID:1561777)

# EXHIBIT

# 2

EX-10.2 3 tv510212_ex10-2.htm EXHIBIT 10.2

**Exhibit 10.2**

### LIQUIDATING TRUST AGREEMENT

**Dated as of December 21, 2018**

by and among

ICON EQUIPMENT AND CORPORATE INFRASTRUCTURE FUND FOURTEEN, L.P.

individually as Grantor

and

ICON CAPITAL, LLC

as Managing Trustee

and

NRAI SERVICES, LLC

as Resident Trustee

TABLE OF CONTENTS

| | | |
|---|---|---:|
| LIQUIDATING TRUST AGREEMENT | | 4 |
| RECITALS | | 4 |
| ARTICLE I:  NAME AND DEFINITIONS | | 5 |
| 1.1 | Name | 5 |
| 1.2 | Certain Terms Defined | 5 |
| ARTICLE II:  NATURE OF TRANSFER | | 8 |
| 2.1 | Purpose of Trust | 8 |
| 2.2 | Prohibited Activities | 8 |
| 2.3 | No Reversion to the Company | 9 |
| 2.4 | Payment of Liabilities | 9 |
| 2.5 | Bill of Sale, Assignment, Acceptance and Assumption Agreement; Instruments of Further Assurance | 9 |
| 2.6 | Incidents of Ownership | 9 |
| 2.7 | Notice to Unlocated Holders of Shares | 9 |
| ARTICLE III:  BENEFICIARIES | | 9 |
| 3.1 | Beneficial Interests | 9 |
| 3.2 | Rights of Beneficiaries | 10 |
| 3.3 | No Transfer of Interests of Beneficiaries | 10 |
| 3.4 | Managing Trustee as Beneficiary | 11 |
| ARTICLE IV:  DURATION AND TERMINATION OF TRUST | | 11 |
| 4.1 | Duration | 11 |
| 4.2 | Other Obligations of the Managing Trustee upon Termination | 11 |
| ARTICLE V:  ADMINISTRATION OF TRUST ASSETS | | 11 |
| 5.1 | Sale of Trust Assets | 11 |
| 5.2 | Transactions with Related Persons | 11 |
| 5.3 | Payment of Claims, Expenses and Liabilities | 12 |
| 5.4 | Allocation of Profit and Loss Among the Beneficiaries | 12 |
| 5.5 | Interim Distributions | 15 |
| 5.6 | Final Distribution | 15 |
| 5.7 | Reports to Beneficiaries and Others | 16 |
| 5.8 | Tax Returns and Tax Information | 16 |
| 5.9 | Employment of Investment Manager | 16 |
| ARTICLE VI:  POWERS OF AND LIMITATIONS ON THE MANAGING TRUSTEE | | 17 |
| 6.1 | Limitations on the Managing Trustee | 17 |
| 6.2 | Specific Powers of the Managing Trustee | 17 |
| ARTICLE VII:  RESIDENT TRUSTEE | | 19 |
| 7.1 | Generally | 19 |
| 7.2 | Fees and Indemnity | 21 |
| 7.3 | Insurance | 21 |
| 7.4 | Miscellaneous | 21 |
| ARTICLE VIII:  CONCERNING THE MANAGING TRUSTEE, EMPLOYEES AND AGENTS | | 22 |
| 8.1 | Generally | 22 |
| 8.2 | Reliance by Managing Trustee | 23 |
| 8.3 | Limitation on Liability to Third Persons | 23 |
| 8.4 | Recitals | 24 |
| 8.5 | Indemnification | 24 |
| 8.6 | Rights of Managing Trustees, Employees, Independent Contractors and Agents to Own Trust Shares or Other Property and to Engage in Other Business | 25 |
| ARTICLE IX:  PROTECTION OF PERSONS DEALING WITH THE MANAGING TRUSTEE | | 25 |

2

| | | |
|---|---|---|
| 9.1 | Reliance on Statements by the Managing Trustee | 25 |
| **ARTICLE X:  REIMBURSEMENT TO THE MANAGING TRUSTEE** | | 25 |
| 10.1 | Expenses | 25 |
| **ARTICLE XI:  THE MANAGING TRUSTEE AND SUCCESSOR MANAGING TRUSTEE** | | 26 |
| 11.1 | Number and Qualification of Managing Trustees | 26 |
| 11.2 | Resignation and Removal | 26 |
| 11.3 | Appointment of Successor | 26 |
| 11.4 | Acceptance of Appointment by Successor Managing Trustee | 27 |
| 11.5 | Bonds | 27 |
| **ARTICLE XII:  CONCERNING THE BENEFICIARIES** | | 27 |
| 12.1 | Evidence of Action by Beneficiaries | 27 |
| 12.2 | Limitation on Suits by Beneficiaries | 27 |
| 12.3 | Requirement of Undertaking | 27 |
| **ARTICLE XIII:  MEETING OF BENEFICIARIES** | | 28 |
| 13.1 | Purpose of Meetings | 28 |
| 13.2 | Meeting Called by Managing Trustee | 28 |
| 13.3 | Meeting Called on Request of Beneficiaries | 28 |
| 13.4 | Persons Entitled to Vote at Meeting of Beneficiaries | 28 |
| 13.5 | Quorum | 28 |
| 13.6 | Adjournment of Meeting | 28 |
| 13.7 | Conduct of Meeting | 28 |
| **ARTICLE XIV:  AMENDMENTS** | | 28 |
| 14.1 | Consent of Beneficiaries | 28 |
| 14.2 | Effect of Amendment | 29 |
| 14.3 | Managing Trustee's Declining to Execute Documents | 29 |
| **ARTICLE XV:  MISCELLANEOUS PROVISIONS** | | 29 |
| 15.1 | Filing Documents | 29 |
| 15.2 | Intention of Parties to Establish Trust | 29 |
| 15.3 | Beneficiaries Have No Rights or Privileges as Holders of Shares | 29 |
| 15.4 | Laws as to Construction | 29 |
| 15.5 | Severability | 29 |
| 15.6 | Notices | 30 |
| 15.7 | Counterparts. | 30 |
| **EXHIBIT A:  Bill of Sale, Assignment, Acceptance and Assumption Agreement.** | | 32 |

3

---

## LIQUIDATING TRUST AGREEMENT

This LIQUIDATING TRUST AGREEMENT (this "Agreement") is entered into as of December 21, 2018 (the "Effective Date"), by and among ICON Equipment and Corporate Infrastructure Fund Fourteen, L.P., a Delaware limited partnership, as Grantor (the "Company"), ICON Capital, LLC, a Delaware limited liability company, as Managing Trustee (the "Managing Trustee"), and NRAI Services, LLC, a Delaware limited liability company, as Resident Trustee (the "Resident Trustee" and, with the Managing Trustee, the "Trustees").

### RECITALS:

WHEREAS, the Company was organized for the objectives and purposes of owning and leasing, and otherwise dealing with equipment and other personal property; and

WHEREAS, ICON GP 14, LLC, a Delaware limited liability company and the general partner of the Company (the "General Partner"), will file a Certificate of Cancellation with the Secretary of State of the State of Delaware pursuant to the terms of the Company's Limited Partnership Agreement dated as of March 30, 2009 (the "Partnership Agreement"); and

WHEREAS, as of the date hereof, substantially all of the assets of the Company have been sold or otherwise disposed of; and

WHEREAS, the General Partner believes it to be in the best interest of the Company to complete the liquidation of the Company by transferring all remaining assets of the Company (the "Retained Assets"), including cash reserves set aside for the contingent and existing obligations of the Company (the "Company Cash Reserves"), to a liquidating trust (the "Liquidating Trust" or the "Trust") with ICON Capital, LLC, the Company's investment manager (the "Investment Manager"), serving as its initial Managing Trustee, including cash reserves set aside for the contingent and existing obligations of the Liquidating Trust (the "Liquidating Trust Cash Reserves," and together with the Company Cash Reserves, the "Cash Reserves"); and

WHEREAS, the Managing Trustee shall administer the Liquidating Trust pursuant to the terms of this Agreement and, upon satisfaction of all liabilities and obligations of the Company and the Liquidating Trust, the Managing Trustee shall distribute the residue of the proceeds of the liquidation of the assets of the Company in accordance with the terms hereof.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company hereby agrees to grant, release, assign, convey and deliver unto the Managing Trustee for the benefit of the Beneficiaries (as hereinafter defined), all of the right, title and interest of the Company in and to the Retained Assets and Company Cash Reserves for the uses and purposes stated herein on the Effective Date, subject to the terms and provisions set out below, and the Managing Trustee hereby agrees to accept such Retained Assets and Company Cash Reserves and such Trust, subject to the following terms and provisions:

4

## ARTICLE I
## NAME AND DEFINITIONS

**1.1 Name**. This Trust shall be known as the ICON Equipment and Corporate Infrastructure Fund Fourteen Liquidating Trust.

**1.2 Certain Terms Defined**. For all purposes of this instrument, unless the context otherwise requires:

(a) "ADJUSTED BENEFICIAL INTEREST DEFICIT" shall mean with respect to any Beneficial Interests as of the end of any taxable year, the amount by which the balance in such Beneficial Interests is less than zero. For this purpose, a Beneficiary's Beneficial Interests balance shall be (a) reduced for any items described in Treas. Reg. Section 1.704-1(b)(2)(ii)(d)(4),(5), and (6), (b) increased for any amount such Beneficiary is unconditionally obligated to contribute to the Trust no later than the end of the taxable year in which his or her Trust Shares, or the General Partner's Trust Shares, are liquidated (as defined in Treas. Reg. Section 1.704-1(b)(2)(ii)(g)) or, if later, within 90 days after such liquidation, and (c) increased for any amount such Beneficiary is treated as being obligated to contribute to the Trust pursuant to the penultimate sentences of Treas. Reg. Sections 1.704-2(g)(1) and 1.704-2(i)(5) (relating to minimum gain).

(b) "AFFILIATE" shall mean, with respect to any Person, (a) any other Person directly or indirectly controlling, controlled by or under common control with such Person, (b) any officer, director or partner of such Person, (c) any other Person owning or controlling 10% or more of the outstanding voting securities of such Person and (d) if such Person is an officer, director or partner, any other person for which such Person acts in such capacity.

(c) "AGREEMENT" shall mean this instrument as originally executed or as it may from time to time be amended pursuant to the terms hereof.

(d) "BENEFICIAL INTEREST" shall mean each Beneficiary's Unreturned Capital (as defined in this Section 1.2) (i) *increased* by any allocations of Profits; (ii) *decreased* by any allocations of Losses pursuant to Section 5.4 hereof; and (iii) *decreased* by any distributions received by each Beneficiary after the Effective Date.

(e) "BENEFICIARIES" shall mean the holders of Trust Shares from time to time on or after the Record Date, including the Initial Beneficiaries and the Subsequent Beneficiaries.

(f) "BENEFICIARY NONRECOURSE DEDUCTIONS" shall have the same meaning as the term "partner nonrecourse deductions" in Treas. Reg. Sections 1.704-2(i)(1) and 1.704-2(i)(2).

(g) "BENEFICIARY NONRECOURSE DEBT MINIMUM GAIN" shall mean an amount, with respect to each Beneficiary Nonrecourse Debt (defined as "partner nonrecourse debt" in Treas. Reg. Section 1.704-2(b)(4)), equal to the Trust Minimum Gain that would result if such Beneficiary Nonrecourse Debt were treated as a nonrecourse liability, determined in accordance with Treas. Reg. Section 1.704-2(i)(3).

(h) "FISCAL YEAR" shall be the period commencing on January 1st and ending on December 31st of each year.

(i) "GRANTOR" shall mean the Company.

(j) "GROSS ASSET VALUE" shall mean, with respect to any Trust Asset, such Trust Asset's adjusted tax basis, except that:

5

   (i) the initial Gross Asset Value of any Trust Asset contributed by a Beneficiary to the Liquidating Trust shall be the fair market value of such Trust Asset on the date of contribution;

   (ii) the Gross Asset Values of all Trust Assets shall be adjusted to equal their respective gross fair market values at such times as the Beneficiaries' Beneficial Interests are adjusted pursuant to Section 5.4(h) hereof;

   (iii) the Gross Asset Value of any Trust Asset distributed to any Beneficiary shall be the gross fair market value of such Trust Asset on the date of distribution;

   (iv) to the extent not otherwise reflected in the Beneficiaries' Beneficial Interests, the Gross Asset Values of Trust Assets shall be increased (or decreased) to appropriately reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Beneficial Interests pursuant to Treas. Reg. Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this paragraph (iv) to the extent that an adjustment pursuant to paragraph (ii) above is required in connection with a transaction that would otherwise result in an adjustment pursuant to this paragraph (iv); and

   (v) if on the date of contribution of any Trust Asset or a revaluation of a Trust Asset in accordance with (ii) – (iv) above, the adjusted tax basis of such asset differs from its fair market value, the Gross Asset Value of such asset shall thereafter be adjusted by reference to the depreciation method described in Treas. Reg. Section 1.704-1(b)(2)(iv)(g)(3).

(k) "GROSS INCOME" shall mean the Liquidating Trust's gross income for federal income tax purposes.

(l) "INITIAL BENEFICIARIES" shall mean the initial holders of Trust Shares.

(m) "INVESTMENT MANAGER" shall mean such Person or Persons who have been employed by, or who have contracted with, the Managing Trustee to assist in the management of the Trust, and for the avoidance of doubt, the Investment Manager may be the Investment Manager or any Affiliate of the Investment Manager.

(n) "LIQUIDATING TRUST" shall mean the liquidating trust maintained by the Managing Trustee holding the Trust Assets of the Company, identified as the "ICON Equipment and Corporate Infrastructure Fund Fourteen Liquidating Trust"; also referred to herein as the "Trust."

(o) "PARTIALLY ADJUSTED BENEFICIAL INTEREST" shall mean, with respect to any Beneficiary (including the General Partner with respect to that portion of its Beneficial Interest and the adjustments described below attributable to any Trust Shares it owns) for any fiscal period, the Beneficial Interest of such Beneficiary as of the beginning of such Period, adjusted by all special allocations pursuant to Section 5.4(e) with respect to such Period, increased by the sum of (i) the Beneficiary's share of Trust Minimum Gain (as determined pursuant to Treas. Reg. Section 1.704-2(g) and defined in the Partnership Agreement), (ii) the Beneficiary's share of Member Nonrecourse Debt Minimum Gain (as determined pursuant to Treas. Reg. Section 1.704-2(i) and defined in the Partnership Agreement), and (iii) the amount, if any, which such Beneficiary is obligated to contribute to the capital of the Liquidating Trust pursuant to this Agreement (but only to the extent that such capital contribution obligation has not been taken into account in determining such Beneficiary's share of Member Nonrecourse Debt Minimum Gain).

6

4/16/2019                                    https://www.sec.gov/Archives/edgar/data/1446806/000114420419000543/tv510212_ex10-2.htm

(p) "PERSON" shall mean any natural person, partnership, trust, corporation, association or other legal entity, including, but not limited to, the Investment Manager and any Affiliate of the Investment Manager.

(q) "PROFITS OR LOSSES" shall mean, for any Fiscal Year, the Liquidating Trust's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i) any income of the Liquidating Trust that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be applied to increase such taxable income or reduce such loss;

(ii) any expenditure of the Liquidating Trust described in Code Section 705(a)(2)(B), or treated as such pursuant to Treas. Reg. Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits and Losses shall be applied to reduce such taxable income or increase such loss;

(iii) gain or loss resulting from a taxable disposition of any asset of the Liquidating Trust shall be computed by reference to the Gross Asset Value of such asset and the special depreciation calculations described in Treas. Reg. Section 1.704-1(b)(2)(iv)(g), notwithstanding that the adjusted tax basis of such asset may differ from its Gross Asset Value;

(iv) in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss for such Fiscal Year, there shall be taken into account depreciation, amortization, or other cost recovery determined pursuant to the method described in Treas. Reg. Section 1.704-1(b)(2)(iv)(g)(3); and

(v) any items which are specifically allocated pursuant to Section 5.4(e) shall not be taken into account in computing Profits or Losses.

(r) "RECORD DATE" shall mean the date selected by the Grantor for determination of the holders of Shares entitled to become Beneficiaries.

(s) "SHARES" shall mean the shares of limited partnership interests in the Company held by each of the Beneficiaries as of the Record Date.

(t) "SUBSEQUENT BENEFICIARIES" shall mean Beneficiaries as reflected on the books and records of the Trust from time to time after the Effective Date, other than the Initial Beneficiaries.

(u) "TRUST" shall mean a Delaware Statutory Trust pursuant to Chapter 38 of Title 12 of the Delaware Code and created by the filing of a Certificate of Trust with the Secretary of State of the State of Delaware.

(v) "TRUST ASSETS" shall mean all the property held from time to time by the Managing Trustee under this Agreement, which initially shall consist of the Retained Assets of the Company granted, assigned and conveyed to the Managing Trustee by the Company, the Cash Reserves, and, in addition, shall thereafter include all proceeds and other receipts of, from, or attributable to any assets, causes of actions or claims held by the Trust.

7

(w) "TRUST MINIMUM GAIN" shall have the same meaning as the term "partnership minimum gain" in Treas. Reg. Sections 1.704-2(b)(2) and (d).

(x) "TRUST NONRECOURSE DEDUCTIONS" shall have the same meaning as the term "nonrecourse deductions" in Treas. Reg. Sections 1.704-2(b)(1) and 1.704-2(c).

(y) "TRUST SHARES" shall mean those equal, undivided portions into which the Beneficial Interests in the Trust Assets are divided, as evidenced on the books and records of the Trust.

(z) "TRUSTEE(S)" shall mean the original Trustee(s) under this Agreement and their successor(s) and assignee(s), if any.

(aa) "UNRETURNED CAPITAL" shall mean the Gross Asset Value of property contributed by each Beneficiary determined by reference to the ending balance in his/her/its capital account of the Company on the Effective Date.

## ARTICLE II
## NATURE OF TRANSFER

**2.1 Purpose of the Trust**.

(a) It is expected that the Company shall dissolve and liquidate prior to fully winding up its affairs, including, but not limited to, the sale of its remaining assets, the collection of any receivables and the payment of any unsatisfied debts, claims, liabilities, commitments, suits and other obligations, whether contingent or fixed or otherwise (the "Liabilities"), except for such liabilities and obligations for which the Company has previously established reserves by the retention of the Company Cash Reserves as described in the recitals hereto. The Trust hereby is organized for the sole purpose of winding up the affairs of the Company as promptly as reasonably possible and with no objective to continue or engage in the conduct of a trade or business.

(b) The Company Cash Reserves and Retained Assets to be granted, assigned and conveyed to the Managing Trustee as of the Effective Date will be held in the Trust, and the Managing Trustee will: (i) further liquidate the Trust Assets as it deems necessary to carry out the purpose of the Trust and facilitate distribution of the Trust Assets; (ii) protect, conserve and manage the Trust Assets in accordance with the terms and conditions hereof; and (iii) distribute the Trust Assets in accordance with the terms and conditions hereof.

(c) It is intended that for federal, state and local income tax purposes the Trust shall continue to be treated as a partnership as a continuation of the Company under Treasury Regulation Section 1.708-1(a) (and any analogous provision of state or local law) and will continue to file a Form 1065 U.S. Return of Partnership Income. The Managing Trustee shall file all tax returns required to be filed with any governmental agency consistent with this position, including, but not limited to, any returns required of partnerships pursuant to Treasury Regulation Section 1.701-1.

**2.2 Prohibited Activities**. The Trust shall not continue or engage in the conduct of any trade or business, and the Managing Trustee is expressly prohibited from continuing or engaging, and shall have no power or authority to continue or engage in the conduct of any trade or business on behalf of the Trust or the Beneficiaries, and all of the terms and conditions hereof shall be construed accordingly.

8

**2.3 No Reversion to the Company**. In no event shall any part of the Trust Assets revert to or be distributed to the Company.

**2.4 Payment of Liabilities**. The Trust hereby agrees to assume all Liabilities of the Company on the Effective Date. Should any Liability be asserted against the Trust as the transferee of the Trust Assets or as a result of the assumption of the Liabilities, the Managing Trustee may use such part of the Trust Assets as may be necessary in contesting any such Liability or in payment thereof. In no event shall the Managing Trustee, Beneficiaries or employees or agents of the Trust be personally liable, nor shall any personal property of such Persons or any other Trust Assets be subject to attachment, in the event the Trust Assets are not sufficient to satisfy the Liabilities asserted against or payable out of the Company's available Trust Assets in the Trust.

**2.5 Bill of Sale, Assignment, Acceptance and Assumption Agreement; Instruments of Further Assurance**. On the Effective Date, the Company and the Trust shall execute a Bill of Sale, Assignment, Acceptance and Assumption Agreement conveying the Retained Assets, Company Cash Reserves and Liabilities to the Trust, a copy of which is attached as Exhibit A hereto. After the dissolution of the Company, such Persons who shall have the right and power to so act, will, upon reasonable request of the Managing Trustee, execute, acknowledge, and deliver such further instruments and do such further acts as may be necessary or proper to carry out effectively the purposes of this Agreement, to confirm or effectuate the transfer to the Managing Trustee of any property intended to be covered hereby, and to vest in the Managing Trustee, its successors and assigns, the estate, powers, instruments or funds in trust hereunder.

**2.6 Incidents of Ownership**. The holders of Shares as of the Record Date shall be the Initial Beneficiaries of the Trust as holders of Trust Shares in the Trust, and the Managing Trustee shall retain only such incidents of legal ownership as are necessary to undertake the actions and transactions authorized herein.

**2.7 Notice to Unlocated Holders of Shares**. If the Trust holds Trust Assets for the benefit of unlocated holders of any Shares, due notice shall be given to such unlocated holders of Shares in accordance with Delaware law.

**ARTICLE III**
**BENEFICIARIES**

**3.1 Beneficial Interests**.

(a) The Managing Trustee shall maintain each Beneficiary's Beneficial Interest in accordance with Section 1.2(d) hereof.

(b) In the case of the Share holders, book-entry or other records or any other evidence of ownership satisfactory to the Managing Trustee will be deemed to evidence the Beneficial Interest in the Trust of each such Beneficiary.

9

(c) If any conflicting claims or demands are made or asserted with respect to the ownership of any Trust Shares, or if there should be any disagreement between the transferees, assignees, heirs, representatives or legatees succeeding to all or part of the interest of any Beneficiary resulting in adverse claims or demands being made in connection with such Trust Shares, then, in any of such events, the Managing Trustee shall be entitled, at its sole election, to refuse to comply with any such conflicting claims or demands. In so refusing, the Managing Trustee may elect to make no payment or distribution with respect to such Trust Shares, or to make such payment to a court of competent jurisdiction or an escrow agent, and in so doing the Managing Trustee shall not be or become liable to any of such parties for their failure or refusal to comply with any of such conflicting claims or demands, nor shall the Managing Trustee be liable for interest on any funds which it may so withhold. The Managing Trustee shall be entitled to refrain and refuse to act until either (i) the rights of the adverse claimants have been adjudicated by a final non-appealable judgment of a court of competent jurisdiction, (ii) all differences have been adjusted by valid written agreement between all of such parties, and the Managing Trustee shall have been furnished with an executed counterpart of such agreement, or (iii) there is furnished to the Managing Trustee a surety bond or other security satisfactory to the Managing Trustee, as it shall deem appropriate, to fully indemnify it as between all conflicting claims or demands.

(d) If a Trust Share is transferred in accordance with this Agreement, the Beneficial Interests of the transferor with respect to such Trust Share shall carry over to the transferee in accordance with Treas. Reg. Section 1.704-1(b)(2)(iv)(l).

(e) Upon the occurrence of the events specified in Treas. Reg. Section 1.704-1(b)(2)(iv)(f), the Beneficiaries' Beneficial Interests shall be adjusted and thereafter maintained to reflect the revaluation of Trust assets on the books of the Trust in accordance with such Treasury Regulation and Treas. Reg. Sections 1.704-1(b)(2)(iv)(f) through (h); provided, however, that, other than upon liquidation of the Trust within the meaning of Treas. Reg. Section 1.704-1(b)(2)(ii)(g), such an adjustment shall be made only if the Managing Trustee determines in its sole discretion that such an adjustment is necessary to reflect the relative economic interests of the Beneficiaries in the Trust.

**3.2 Rights of Beneficiaries**. Each Beneficiary shall be entitled to participate in the rights and benefits due to a Beneficiary hereunder according to his Beneficial Interest. Each Beneficiary shall take and hold the same subject to all the terms and provisions of this Agreement. The interest of the Beneficiary hereby is declared and shall be in all respects personal property and upon the death of an individual Beneficiary, his Beneficial Interest shall pass as personal property to his legal representative and such death shall in no way terminate or affect the validity of this Agreement, provided that the Managing Trustee shall not be required to evidence a book entry transfer of a deceased Beneficiary's Beneficial Interest to his legal representative until the Managing Trustee shall have received Letters Testamentary or Letters of Administration and written notice of the death of the deceased Beneficiary. A Beneficiary shall have no title or right to, or possession, management or control of, the Trust Assets except as herein expressly provided. No widower, widow, heir, or devisee of any Person who may be a Beneficiary shall have any right of dower, homestead, or inheritance, or of partition, or of any other right, statutory or otherwise, in any property forming a part of Trust Assets but the whole title to the Trust Assets shall be vested in the Managing Trustee and the sole interest of the applicable Beneficiaries shall be the rights and benefits given to such Persons under this Agreement.

**3.3 No Transfer of Interests of Beneficiaries**. No Beneficial Interest may be transferred by any Beneficiary in person or by a duly authorized agent or attorney, or by the properly appointed legal representatives of the Beneficiary. No Beneficiary has authority or power to sell, assign, transfer, encumber, or in any other manner dispose of his Beneficial Interest; provided, however, that the Beneficial Interest shall be assignable or transferable by will, intestate succession, or operation of law and, further provided, that the executor or administrator of the estate of a Beneficiary may mortgage, pledge, grant a security interest in, hypothecate or otherwise encumber, the Beneficial Interest held by the estate of such Beneficiary if necessary in order to borrow money to pay estate, succession or inheritance taxes or the expenses of administering the estate of the Beneficiary, upon written notice to and upon written consent of the Managing Trustee, which consent may be withheld in the Managing Trustee's sole discretion.

10

Except as may be otherwise required by law, the Beneficial Interests of the Beneficiaries hereunder shall not be subject to attachment, execution, sequestration or any order of a court, nor shall such Beneficial Interests be subject to the contracts, debts, obligations, engagements or liabilities of any Beneficiary, but the Beneficial Interest of a Beneficiary shall be paid by the Managing Trustee to the Beneficiary free and clear of all assignments, attachments, anticipations, levies, executions, decrees and sequestrations and shall become the property of the Beneficiary only when actually received by such Beneficiary.

**3.4 Managing Trustee as Beneficiary.** The Managing Trustee, either individually or in a representative or fiduciary capacity, may be a Beneficiary to the same extent as if it were not a Managing Trustee hereunder and shall have all the rights of a Beneficiary, including, without limitation, the right to vote and to receive distributions, to the same extent as if it were not the Managing Trustee hereunder.

**ARTICLE IV**
**DURATION AND TERMINATION OF TRUST**

**4.1 Duration.** The existence of this Trust shall terminate upon the earliest of (i) a termination required by the applicable laws of the State of Delaware, (ii) the termination due to the distribution of all Trust Assets as provided in Section 5.6, or (iii) December 23, 2021; provided, however, that the Managing Trustee, in its discretion, may extend the existence of this Trust to such later date as it may designate, if it determines that an extension is reasonably necessary to wind up the affairs of this Trust.

**4.2 Other Obligations of the Managing Trustee upon Termination.** Upon distribution of all the Trust Assets, the Managing Trustee shall pay or make reasonable provision to pay all claims and obligations, including all contingent, conditional or unmatured claims and obligations, known to the Trust, but for which the identity of the claimant is unknown and not known to the Trust, but based on the facts known to the Trust, are likely to arise or to become known to the Trust within 10 years after the date of dissolution. Except as otherwise specifically provided herein, upon the distribution of all Trust Assets in the Trust, the Managing Trustee shall have no further duties or obligations hereunder.

**ARTICLE V**
**ADMINISTRATION OF TRUST ASSETS**

**5.1 Sale of Trust Assets.** The Managing Trustee is hereby authorized and directed, at such times as it may deem appropriate, to transfer, assign, or otherwise dispose of all or any part of the Trust Assets as it deems appropriate at public auction or at private sale for cash, securities or other property, or upon credit (either secured or unsecured as the Managing Trustee shall determine, in its sole discretion).

**5.2 Transactions with Related Persons.** Notwithstanding any other provisions of this Agreement, the Managing Trustee shall not knowingly, directly or indirectly, sell or otherwise transfer all or any part of any Trust Assets to, or contract with, (i) itself or any other Trustee or an employee or agent (acting in its or their individual capacities) of this Trust, or (ii) any Person of which any Trustee, employee or agent of this Trust is an Affiliate.

11

**5.3 Payment of Claims, Expenses and Liabilities**. Provided the Managing Trustee has been advised in writing with respect to such claims, expenses, charges, liabilities and obligations, the Managing Trustee shall pay from the Trust Assets all claims, expenses, charges, liabilities, and obligations of the Trust Assets and all Liabilities relating to the Trust Assets and obligations which the Managing Trustee specifically assumes and agrees to pay pursuant to this Agreement and such transferee liabilities which the Managing Trustee may be obligated to pay as transferee of the Trust Assets, including, without limitation, interest, penalties, taxes, assessments, and public charges of every kind and nature and the costs, charges, and expenses connected with or growing out of the execution or administration of this Trust and such other payments and disbursements as are provided in this Agreement or which may be determined to be a proper charge against the Trust Assets by the Managing Trustee.

**5.4 Allocation of Profit and Loss Among the Beneficiaries**.

(a) The Profits and Losses of the Trust shall be determined for each Fiscal Year or fiscal period.

(b) Except as otherwise provided in this Agreement, the Managing Trustee shall allocate Profits and Losses and items thereof for any Fiscal Year or fiscal period to the Beneficiaries (including the General Partner with respect to any Trust Shares it owns), in each case, among the Beneficiaries in proportion to the number of Trust Shares held by each Beneficiary relating to the Trust.

(c) Profits for any fiscal period shall be allocated as follows:

(i) first, the greater of (A) 1% or (B) the excess of the distributions made to the General Partner other than with respect to any Trust Shares it owns (but only to the extent that such distributions have neither (I) been treated under the Treasury Regulations as attributable to the distribution of the proceeds of non-recourse liabilities nor (II) been matched, as determined by the Managing Trustee, with an allocation of Gross Income pursuant to Section 5.4(e)(v) hereof) over the cumulative amount of income previously allocated to the General Partner pursuant to this Section 5.4(c)(i) (and not offset by Losses allocated pursuant to Section 5.4(d)(ii)) to the General Partner and the balance to the Beneficiaries (including the General Partner with respect to any Trust Shares it owns) until such Beneficiaries have been allocated in the aggregate an amount equal to the excess of the unpaid target distribution over the sum of their Partially Adjusted Beneficial Interests; and

(ii) thereafter, 10% to the General Partner and 90% to the Beneficiaries (including the General Partner with respect to any Trust Shares it owns).

(d) Losses for any fiscal period shall be allocated as follows:

(i) first, 10% to the General Partner and 90% to the Beneficiaries (including the General Partner with respect to any Trust Shares it owns) until the cumulative amount of Losses allocated pursuant to this Section 5.4(d)(i) to those who are then Beneficiaries equals the cumulative Profits previously allocated to such Beneficiaries (or their predecessors in interest) pursuant to Section 5.4(c)(ii); and

12

(ii) thereafter, 1% to the General Partner and 99% to the Beneficiaries (including the General Partner with respect to any Trust Shares it owns); provided, however, that if and to the extent that an allocation of Losses to any Beneficiary (other than the General Partner) pursuant to this Section 5.4(d)(ii) or Section 5.4(e) would result in any such Beneficiary having an Adjusted Beneficial Interest Deficit, such Losses shall be allocated to all other Beneficiaries in accordance with this Section 5.4(d) and, when no Beneficiary (other than the General Partner) can be allocated any such Losses without violating the limitation contained in this proviso, such remaining Losses shall be allocated to the General Partner.

(e) *Special Allocations*. The following special allocations shall, except as otherwise provided, be made prior to allocations in Section 5.4(a)-(d) in the following order:

(i) *Minimum Gain Charge-Back*. Notwithstanding any other provision of this Section 5, if there is a net decrease in Trust Minimum Gain or in any Beneficiary Nonrecourse Debt Minimum Gain during any fiscal period, prior to any other allocation pursuant this Section 5, each Beneficiary shall be specifically allocated items of Trust income and gain for such fiscal period (and, if necessary, subsequent fiscal periods) in an amount and manner required by Treas. Reg. Sections 1.704-2(f) and 1.704-2(i)(4) or any successor provisions. The items to be so allocated shall be determined in accordance with Treas. Reg. Section 1.704-2(j)(2) or any successor provision.

(ii) *Trust Nonrecourse Deductions*. Trust Nonrecourse Deductions for any fiscal period shall be allocated 1% to the General Partner and 99% to the other Beneficiaries, including the General Partner with respect to any Trust Shares it owns.

(iii) *Beneficiary Nonrecourse Deductions*. Beneficiary Nonrecourse Deductions for any fiscal period shall be allocated to the Beneficiary who made or guaranteed or is otherwise liable with respect to the loan to which such Beneficiary Nonrecourse Deductions are attributable in accordance with principles of Treas. Reg. Section 1.704-2(i) or any successor provision.

(iv) *Qualified Income Offset*. If in any fiscal period, any Beneficiary has an Adjusted Beneficial Interest Deficit, whether resulting from an unexpected adjustment, allocation or distribution described in Treas. Reg. Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) or otherwise, such Beneficiary shall be allocated items of Trust income and gain (consisting of a pro rata portion of each item of Trust income, including Gross Income, and gain for such fiscal period) sufficient to eliminate such Adjusted Beneficial Interest Deficit as quickly as possible, to the extent required by such Treasury Regulation. It is the intention of the parties that this allocation provision constitute a "qualified income offset" within the meaning of Treas. Reg. Section 1.704-1(b)(2)(ii)(d), provided that an allocation shall be made pursuant to this Section 5.4(e)(iv) only if and to the extent that the Beneficiary would have an Adjusted Beneficial Interest Deficit after all other allocations provided for in this Article 5 had tentatively been made as if this Section 5.4(e)(iv) were not part of this Agreement.

(v) *Special Allocations of Gross Income*. There shall be a special allocation of Gross Income to the Beneficiaries (including the General Partner regardless of its Trust Shares) in proportion to, and to the extent of, the deficit balances, if any, in their respective Beneficial Interests in excess of the amounts that such Beneficiaries are obligated to restore and are deemed obligated to restore pursuant to the penultimate sentences of Treas. Reg. Sections 1.704-2(g)(i) and 1.704-2(i)(5), provided that an allocation pursuant to this Section 5.4(e)(v) shall be made only if and to the extent that such Beneficiary would have a deficit Beneficial Interest in excess of such sum after all other allocations pursuant to this Article 5 have been made as if this Section 5.4(e)(v) and Section 5.4(e)(iv) were not part of this Agreement.

---

13

(vi) *Curative Allocations.*  The special allocations provided for in the proviso of Section 5.4(d) and in Sections 5.4(e)(i)-(v) are intended to comply with certain requirements of Treas. Reg. Sections 1.704-1 and 1.704-2. To the extent that any of such special allocations shall have been made, subsequent allocations of income, gains, losses and deductions and items thereof (curative allocations) shall be made as soon as possible and in a manner so as to cause, to the extent possible without violating the requirements of Treas. Reg. Sections 1.704-1 and 1.704-2, the Beneficiaries' Beneficial Interest balances to be as nearly as possible in the same proportions in which they would have been had such special allocations not occurred. In making such curative allocations, due regard shall be given to the character of the Profits and Losses and items thereof that were originally allocated pursuant to the provision of Sections 5.4(d) and Sections 5.4(e)(i)-(v) in order to put the Beneficiaries as nearly as possible in the positions in which they would have been had such special allocations not occurred.

If the Managing Trustee determines, after consultation with counsel, that the allocation of any item of Trust income, gain, loss or deduction is not specified in this Section 5 (an "unallocated item"), or that the allocation of any item of Trust income, gain, loss or deduction hereunder is clearly inconsistent with the Beneficiaries' economic interests in the Trust determined by reference to this Agreement, the general principles of Treas. Reg. Section 1.704-1(b) and the factors set forth in Treas. Reg. Section 1.704-1(b)(3)(ii)(a) "misallocated item"), then the Managing Trustee may allocate such unallocated items and reallocate such misallocated items, to reflect such economic interests.

(vii) *Special Allocation of State, Local and Foreign Taxes.*  Any state, local or foreign taxes imposed on the Trust by reason of a Beneficiary being a citizen, resident or national of such state, locality or foreign jurisdiction, including any item(s) of taxable income or tax loss resulting therefrom, shall be specially allocated to such Beneficiary.

(viii) *Transactions with the Trust.*  If, and to the extent that, any Beneficiary is deemed to recognize any item of income, gain, loss, deduction or credit as a result of any transaction between such Beneficiary and the Trust pursuant to Code Sections 482, 483, 1272-1274, 7872 or any similar provision now or hereafter in effect, any corresponding Profits or Losses or items thereof shall be allocated to the Beneficiary who was charged with such item.

(ix) Notwithstanding Section 5.4(b) above, Profits and Losses allocated to the Beneficiaries (as distinct from Profits and Losses allocated to the General Partner) pursuant to this Agreement shall first be allocated among the Beneficiaries so as to equalize, as soon as practicable, the ratio for each Beneficiary of such Beneficiary's Beneficial Interest increased by the amounts for such Beneficiary described in clauses (i), (ii) and (iii) of the definition of Partially Adjusted Beneficial Interest to the number of Trust Shares held by such Beneficiary, and thereafter in proportion to their respective number of Trust Shares. If there are not sufficient Profits or Losses so allocated to the Beneficiaries for such Fiscal Year to bring such ratios into equality, such Profits and Losses shall be allocated among the Beneficiaries in the same proportions as would have been the case had the minimum amount of Profits or Losses, as the case may be, necessary to produce such equality been available for allocation. For purposes of applying this provision to the General Partner with respect to any Trust Shares it owns, the principles set forth in the definition of Partially Adjusted Beneficial Interest for determining such account for the General Partner with respect to its Trust Shares shall be applied.

14

(f) *Tax Allocations; Code Section 704(c); Revaluations.*

(i) In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction, and items thereof, with respect to any property contributed to the capital of the Trust shall, solely for tax purposes, be allocated among the Beneficiaries so as to take account of any variation between the adjusted basis of such property to the Trust for federal income tax purposes and its initial Gross Asset Value.

(ii) In the event the Gross Asset Value of any Trust asset is adjusted pursuant to clause (b) of the definition of Gross Asset Value herein, subsequent allocations of income, gain, loss and deduction, and items thereof, with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in a manner consistent with the requirements of Treas. Reg. Section 1.704-3(a)(6).

(iii) Any elections or other decisions relating to the allocations required by clauses (i) and (ii) of this Section 5.4(f) shall be made in a manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this clause (iii) of this Section 5.4(f) are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Beneficiary's Beneficial Interests or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

**5.5 Interim Distributions.** Except to the extent otherwise provided herein, at such times as may be determined by it in its sole discretion, but no less frequently than annually, the Managing Trustee shall distribute, or cause to be distributed, to the Beneficiaries such cash or other property comprising a portion of the Trust Assets as the Managing Trustee may, in its sole discretion, determine may be distributed without detriment to the conservation and protection of the Trust Assets in the Trust. Distributions shall be calculated based on relative Unreturned Capital (as defined in Section 1.2(aa)). If the Managing Trustee determines at any time that the sum of distributions made to any such Beneficiary during or with respect to a Fiscal Year does not (or will not) properly reflect such Beneficiary's share of the total distributions made or to be made by the Liquidating Trust for such Fiscal Year, the Managing Trustee shall, as soon as practicable, make a supplemental distribution to such Beneficiary, or withhold from a subsequent distribution that otherwise would be payable to such Beneficiary, such amount as shall cause the total distributions to such Beneficiary for such Fiscal Year to be the proper amount.

**5.6 Final Distribution.** If the Managing Trustee determines that the Liabilities and all other claims, expenses, charges, liabilities and obligations of the Trust have been paid or discharged, or if the existence of the Trust shall terminate pursuant to Section 4.1 hereof and not have been extended pursuant to such Section 4.1, the Managing Trustee shall, consistent with the conservation and protection of the Trust Assets, expeditiously distribute the Trust Assets to the Beneficiaries in proportion to, and to the extent of, the positive balances of their Beneficial Interests. The Managing Trustee shall hold in the Trust and thereafter make disposition of all liquidating distributions and other payments due any Beneficiaries who have not been located subject to applicable state laws regarding escheat and abandoned property. It is understood that the Managing Trustee and the Beneficiary's bank in any funds transfer may rely solely upon any account numbers or similar identifying number provided by the parties hereto to identify (i) the Beneficiary, (ii) the Beneficiary's bank, or (iii) an intermediary bank. The Managing Trustee may apply any of the Trust Assets for any payment order it executes using any such identifying number, even where its use may result in a person other than the Beneficiary being paid, or the transfer of funds to a bank other than the Beneficiary's bank, or an intermediary bank designated.

15

**5.7 Reports to Beneficiaries and Others.** As soon as practicable after the end of each taxable year of the Trust, the Managing Trustee shall file an annual report under cover of Form 10-K with the U.S. Securities and Exchange Commission (the "Commission") showing the assets and liabilities of the Trust at the end of each calendar year and the receipts and disbursements of the Managing Trustee with respect to the Trust for such period covered by the report. The annual report will also describe the changes in the assets of the Trust and the actions taken by the Managing Trustee during such period covered by the report. The Managing Trustee will also file periodic reports under cover of Form 8-K with the Commission whenever an event occurs for which a Form 8-K would have been required to be filed for the Trust or whenever, in the opinion of the Managing Trustee, any other material event relating to the Trust or its assets has occurred. The taxable year of the Trust shall end on December 31 of each year unless the Managing Trustee deems it advisable to establish some other date as the date on which the taxable year of the Trust shall end.

**5.8 Tax Returns and Tax Information.** The Managing Trustee shall: (a) prepare or cause its accountants to prepare, in accordance with applicable laws and regulations, the tax returns (federal, state, local and foreign, if any) of the Trust for each Fiscal Year not later than 75 days after the end of such Fiscal Year; and (b) deliver to each Beneficiary by March 15 following each Fiscal Year a Form K-1 or other statement setting forth such Beneficiary's share of the Trust's income, gains, losses, deductions, and items thereof, and credits if any, for such Fiscal Year.

**5.9 Employment of Investment Manager.**

(a) The Managing Trustee shall be responsible for the general policies of the Trust and for the general supervision of the activities of the Trust conducted by all agents, employees, advisors or managers of the Trust, including the Investment Manager. However, the Managing Trustee is not and shall not be required personally to conduct the activities of the Trust, and consistent with its ultimate responsibility as stated above, the Managing Trustee shall have the power to appoint, employ or contract with any Person or Persons as the Managing Trustee may deem necessary or proper for the transaction of the activities of the Trust, including the Investment Manager. The Managing Trustee may grant or delegate such authority to the Investment Manager as the Managing Trustee may in its sole discretion deem necessary or desirable to carry out the purpose of the Trust without regard to whether such authority is normally granted or delegated by trustees.

The Managing Trustee shall have the power to determine the terms and compensation of the Investment Manager or any other Person whom it may employ or with whom it may contract. The Managing Trustee may exercise broad discretion in allowing the Investment Manager to administer and regulate the operations of the Trust, to act as agent for the Trust, to execute documents on behalf of the Managing Trustee, and to make executive decisions which conform to general policies and general principles previously established by the Managing Trustee.

(b) The Investment Manager or other Persons shall not be required to administer the Trust as its sole and exclusive function and may have other business interests and may engage in other activities similar or in addition to those relating to the Trust, including the rendering of advice or services of any kind to investors or any other Persons and the management of other investments.

16

## ARTICLE VI
## POWERS OF AND LIMITATIONS ON THE MANAGING TRUSTEE

**6.1 Limitations on the Managing Trustee.** Except as contemplated by this Agreement, the Managing Trustee shall not at any time, on behalf of the Trust or the Beneficiaries, enter into or engage in any trade or business, and no part of any Trust Assets shall be used or disposed of by the Managing Trustee in furtherance of any trade or business. Except as the Managing Trustee reasonably believes is consistent with and in furtherance of its obligations under this Agreement, the Managing Trustee shall be restricted to the holding, collection and sale of the Trust Assets and the payment and distribution thereof for the purposes set forth in this Agreement and to the conservation and protection of the Trust Assets and the administration thereof in accordance with the provisions of this Agreement. In no event shall the Managing Trustee receive any property, make any distribution, satisfy or discharge any claims, expenses, charges, liabilities and obligations or otherwise take any action which is inconsistent with a complete liquidation of the Company within the meaning of the Internal Revenue Code of 1986, as amended, Treasury Regulations promulgated thereunder, and rulings, decisions and determinations of the Internal Revenue Service and courts of competent jurisdiction, or take any action which would jeopardize the status of the Trust as a "liquidating trust" for federal income tax purposes within the meaning of Treasury Regulation Section 301.7701-4(d). This limitation shall apply regardless of whether the conduct of any such trade or business is deemed by the Managing Trustee to be necessary or proper for the conservation and protection of the Trust Assets. The Managing Trustee shall not invest any of the cash held as Trust Assets, except that the Managing Trustee may invest in (i) direct obligations of the United States of America or obligations of any agency or instrumentality thereof which mature not later than one year from the date of acquisition thereof; (ii) money market deposit accounts, checking accounts, savings accounts, or certificates of deposit, commercial paper rated not less than A1/P1, or other time deposit accounts which mature not later than one year from the date of acquisition thereof which are issued by a commercial bank, brokerage firm or savings institution organized under the laws of the United States of America or any state thereof; or (iii) other temporary investments not inconsistent with the Trust's status as a liquidating trust for tax purposes (collectively, "Permitted Investments"). It is hereby acknowledged that the Managing Trustee shall not be required to maximize the investment return on the Trust Assets during the term of this Agreement. The Managing Trustee shall be and hereby is relieved of all liability with respect to the purchasing, holding or selling of Permitted Investments in accordance with the terms hereof. The Managing Trustee is not responsible for any losses to the Trust which may occur, including, without limitation, by reason of bank failure or the amount of the Trust exceeding the Federal Deposit Insurance Corporation limits.

**6.2 Specific Powers of the Managing Trustee.** Subject to the provisions of Section 6.1, the Managing Trustee shall have the following specific powers in addition to any powers conferred upon it by any other Section or provision of this Agreement or any statutory laws of the State of Delaware; provided, however, that the enumeration of the following powers shall not be considered in any way to limit or control the power of the Managing Trustee to act as specifically authorized by any other Section or provision of this Agreement and to act in such a manner as the Managing Trustee may deem necessary or appropriate to conserve and protect any Trust Assets or to confer on the Beneficiaries the benefits intended to be conferred upon them by this Agreement:

(a) To determine the nature and amount of the consideration to be received with respect to the sale or other disposition of, or the grant of interests in, any Trust Assets.

(b) To collect, liquidate or otherwise convert into cash, or such other property as the Managing Trustee deems appropriate, all property, assets and rights in any Trust Assets, and to pay, discharge and satisfy all other claims, expenses, charges, liabilities, and obligations existing with respect to any Trust Assets, the Trust or the Managing Trustee.

17

(c) To elect, appoint, engage, retain or employ any Persons as agents, representatives, employees, or independent contractors (including, without limitation, real estate advisors, investment advisors, accountants, transfer agents, custodians, attorneys-at-law, managers, appraisers, brokers, or otherwise) in one or more capacities, and to pay compensation from the Trust Assets for services in as many capacities as such Person may be so elected, appointed, engaged, retained or employed, to prescribe the titles, powers and duties, terms of service and other terms and conditions of the election, appointment, engagement, retention or employment of such Persons and, except as prohibited by law, to delegate any of the powers and duties of the Managing Trustee to any one or more Trustees, agents, representatives, employers, independent contractors or other Persons.

(d) To retain and set aside such funds out of the Trust as the Managing Trustee shall deem necessary or expedient to pay, or provide for the payment of (i) unpaid claims, expenses, charges, liabilities, and obligations of the Trust or the Company, except to the extent that liabilities for which the Company has previously reserved Cash Reserves are satisfied with funds from said Cash Reserves; (ii) contingencies; and (iii) the expenses of administering the Trust Assets.

(e) To do and perform any and all acts necessary or appropriate for the conservation and protection of the Trust Assets, including acts or things necessary or appropriate to maintain Trust Assets held by the Managing Trustee pending sale or other disposition thereof or distribution thereof to the Beneficiaries.

(f) To hold legal title to property of the Trust in the name of the Trust, or in the name of the Managing Trustee, or of any other Person, without disclosure of the interest of the Trust therein.

(g) To cause any investments of any part of the Trust Assets to be registered and held in the name of any one or more of its names or in the names of a nominee or nominees without increase or decrease of liability with respect thereto.

(h) To institute or defend actions or declaratory judgments or other actions and to take such other action, in the name of the Trust or the Company or as otherwise required, as the Managing Trustee may deem necessary or desirable to enforce any instruments, contracts, agreements, causes of action, claims or rights relating to or forming a part of the Trust Assets.

(i) To determine conclusively from time to time the value of and to revalue the securities and other property of the Trust, in accordance with independent appraisals or other information as it deems necessary or appropriate.

(j) To cancel, terminate, or amend any instruments, contracts, agreements, obligations or causes of action relating to or forming a part of any Trust Assets, and to execute new instruments, contracts, agreements, obligations or causes of action notwithstanding that the terms of any such instruments, contracts, agreements, obligations or causes of action may extend beyond the terms of this Trust, provided that no such new instrument, contract, agreement, obligation or cause of action shall permit the Managing Trustee to engage in any activity prohibited by Section 6.1 of this Agreement.

(k) To vote by proxy or otherwise on behalf of the Beneficiaries and with full power of substitution all shares of stock and all securities held by the Managing Trustee hereunder and to exercise every power, election, discretion, option and subscription right and give every notice, make every demand, and to do every act or thing in respect to any shares of stock or any securities held by the Managing Trustee which the Managing Trustee might or could do if the Managing Trustee was the absolute owner thereof.

18

(l) To undertake or join in any merger, plan of reorganization, consolidation, liquidation, dissolution, readjustment or other transaction of any corporation, any of whose shares of stock or other securities, obligations, or properties may at any time constitute a part of any Trust Assets, and to accept the substituted shares of stock, bonds, securities, obligations and properties and to hold the same in trust in accordance with the provisions hereof.

(m) In connection with the sale or other disposition or distribution of any securities held by the Managing Trustee, to comply with the applicable federal and state securities laws, and to enter into agreements relating to the sale or other disposition or distribution thereof.

(n) To authorize transactions between corporations or other entities whose securities, or other interests therein (either in the nature of debt or equity) are held by the Managing Trustee as part of any Trust Assets.

(o) To terminate and dissolve any entities owned by the Trust.

(p) To have a judicial settlement of its account of the Trust at any time to the extent it determines necessary or advisable.

(q) To perform any act authorized, permitted, or required under any instrument, contract, agreement, right, obligation or cause of action relating to or forming a part of any Trust Assets whether in the nature of an approval, consent, demand or notice thereunder or otherwise, unless such act would require the consent of the Beneficiaries in accordance with the express provisions of this Agreement.

**ARTICLE VII**
**RESIDENT TRUSTEE**

**7.1 Generally.** The Resident Trustee shall be a Trustee for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Delaware Statutory Trust Act. The Resident Trustee shall have the power and authority to execute, deliver, acknowledge and file all documents required to maintain the existence of the Trust as required by the Delaware Statutory Trust Act and shall accept service of legal process upon the Trust in the State of Delaware. The Resident Trustee shall provide prompt notice to the Managing Trustee of its performance of any such acts. The Managing Trustee shall reasonably keep the Resident Trustee informed of any action taken by the Managing Trustee with respect to the Trust that may affect the Resident Trustee. The Resident Trustee shall not be entitled to exercise any powers, nor shall the Resident Trustee have any of the duties or liabilities, of the Managing Trustee. The Resident Trustee shall not be liable for the acts or omissions of the Managing Trustee or the Trust. The Resident Trustee shall owe no fiduciary or other duties to the Trust or the Beneficiaries except as expressly provided for in this Article VII. Unless required by the Delaware Court of Chancery, the Resident Trustee shall serve without bond.

19

The Resident Trustee accepts the trust hereby created and agrees to perform its duties hereunder with respect to the same but only upon the terms of this Agreement. The Resident Trustee shall not be personally liable to any Person under any circumstances in connection with any of the transactions contemplated by this Agreement, except that such limitation shall not relieve the Resident Trustee of any personal liability it may have to the Beneficiaries for the Resident Trustee's own bad faith, willful misconduct or gross negligence. In particular, but not by way of limitation:

(a) The Resident Trustee shall not be personally liable for any error of judgment made in good faith by any of its officers or employees;

(b) No provision of this Agreement shall require the Resident Trustee to expend or risk its personal funds or otherwise incur any financial liability in the exercise of its rights or powers hereunder;

(c) Under no circumstance shall the Resident Trustee be personally liable for any representation, warranty, covenant, obligation or indebtedness of the Trust or the Managing Trustee; and

(d) The Resident Trustee shall not be personally responsible for or in respect of the validity or sufficiency of this Agreement or for the due execution hereof by any Person other than the Resident Trustee.

Except as otherwise expressly required herein, the Resident Trustee shall not have any duty or liability with respect to the administration of the Trust, the investment of the Trust's Assets or the payment of distributions of income or principal to the Trust's Beneficiaries, and no implied obligations shall be inferred from this Agreement on the part of the Resident Trustee. The Resident Trustee shall not be liable for the acts or omissions of the Managing Trustee, the Investment Manager, the General Partner or any other Person who acts on behalf of the Trust, nor shall the Resident Trustee be liable for any act or omission by it in good faith in accordance with the directions of the Managing Trustee.

The Resident Trustee shall incur no liability to anyone in acting upon any signature, instrument, notice, resolution, request, consent, order, certificate, report, opinion, bond or other document or paper believed by it to be genuine and believed by it to be signed by the proper party or parties. The Resident Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any Person as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect. As to any fact or matter, the Resident Trustee may, for all purposes hereof, rely on a certificate, signed by any director, the president, any vice president, the treasurer, any assistant treasurer, the secretary or any assistant secretary of the relevant party, and such certificate shall constitute full protection to the Resident Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon.

In the exercise or administration of the Trust hereunder, the Resident Trustee (i) may act directly or through agents or attorneys, and the Resident Trustee shall not be liable for the default or misconduct of such agents or attorneys selected by it in good faith; and (ii) may, at the expense of the Trust, consult with counsel, accountants and other skilled persons, and the Resident Trustee shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons selected by it in good faith.

Except as expressly provided in this Article VII, in accepting the Trust hereby created, the Resident Trustee acts solely as Trustee hereunder and not in its individual capacity, and all Persons having any claim against the Resident Trustee by reason of the transactions contemplated by this Agreement shall look only to the Trust's property for payment or satisfaction thereof.

20

**7.2 Fees and Indemnity.** The Resident Trustee shall be entitled to receive from the Trust as compensation for its services hereunder such fees as have been separately agreed upon with the Trust in a separate agreement, which compensation shall not be limited by any provision of law in regard to compensation of a trustee of an express trust.

The Trust shall (i) reimburse the Resident Trustee for all reasonable expenses incurred by it in connection with the execution and performance of its rights and duties hereunder (including reasonable fees and expenses of counsel and other experts); (ii) indemnify, defend and hold harmless the Resident Trustee (in both its individual and Trustee capacities) and the officers, directors, employees and agents of the Resident Trustee (collectively, including the Resident Trustee in its individual capacity, the "RT Covered Persons") from and against any and all losses, damages, liabilities, claims, actions, suits, costs, expenses, disbursements (including the reasonable fees and expenses of counsel), taxes and penalties of any kind and nature whatsoever, to the extent that such expenses arise out of or are imposed upon or asserted at any time against one or more RT Covered Persons with respect to the Resident Trustee's performance pursuant to this Agreement, the creation, operation, administration or termination of the Trust, or the transactions contemplated hereby (all such expenses as provided in clauses (i) and (ii) are herein referred to collectively as "RT Expenses"); provided, however, that the Trust shall not be required to indemnify an RT Covered Person for RT Expenses to the extent such RT Expenses result from the bad faith, willful misconduct or gross negligence of such RT Covered Person; and (iii) advance to each RT Covered Person RT Expenses (including reasonable legal fees and expenses) incurred by such RT Covered Person in defending any claim, demand, action, suit or proceeding, prior to the final disposition of such claim, demand, action, suit or proceeding, upon receipt by the Trust of a written request therefor and of an undertaking by or on behalf of the RT Covered Person to repay such amount if it shall ultimately be determined that the RT Covered Person is not entitled to be indemnified therefor under this Article VII. With respect to reimbursement or indemnity provided hereunder, an RT Covered Person shall have a lien on the Trust's Assets prior to any rights in such property of the Beneficiaries or any other Person.

**7.3 Insurance.** The Resident Trustee shall be permitted to obtain and maintain fidelity and liability insurance covering the Resident Trustee personally and insuring against acts of any agents, servants or others retained or employed by the Resident Trustee and to retain insurance agents and brokers in connection therewith, all at the expense of the Trust.

**7.4 Miscellaneous.** The Resident Trustee shall take such action or refrain from taking such action under this Agreement as it may be directed in writing by the Managing Trustee from time to time; provided, however, that the Resident Trustee shall not be required to take or refrain from taking any such action if it shall have determined, or shall have been advised by counsel, that such performance is likely to incur personal liability for the Resident Trustee or is contrary to the terms of this Agreement or of any document contemplated hereby to which the Trust is a party or is otherwise contrary to law.

To the extent that, at law or in equity, an RT Covered Person has duties (including fiduciary duties) and liabilities relating to the Trust, the Beneficiaries or any other Person, such RT Covered Person acting under this Agreement shall not be liable to the Trust, the Beneficiaries or such other Persons for its good faith reliance on the provisions of this Agreement. To the extent that provisions of this Agreement restrict the duties and liabilities of an RT Covered Person otherwise existing at law or in equity, such provisions are agreed by the parties hereto to replace such other duties and liabilities of such RT Covered Person.

21

The Resident Trustee may resign and be discharged of the trust created by this Agreement upon not less than 30 days' prior written notice to the Managing Trustee. Upon receiving such notice of resignation, the Managing Trustee shall use its best efforts promptly to appoint a substitute or successor Resident Trustee in the manner and meeting the qualifications hereinafter provided by written instrument or instruments delivered to such resigning Resident Trustee and the substitute or successor Resident Trustee. In addition, upon not less than 30 days' prior written notice to the Resident Trustee, the Managing Trustee may remove the Resident Trustee, with or without cause, and appoint a successor Resident Trustee meeting the qualifications hereinafter provided by written instrument or instruments delivered to the Resident Trustee being removed and to the substitute or successor Resident Trustee. Any resignation or removal of the Resident Trustee and appointment of a substitute or successor Resident Trustee shall become effective only upon acceptance of the appointment by the substitute or successor Resident Trustee. If no substitute or successor Resident Trustee shall have been appointed within 30 days after notice of such resignation or removal has been delivered, the Resident Trustee may apply to a court of competent jurisdiction for the appointment of a successor Resident Trustee. Such court may thereupon, after such notice, if any, as it may deem proper, prescribe and appoint a successor Resident Trustee meeting the qualifications provided for herein.

Any Person into which the Resident Trustee may be merged or with which it may be consolidated, or any Person resulting from any merger or consolidation to which the Resident Trustee shall be a party, or any Person that succeeds to all or substantially all of the corporate trust business of the Resident Trustee, shall be the successor Resident Trustee under this Agreement without the execution, delivery or filing of any paper or instrument or further act to be done on the part of the parties hereto (except for the filing of an amendment to the Trust's certificate of trust if required by law), notwithstanding anything to the contrary herein; provided, however, that such successor Resident Trustee shall have its principal place of business in the State of Delaware and otherwise meet the requirements of applicable law.

## ARTICLE VIII
## CONCERNING THE MANAGING TRUSTEE, BENEFICIARIES, EMPLOYEES AND AGENTS

**8.1 Generally**. The Managing Trustee accepts and undertakes to discharge the Trust created by this Agreement, upon the terms and conditions thereof on behalf of the Beneficiaries. The Managing Trustee shall exercise such rights and powers vested in it by this Agreement, and use the same degree of care and skill in its exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs. No provision of this Agreement shall be construed to relieve the Managing Trustee from liability for its own willful misconduct, knowingly and intentionally committed in bad faith, except that:

(a) No successor Managing Trustee shall be in any way responsible for the acts or omissions of the Managing Trustee in office prior to the date on which it became a Managing Trustee.

(b) The Managing Trustee shall not be liable for the performance of such duties and obligations as are specifically set forth in this Agreement except for its bad faith or willful misconduct, and no implied covenants or obligations shall be read into this Agreement against the Managing Trustee.

22

(c) The Managing Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Managing Trustee and conforming to the requirements of this Agreement.

(d) The Managing Trustee shall not be liable for any act which the Managing Trustee may do or omit to do hereunder, or for any mistake of fact or law, or for any error of judgment, or for the misconduct of any employee, agent, representative or attorney appointed by it, or for anything that it may do or refrain from doing in connection with this Agreement while acting in good faith; unless caused by or arising from gross negligence, willful misconduct, fraud or any other breach of fiduciary duty of the Trustee or any of its employees, agents, representatives or attorneys.

(e) The duties and obligations of the Managing Trustee shall be limited to and determined solely by the express provisions of this Agreement, and no implied duties or obligations shall be read into this Agreement against the Managing Trustee.

**8.2 Reliance by the Managing Trustee.** Except as otherwise provided in Section 7.1 of this Agreement:

(a) The Managing Trustee may rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(b) The Managing Trustee may consult with legal counsel, auditors or other experts to be selected by it, including firms with which the Managing Trustee may be an Affiliate, and the advice or opinion of such counsel, accountants, auditors or other experts shall be full and complete protection to the Managing Trustee, the employees and the agents of the Managing Trustee in respect of any action taken or omitted or suffered by them in good faith and in reliance on, or in accordance with, such advice or opinion.

(c) Persons dealing with the Managing Trustee shall look only to the Trust Assets to satisfy any liability incurred by the Managing Trustee to such Person in carrying out the terms of this Agreement, and the Managing Trustee shall have no personal obligation to satisfy any such liability.

(d) As far as practicable and except as expressly permitted above, the Managing Trustee shall cause any written instrument creating an obligation of the Trust to include a reference to this Agreement and to provide that neither the Beneficiaries, the Managing Trustee nor their agents shall be liable thereunder and that the other parties to such instrument shall look solely to the Trust Assets for the payment of any claim thereunder or the performance thereof; provided, however, that the omission of such provision from any such instrument shall not render the Beneficiaries, the Managing Trustee, or their agents liable, nor shall the Managing Trustee be liable to anyone for such omission.

**8.3 Limitation on Liability to Third Persons.** No Beneficiary shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any Person in connection with the Trust Assets or the affairs of the Trust; and neither the Managing Trustee nor any employee or agent of the Trust shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any Person in connection with any Trust Assets or the affairs of the Trust, except for such Person's own willful misconduct, knowingly and intentionally committed in bad faith; and all such other Persons shall look solely to any Trust Assets for satisfaction of claims of any nature arising in connection with the affairs of the Trust. The Managing Trustee shall purchase and maintain insurance as it deems reasonably necessary for the protection of all Trust Assets, its Beneficiaries, the Trustee and its employees and agents in such amount as the Managing Trustee shall deem adequate to cover all foreseeable liability to the extent available at reasonable rates.

23

**8.4 Recitals**. Any written instrument creating an obligation of the Trust shall be conclusively taken to have been executed or done by the Managing Trustee, or the employee or agent of this Trust only in its capacity as Managing Trustee under this Agreement or in its capacity as employee or agent of the Trust.

**8.5 Indemnification**. The Managing Trustee and each of its employees and agents, including the Investment Manager and the General Partner (each an "Indemnified Person" and collectively, the "Indemnified Persons"), shall be indemnified out of all Trust Assets against all liabilities and expenses, including amounts paid in satisfaction of judgments, in compromise or as fines and penalties, and all costs and expenses, including, but not limited to, reasonable counsel fees and disbursements paid or incurred in investigating or defending against any such claim, demand, action, suit or proceeding by the Indemnified Persons in connection with the defense or disposition of any action, suit or other proceeding by the Trust or any other Person, whether civil or criminal, in which the Indemnified Person may be involved or with which the Indemnified Person may be threatened while in office or thereafter, by reason of its or his being or having been such a Managing Trustee, employee or agent; provided, however, that the Indemnified Person shall not be entitled to such indemnification in respect of any matter as to which the Indemnified Person shall have been adjudicated to have acted in bad faith or with willful malfeasance or in reckless disregard of the Indemnified Person's duties. The rights accruing to any Indemnified Person under these provisions shall not exclude any other right to which the Indemnified Person may be lawfully entitled. The Managing Trustee may make advance payments in connection with indemnification under this Section, provided that the Indemnified Person shall have given a written undertaking to repay any amount advanced to the Indemnified Person and to reimburse the Trust in the event it is subsequently determined in a final adjudication by a court of law that the Indemnified Person is not entitled to such indemnification. The Managing Trustee may purchase such insurance as it believes, in the exercise of its discretion, adequately insures that each Indemnified Person shall be indemnified against any such loss, liability or damage pursuant to this Section. The rights accruing to any Indemnified Person by reason of the foregoing shall not be deemed to exclude any other right to which he may legally be entitled nor shall anything else contained herein restrict the right of the Managing Trustee to indemnify or reimburse such Indemnified Person in any proper case even though not specifically provided for herein, nor shall anything contained herein restrict the right of any such Indemnified Person to contribution under applicable law. As security for the timely and full payment and satisfaction of all of the present and future obligations of the parties to the Managing Trustee under this Agreement, including, without limitation, the indemnity obligations hereunder, whether joint or several, the Trust (and by accepting distributions hereunder, each Beneficiary) hereby grants to the Managing Trustee a continuing security interest in and to any and all of the Trust Assets, whether now existing or hereafter acquired or created, together with the products and proceeds thereof, all payments and other distributions with respect thereto, and any and all investments, renewals, substitutions, modifications and extensions of any and all of the foregoing. The Managing Trustee shall have all of the rights and remedies of a secured party under the Uniform Commercial Code. In addition, in the event the Managing Trustee has not received any payment, indemnity, reimbursement or other amount due it under this Agreement, then, notwithstanding any other term or provision of this Agreement, the Managing Trustee may, in its discretion, set off and apply any of the Trust Assets as is required to pay and satisfy those obligations. Promptly after the receipt by the Managing Trustee of notice of any demand or claim or the commencement of any action, suit or proceeding, the Managing Trustee shall, if a claim in respect thereof is to be made against any of the other parties hereto, notify such other parties thereof in writing; but the failure by the Managing Trustee to give such notice shall not relieve any party from any liability which such party may have to the Managing Trustee hereunder. Notwithstanding any obligation to make payments and deliveries hereunder, the Managing Trustee may retain and hold for such time as it reasonably deems necessary such amount of the Trust Assets as it shall from time to time, in its sole discretion, reasonably deem sufficient to indemnify itself for any such loss or expense and for any amounts due it hereunder. Except as required by law or as expressly provided herein, the Managing Trustee shall be under no duty to institute any suit, or to take any remedial procedures under this Agreement, or to enter any appearance or in any way defend any suit in which it may be made a defendant hereunder until it shall be indemnified as provided above, except as expressly set forth herein.

24

**8.6 Rights of Managing Trustees, Employees, Independent Contractors and Agents to Own Trust Shares or Other Property and to Engage in Other Business.** Any Managing Trustee, employee, independent contractor or agent, including the Investment Manager, may own, hold and dispose of Trust Shares for its individual account, and may exercise all rights thereof and thereunder to the same extent and in the same manner as if it were not a Managing Trustee, employee, independent contractor or agent. Any Managing Trustee, employee, independent contractor or agent, including the Investment Manager, may, in its personal capacity or in the capacity of trustee, manager, officer, director, shareholder, partner, member, advisor, employee of any Person or otherwise, have business interests and holdings similar to or in addition to those relating to the Trust. Subject to the provisions of Article V hereof, any Managing Trustee, employee, independent contractor or agent of the Trust, including the Investment Manager, may be a trustee, manager, officer, director, shareholder, partner, member, advisor, employee or independent contractor of, or otherwise have a direct or indirect interest in, any Person who may be engaged to render advice or services to the Trust, and may receive compensation from such Person as well as compensation as Trustee, employee, independent contractor or agent, including as Investment Manager, or otherwise hereunder so long as such interest is disclosed to the Managing Trustee. None of these activities in and of themselves shall be deemed to conflict with its duties as Managing Trustee, employee, independent contractor or agent, including as Investment Manager.

**ARTICLE IX**
**PROTECTION OF PERSONS DEALING WITH THE MANAGING TRUSTEE**

**9.1 Reliance on Statements by the Managing Trustee.** Any Person dealing with the Managing Trustee shall be fully protected in relying upon the Managing Trustee's certificate or instrument signed by the Managing Trustee that it has authority to take any action under this Trust.

**ARTICLE X**
**REIMBURSEMENT TO THE MANAGING TRUSTEE**

**10.1 Expenses.** The Managing Trustee shall be reimbursed from the Trust Assets for all expenses reasonably incurred by it in the performance of its duties in accordance with this Agreement including the reasonable compensation and out-of-pocket expenses of attorneys, accountants, appraisers, consultants and other persons retained by the Managing Trustee or the Manager pursuant to the terms of this Agreement.

25

4/16/2019                    https://www.sec.gov/Archives/edgar/data/1446806/000114420419000543/tv510212_ex10-2.htm

## ARTICLE XI
### THE MANAGING TRUSTEE AND SUCCESSOR MANAGING TRUSTEE

**11.1 Number and Qualification of Managing Trustees**. Subject to the provisions of Section 11.3 of this Agreement relating to the period pending the appointment of a successor Managing Trustee, there shall be one Managing Trustee of this Trust, which shall be a citizen and resident of or a corporation or other entity which is incorporated or formed under the laws of a state of the United States. The number of Managing Trustees may be increased or decreased from time to time by the Managing Trustee.

If any corporate Managing Trustee shall change its name, or shall reorganize or reincorporate, or shall merge with or into or consolidate with any other corporation or entity, bank or trust company, such corporate Managing Trustee shall be deemed to be a continuing entity and shall continue to act as a Managing Trustee hereunder with the same liabilities, duties, powers, titles, discretions and privileges as are herein specified for a Managing Trustee.

**11.2 Resignation and Removal**. Any Managing Trustee may resign and be discharged from the Trust hereby created by giving written notice thereof to any remaining Managing Trustee or Trustees or by giving written notice to the Beneficiaries. Such resignation shall become effective on the day specified in such notice or upon the appointment of such Managing Trustee's successor and such successor's acceptance of such appointment, whichever is earlier. Any Managing Trustee may be removed only "for cause," by Beneficiaries having an aggregate Beneficial Interest of at least a majority of the total Beneficial Interests in the Trust. Removal "for cause" shall mean removal due to the (a) gross negligence or fraud of the Managing Trustee, (b) willful misconduct or willful breach of this Agreement by the Managing Trustee or (c) bankruptcy, insolvency or inability of the Managing Trustee to meet its obligations as the same come due. All obligations of the Managing Trustee hereunder shall cease and terminate on the effective date of its resignation or removal and its sole responsibility thereafter shall be to hold the Trust Assets for a period of thirty (30) calendar days following the effective date of resignation or removal, at which time, if a successor Managing Trustee shall have been appointed and have accepted such appointment in a writing to the Beneficiaries, then upon written notice thereof given by the successor Managing Trustee to the resigning Managing Trustee, the resigning Managing Trustee shall deliver the Trust Assets to the successor Managing Trustee. If a successor Managing Trustee shall not have been appointed within a thirty (30) day period from the predecessor Managing Trustee's resignation or removal, for any reason whatsoever, the resigning Managing Trustee shall deliver the Trust Assets to a court of competent jurisdiction in the county in which the Trust Assets are there being held and give written notice of the same to the parties hereto.

The resigning Managing Trustee shall be entitled to payment of any unpaid fees (which shall be pro-rated as of the effective date of the resignation or removal) and expenses and to reimbursement by the Beneficiaries out of the Trust Assets for any expenses incurred in connection with the transfer of the Trust Assets pursuant to and in accordance with the provisions of this Section 11.2 of this Agreement.

**11.3 Appointment of Successor**. Should at any time a Managing Trustee resign or be removed, unless any remaining Managing Trustees shall decrease the number of Managing Trustees of the Trust pursuant to Section 11.1 hereof, a vacancy shall be deemed to exist and a successor shall be appointed by any remaining Managing Trustees. If there are no remaining Managing Trustees, the Beneficiaries may, pursuant to Article XIII hereof, call a meeting to appoint a successor Managing Trustee by vote of the Beneficiaries holding Trust Shares representing an aggregate of at least a majority of the total Beneficial Interests in the Trust. If such a vacancy is not filled by any remaining Managing Trustees within ninety (90) days, the remaining Managing Trustees must notify the Beneficiaries of their inability to fill such vacancy, and the Beneficiaries may, pursuant to Article XIII hereof, call a meeting to appoint a successor Managing Trustee by Beneficiaries holding Trust Shares representing an aggregate of at least a majority of the total Beneficial Interests in the Trust. Pending the appointment of a successor Managing Trustee, the remaining Managing Trustee or Trustees then serving may take any action in the manner set forth in this Agreement.

26

**11.4 Acceptance of Appointment by Successor Managing Trustee**. Any successor Managing Trustee appointed hereunder shall execute an instrument accepting such appointment hereunder. Thereupon such successor Managing Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts and duties of his or its predecessor in the Trust hereunder with like effect as if originally named therein.

**11.5 Bonds**. No bond shall be required of the original Managing Trustee hereunder, and no bond shall be required of any successor Managing Trustee hereunder. If a bond is required by law, no surety or security with respect to such bond shall be required unless required by law.

**ARTICLE XII**
**CONCERNING THE BENEFICIARIES**

**12.1 Evidence of Action by Beneficiaries**. Whenever in this Agreement it is provided that the Beneficiaries may take any action (including the making of any demand or request, the giving of any notice, consent, or waiver, the removal of a Trustee, the appointment of a successor Trustee, or the taking of any other action), the fact that at the time of taking any such action such Beneficiaries have joined therein may be evidenced (i) by any instrument or any number of instruments of similar tenor executed by Beneficiaries in person or by agent or attorney appointed in writing, or (ii) by the record of the Beneficiaries voting in favor thereof at any meeting of Beneficiaries duly called and held in accordance with the provisions of Article XIII of this Agreement. Such meeting or writing may take any form permitted under Delaware law.

**12.2 Limitation on Suits by Beneficiaries**. No Beneficiary shall have any right by virtue of any provision of this Agreement to institute any action or proceeding at law or in equity against any party other than the Trustees upon or under or with respect to any Trust Assets or the agreements relating to or forming part of any Trust Assets, and the Beneficiaries do hereby waive any such right.

**12.3 Requirement of Undertaking**. The Managing Trustee may request any court to require, and any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Agreement, or in any suit against the Managing Trustee for any action taken or omitted by it as Managing Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; provided, however, that the provisions of this Section shall not apply to any suit by the Managing Trustee.

27

## ARTICLE XIII
## MEETING OF BENEFICIARIES

**13.1 Purpose of Meetings**. A meeting of the Beneficiaries may be called at any time and from time to time pursuant to the provisions of this Article for the purposes of taking any action which the terms of this Agreement permit a Beneficiary having a specified aggregate Beneficial Interest to take either acting alone or with the Managing Trustee.

**13.2 Meeting Called by the Managing Trustee**. The Managing Trustee may at any time call a meeting of the Beneficiaries of the Trust to be held at such time and at such place as the Managing Trustee shall determine. Written notice of every meeting of the Beneficiaries shall be given by the Managing Trustee (except as provided in Section 13.3 of this Agreement), which written notice will set forth the time and place of such meeting and in general terms the action proposed to be taken at such meeting, and shall be mailed not more than sixty (60) nor less than fifteen (15) days before such meeting is to be held to all of the Beneficiaries of record not more than fifty (50) nor less than ten (10) days before the date of such meeting. The notice shall be directed to the Beneficiaries at their respective addresses as they appear in the records of the Trust.

**13.3 Meeting Called on Request of Beneficiaries**. Within ten (10) days after written request to the Managing Trustee by Beneficiaries holding Trust Shares representing at least a majority of the aggregate Beneficial Interests to call a meeting of all of the Beneficiaries, which written request shall specify in reasonable detail the action proposed to be taken, the Managing Trustee shall proceed under the provisions of Section 13.2 of this Agreement to call a meeting of the Beneficiaries.

**13.4 Persons Entitled to Vote at Meeting of Beneficiaries**. Each Beneficiary shall be entitled to vote at a meeting of the Beneficiaries of the Trust either in person or by his proxy duly authorized in writing. The vote of each Beneficiary shall be weighted based on the number of Trust Shares held by each Beneficiary determined pursuant to Section 3.1. The signature of the Beneficiary on such written authorization need not be witnessed or notarized.

**13.5 Quorum**. At any meeting of Beneficiaries, the presence in person or by proxy of Beneficiaries holding Trust Shares representing at least a majority of the aggregate Beneficial Interests shall constitute a quorum; but if less than a quorum be present, Beneficiaries having a majority of the Beneficial Interests so present and so represented may adjourn such meeting with the same effect and for all intents and purposes as though a quorum had been present.

**13.6 Adjournment of Meeting**. Subject to Section 13.5 hereof, any meeting of Beneficiaries of the Trust may be adjourned from time to time and a meeting may be held at such adjourned time and place without further notice.

**13.7 Conduct of Meeting**. At each meeting of the Beneficiaries, the Beneficiaries present or represented by proxy may adopt such rules for the conduct of such meeting as they shall deem appropriate, provided that such rules shall not be inconsistent with the provisions of this Agreement.

## ARTICLE XIV
## AMENDMENTS

**14.1 Consent of Beneficiaries**. At the direction or with the consent of Beneficiaries holding Trust Shares representing at least a majority of the aggregate Beneficial Interests, or such greater percentage as shall be specified in this Agreement for the taking of an action by the Beneficiaries under the affected provision of this Agreement, the Managing Trustee shall promptly make and execute a declaration amending this Agreement for the purpose of adding any material provisions to or changing in any material manner or eliminating any of the material provisions of this Agreement or amendments thereto as they apply to the Trust; provided, however, that no such amendment shall permit the Managing Trustee to engage in any activity prohibited by Section 6.1 hereof or affect the Beneficiaries' rights to receive their pro rata shares of the Trust Assets at the time of distribution; provided further, however, that no consent of the Beneficiaries shall be required with respect to any amendment made solely for the purpose of facilitating the transferability by Beneficiaries of Trust Shares or to comply with applicable laws, including tax laws, so long as such amendment has been approved by the Managing Trustee.

28

**14.2 Effect of Amendment**. Upon the execution of any such declaration of amendment by the Managing Trustee, this Agreement shall be deemed to be modified and amended in accordance therewith and the respective rights, limitations of rights, obligations, duties, and immunities of the Managing Trustee and the Beneficiaries under this Agreement with respect to the Trust shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modification and amendments, and all the terms and conditions of any such amendment shall be thereby deemed to be part of the terms and conditions of this Agreement for any and all purposes.

**14.3 Managing Trustee's Declining to Execute Documents**. If, in the reasonable opinion of the Managing Trustee, any document required to be executed pursuant to the terms of Section 14.2 hereof adversely affects any right, obligation, immunity or indemnity in favor of the Managing Trustee under this Agreement, the Managing Trustee may in its discretion decline to execute such document.

## ARTICLE XV
### MISCELLANEOUS PROVISIONS

**15.1 Filing Documents**. This Agreement shall be filed or recorded in such office or offices as the Managing Trustee may determine to be necessary or desirable. A copy of this Agreement and all amendments thereof shall be maintained in the office of the Managing Trustee. The Managing Trustee shall file or record any amendment of this Agreement and any instrument which relates to any change in the office of the Managing Trustee.

**15.2 Intention of Parties to Establish Trust**. This Agreement is not intended to create and shall not be interpreted as creating a corporation, association, partnership, or joint venture of any kind for purposes of federal income taxation or for any other purpose.

**15.3 Beneficiaries Have No Rights or Privileges as Holders of Shares**. Except as expressly provided in this Agreement or under applicable law, the Beneficiaries shall have no rights or privileges attributable to their former status as holders of Shares.

**15.4 Laws as to Construction**. The Trustees, and the Beneficiaries (by their acceptance of any distributions made to them pursuant to this Agreement), consent and agree that this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without reference to the choice of law principles thereof.

**15.5 Severability**. In the event any provision of this Agreement or the application thereof to any Person or circumstances shall be finally determined by a court of proper jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

29

**15.6 Notices**. Any notice or other communication shall be in writing and shall be deemed to have been sufficiently given, for all purposes, when delivered personally or 48 hours after being sent by a nationally-recognized courier or deposited in the U.S. mail, as certified or registered mail, with postage prepaid.

**If to the Managing Trustee:**

ICON Capital, LLC
3 Park Avenue, 36th Floor
New York, NY 10016
Attn: General Counsel

**If to the Resident Trustee:**

NRAI Services, LLC
160 Greentree Drive, Suite 101
Dover, DE 19904
Attn: Tina Lipko

**If to the Beneficiary:**

The address of such Beneficiary as shown in the records of the Trust.

**15.7 Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute but one and the same instrument.

[The remainder of this page is left intentionally blank.]

30

IN WITNESS WHEREOF, the General Partner of the Grantor has caused this Agreement to be executed by an authorized officer, and the Trustees hereunder have executed this Agreement, as Trustees and not as individuals, as of the date first set forth herein.

**GRANTOR:**

**ICON EQUIPMENT AND CORPORATE INFRASTRUCTURE FUND FOURTEEN LIQUIDATING TRUST**
By: ICON GP 14, LLC, its General Partner

By:   /s/ Michael A. Reisner
     Michael A. Reisner
Its:   Co-Chief Executive Officer and Co-President

**MANAGING TRUSTEE:**

**ICON CAPITAL, LLC**

By:   /s/ Michael A. Reisner
     Michael A. Reisner
Its:   Co-Chief Executive Officer and Co-President

**RESIDENT TRUSTEE:**

**NRAI SERVICES, LLC**

By: /s/ Tina Lipko
     Tina Lipko
Its: Vice-President

31

4/16/2019
https://www.sec.gov/Archives/edgar/data/1446806/000114420419000543/tv510212_ex10-2.htm

EXHIBIT A

BILL OF SALE, ASSIGNMENT, ACCEPTANCE
AND ASSUMPTION AGREEMENT

32

# EXHIBIT

# 3

14 May 2019

Advantage Sky Shipping LLC
c/o Bowman Gilfillan Inc.
1st Floor, Compendium House
5 The Crescent, Westway Office Park
Harry Gwala Road, Westville
DURBAN
4001

Dear Sirs

**LETTER OF UNDERTAKING**
**CLAIM ("THE CLAIM") BY ADVANTAGE SKY SHIPPING LLC AGAINST ICON**
**AMAZING, LLC, ICON FANTASTIC, LLC AND ICON OCTAVIAN CENTER,**
**LLC ("THE DEFENDANTS") FOR WRONGFUL ARREST OF THE VLCC**
**"ADVANTAGE SKY" ON 30 AUGUST 2018 IN DURBAN BROUGHT UNDER**
**CASE NUMBER A50/2018 IN THE KWAZULU-NATAL HIGH COURT,**
**DURBAN, REPUBLIC OF SOUTH AFRICA, IN THE EXERCISE OF ITS**
**ADMIRALTY JURISDICTION ("THE COURT")**

WHEREAS you have applied for security for your abovementioned claim.

NOW THEREFORE ICON Equipment and Corporate Infrastructure Fund Fourteen
Liquidating Trust ("the Fund") does hereby undertake that to the extent of its assets, the
current estimated net asset value of which is US$9,758,974, it will make payment to you
of any sum or sums:

1          which may be agreed in terms of a written settlement agreement between
           any one or all of the Defendants, on the one hand, and you on the other, in
           respect of the claim; or

2          for which any one or all of the Defendants are found to be liable to you by a
           final unappealable judgment of the Court or by a final unappealable
           judgment on appeal therefrom in respect of the claim,

and furthermore undertakes that no further distributions to investors will be made by it
until after the claim has been settled and the settlement paid, a final unappealable
judgment has been granted in your favour and paid or a final unappealable judgment in
favour of the Defendants has been granted.

Payment of any amount of capital and interest due in terms of this Letter of Undertaking
shall be effected by the Fund within fourteen (14) days of receipt by Edward Nathan

Sonnenberg Inc at Suite 2302, 23rd Floor, Durban Bay House, 333 Anton Lembede Street of a written demand, addressed to us at that address and enclosing a copy of this undertaking together with a copy of the written settlement agreement or final unappealable judgment, as the case may be, provided that if costs have not been agreed at the date of presentation, payment thereof will be effected in terms of this undertaking upon further presentation of a taxed bill of costs in favour of the party entitled to the judgment or an agreement signed by the parties concerned as to the costs payable hereunder.

The Fund does hereby submit to the jurisdiction of the Court for any claim on this Letter of Undertaking and chooses as an address for service of any process for that purpose, the offices of Edward Nathan Sonnenberg Inc, Suite 2302, 23rd Floor, Durban Bay House, 333 Anton Lembede Street, Durban.

This Letter of Undertaking is furnished without admission of liability and without prejudice to the rights and contentions of either the Defendants.

In the event of the Court or any appeal court granting a final unappealable judgment dismissing your claim this Letter of Undertaking shall be null and void and of no force or effect, deemed cancelled and shall be returned to us.

This Letter of Undertaking shall be governed by South African law.

Your faithfully,
Michael A Reisner
Co-President and Co-Chief Executive Officer
of ICON Capital, LLC, the Managing Trustee of the Fund

For and on behalf of
ICON EQUIPMENT AND CORPORATE INFRASTRUCTURE FUND FOURTEEN LIQUIDATING TRUST

STATE OF DELAWARE

COUNTY OF NEW CASTLE

This instrument was acknowledged before me on the 14th day of May, 2019 by Michael A. Reisner as Co-President and Co-Chief Executive Officer of ICON Capital, LLC, the Managing Trustee of ICON Equipment and Corporate Infrastructure Fund Fourteen Liquidating Trust.

Signature of Notary Public
Nolley M. Rainey
My commission expires: March 11, 2021