13

IN THE HIGH COURT OF SOUTH AFRICA

KWA-ZULU NATAL LOCAL DIVISION, DURBAN

EXERCISING ITS ADMIRALTY JURISDICTION     CASE NO: A SO    /2018

NAME OF SHIP: MVS "AMAZING" AND "FANTASTIC" AND THE MT "CENTER"

In the matter between:

ICON AMAZING, LLC                                        First Applicant

ICON FANTASTIC, LLC                                    Second Applicant

ICON OCTAVIAN CENTER, LLC                        Third Applicant

and

VLCC "ADVANTAGE SKY"                                    Respondent

**AND IN THE MATTER** of an *ex parte* application for the arrest of VLCC "Advantage Sky" in terms of Section 5(3) of the Admiralty Jurisdiction Regulation Act, No. 105 of 1983.

---

## AFFIDAVIT

---

I, CATHERINE VIVIEN PITMAN, make oath that:

1

I am an attorney of the High Court of South Africa and practise as such as an executive of EDWARD NATHAN SONNENBERG., at 24th Floor, Durban Bay House, 333 Anton Lembede Road (ex Smith Street), Durban, Kwa-Zulu Natal.

2

I am duly authorised on behalf of the applicants to depose to this affidavit and to bring this application on their behalf.

3

The matters deposed to in this affidavit are either within my personal knowledge or have been made known to me for the purposes of this application. The content of this affidavit is to the best of my knowledge and



belief, true and correct.  To the extent that any allegations of fact are hearsay, the information upon which they are based has been made available to me from Mr Charles Weller and Ms Odes-Clara Leguet of the London office of Reed Smith and Mr Thomas Johnston of Johnston Law Firm LLC of Montclair, New Jersey, USA, the applicant's solicitors and lawyers in this matter and, as will be seen, much of it has been drawn from certain legal proceedings that have taken place in the United States of America in relation to the control of, inter alia, the respondent vessel.

4

The First Applicant is ICON Amazing, LLC, a company duly incorporated and registered in accordance with the company laws of the Marshall Islands, which at all relevant times carried on business as the owner of the mv "Amazing" and which has its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands and its place of business care of ICON Capital Corporation, 3 Park Avenue, 36th Floor, New York, New York, United States of America.

5

The Second Applicant is ICON Fantastic, LLC, a company duly incorporated and registered in accordance with the company laws of the Marshall Islands, which at all relevant times carried on business as the owner of the mv "Fantastic" and which has its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands and its place of business care of ICON Capital Corporation, 3 Park Avenue, 36th Floor, New York, New York, United States of America.

6

The Third Applicant is ICON Octavian Center, LLC, a company duly incorporated and registered in accordance with the company laws of the Marshall Islands, which at all relevant times carried on business as the owner of the mt "Center" and which has its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands and its place



of business care of ICON Capital Corporation, 3 Park Avenue, 36th Floor, New York, New York, United States of America.

7

The respondent is the VLCC "Advantage Sky", a very large crude oil tanker registered in the Marshall Islands in the ownership of Advantage Sky Shipping, LLC.

## THE APPLICATION

8

In this application each of the three Applicants, separately, seeks an order for the arrest of the VLCC "Advantage Sky" as an "associated ship" for the purpose of providing security in respect of claims which each Applicant intends to enforce in separate *in personam* proceedings elsewhere (the English courts in the case of the first and Second Applicants and the Supreme Court of the State of New York in the USA in the case of the Third Applicant) as dealt with more fully below.

9

Whilst the Applicants seek separate relief, a great deal of the factual material which is dealt with in this affidavit and in the annexures hereto is common to all three applications. In the circumstances it is practical and convenient for the relief to be sought in one application supported by one set of papers.

10

The Applicants are special purpose companies of the "ICON" Group, incorporated for the purpose of acquiring new building vessels and chartering them on long-term bareboat charters which, as in this case, include provision for the ultimate acquisition of ownership of the vessels by the bareboat charterers.



16

11

The three bareboat charterers, Amazing Shipping Ltd, Fantastic Shipping Ltd and Center Navigation Ltd, were the special purpose companies of Mr Mehmet Emin Karamehmet ("MEK") incorporated for the purpose of taking the new building vessels on bareboat charter from the individual Applicants. The obligations of the bareboat charterers were further guaranteed by Geden Holdings, Ltd, the parent company of the bareboat charterers and a company also controlled by MEK.

12

The Applicants' claims arise out of three separate bareboat charter parties:

12.1    concluded between the First Applicant, Icon Amazing LLC (as Owners), and Amazing Shipping Ltd (as Charterers) in respect of a new building Vessel the mv "Amazing";

12.2    concluded between the Second Applicant, Icon Fantastic LLC (as Owners), and Fantastic Shipping Ltd (as Charterers) in respect of a new building Vessel the mv "Fantastic"; and

12.3    concluded between the Third Applicant, Icon Octavian Center LLC (as Owners), and Center Navigation Ltd (as Charterers) in respect of the new building Vessel the mt "Center".

13

Each of the three bareboat charterers failed to perform their obligations in terms of the charterparties and as a result, all the charterparties terminated during 2016 due to defaults. the chartered vessels were redelivered to the Applicants soon after the time of termination and there were substantial amounts owing in respect of the arrears of bareboat charter hire. In addition, in terms of the terminated bareboat charters and in consequence of such terminations, each of the charterers has a significant additional liability to the particular Applicant from which it had chartered the Vessel.






14

This honourable court has jurisdiction to hear and determine this application in terms of section 5(3)(a) read with paragraph (j) of the definition of "maritime claim" in section 1(1)  and sections 2(1), 3(4)(b), 3(5)(a), 3(6) and 3(7) of the Admiralty Jurisdiction Regulation Act No 105 of 1983, as amended.

## PRIMA FACIE CASE : THE CLAIMS : MV "AMAZING" MV "FANTASTIC" AND MT "CENTER"

15

I deal below with the claims of the individual Applicants.

### The claim: mv "Amazing": Icon Amazing LLC v Amazing Shipping Ltd

16

The First Applicant, Icon Amazing LLC, concluded a Bareboat Charter on 29 September 2010 (the "Amazing Charter") in terms of which the First Applicant agreed to charter the mv "Amazing", call sign 9HA2330, flagged and registered in Malta, to Amazing Shipping Ltd.

17

I annex a true copy of the aforesaid Amazing Charter, in the form signed on behalf of the Charterer, Amazing Shipping Ltd, hereto marked as annexure "CVP.1". I do not include the lengthy schedule of spare parts and equipment which is not material to this application.

18

The mv "Amazing" was a "newbuilding" having been constructed in China by the Cosco Shipyard Group Co. Ltd and completed for delivery in 2010.







19

The Charterparty was on the amended BIMCO Standard Bareboat Charter ("Barecon 2001") form, and included option to purchase provisions.

20

Terms of the of the Amazing Charter as are material hereto were:

20.1   **Clause 34: Charter Hire**, which provided that, from the delivery date (which was in 2010) the Charterers (Amazing Shipping Ltd) was to pay charter hire to the Owners (Icon Amazing LLC) monthly in advance at a net rate of US$13,500 per day, payable at one monthly intervals thereafter for the duration of the Charterparty.

20.2   **Clause 46: Event of Default**, which identified and dealt with various "Events of Default" for the purposes of the Charterparty.

20.2.1   In terms of clause 46(a), failure by the Charterers to pay any instalment of hire or other sum payable on the due date (with certain exceptions which are not here material) would constitute an Event of Default.

20.2.2   In terms of clause 46(b) it was provided that:

> *"The Owners and the Charterers agree that it is a fundamental term and condition of this Charter that no Event of Default shall occur during the Charter Period and that the occurrence of an Event of Default shall entitle (but not oblige) the Owners at any time during the continuation of such Event of Default to accept the repudiation by the Charterers of this Charter constituted by the occurrence of such Event of Default."*

20.3   **Clause 47: Owner's Rights**, which provided that, in circumstances where there was an Event of Default as dealt with in clause 46(b) of the Charter:



20.3.1  in terms of clause 47(a)(i), the Owners would be entitled at their option, *inter alia*, to:

> "Declare by notice given to the Charterers the aggregate amount of (i) The Agreed Termination Value and (ii) The Indemnity Sum to have been immediately due and payable whereupon the same shall become immediately due and payable and the Charterer shall be obliged to pay the actual balance to the Owners together with any interest accrued in accordance with clause 35(e)"

20.3.2  in terms of clause 47(a)(ii) – (iii), unless the Charterers had paid the full amount of the Agreed Termination Value and other sums dealt with in the preceding subparagraph, the Owners would be entitled to retake possession of the mv "Amazing" or call for the prompt redelivery thereof by the Charterers.

20.3.3  in terms of clause 47(b), if the Owners were to make the declaration under Clause 47(a)(i) and the Charterers pay to the Owners the full amount as mentioned in the clause, and subject to various conditions specified in the sub-clause, including *inter alia* that the Owners have not contracted to sell the Vessel, the Charterers would be entitled to transfer of title in the Vessel.

20.3.4  in terms of Clause 47(g), if (i) the Owners make a declaration under Clause 47(a)(i) and (ii) the Charterers fail to pay the amount required to be paid within the time period specified therein, and (iii) the Owners sell the Vessel pursuant to its rights under Clause 47(a)(v), and (iv) the nett sale proceeds amount to less than the aggregate of the Agreed Termination Value which should have been paid under Clause 47(a)(i), the Charterers would be liable to pay the shortfall to the Owners within 30 days of demand.

**2o**

20.4    **Clause 61.1.1**: "**Agreed Termination Value**", in terms of which the said Agreed Termination Value at any particular time was fixed by reference to a formula set out in the said sub-clause.

20.5    **Clause 58: Jurisdiction,** in terms of which:

20.5.1  the Charterparty and any non-contractual obligations arising from or in connection therewith would in all respects be governed by and interpreted in accordance with English Law;

20.5.2  the Owners and the Charterers irrevocably agreed that the courts of England would have jurisdiction to settle any dispute arising from or in connection with the Charterparty and any proceedings might be brought in those courts; and

20.5.3  the parties appointed process agents for service of process in relation to such proceedings.

21

Pursuant to the Amazing Charter, the mv "Amazing" was delivered to Amazing Shipping Ltd on 1 October 2010.

22

I will hereafter on occasion refer to the parties as "Owners" and "Charterers" respectively.

23

From the outset of the charter, the Charterers did not always make payments of Charter Hire in strict conformity with clause 34 of the Charterparty. On some occasions, they paid more than was required to cover the upcoming month's hire, whilst on other (increasingly regular) occasions, they paid less than was due.

24

During October or November 2013, the Owners and the Charterers entered into



21

negotiations to amend the rider clauses to the Charterparty, including in relation to the rate of Charter Hire. To this end, draft "Amended and Restated Rider Clauses" were prepared, which stipulated that new daily hires were to apply with retrospective effect.

25

Provisions dealing with charter hire, were reflected in such "amended and restated" provisions as follows-

> 34. <u>CHARTER HIRE</u>
>
> Commencing from the Delivery Date, the Charterers shall pay charter hire ("**Charter Hire**") to the Owners monthly in advance calculated by reference to the then Applicable Daily Hire Rate. The first payment of Charter Hire shall be payable on the Delivery Date with subsequent payments of Charter Hire being paid at one monthly intervals thereafter (each a "**Hire Payment Date**").
>
> ...
>
> 61.1.8    "Applicable Daily Hire Rate" means:
>
>> in relation to the period from the Delivery Date until 30 September 2013 [sic], USD 13,500;
>>
>> in relation to the period from 1 October 2012 until 30 June 2013, USD 8,775 per day;
>>
>> in relation to the period from 1 July 2013 until 31 December 2013, USD 2,500 per day;
>>
>> in relation to the period from 1 January 2014 until 31 December 2014, USD 3,000 per day;
>>
>> in relation to the period from 1 January 2015 to 30 September 2015, USD 8,000 per day;
>>
>> in relation to the period from 1 October 2015 until the end of the Charter Period, USD 17,750 per day.




**22**

26

I attach hereto marked as annexure "CVP. 2", copies of the extracts from the draft amended Charterparty setting out the clauses dealt with above.

27

Although the parties never signed and/or reached agreement in relation to the draft "Amended and Restated Rider Clauses", such that the Charterparty as originally negotiated remained in place, the Owners from that time forward began accepting payment of the new rates of Charter Hire set out in the proposed amended clause 61.1.8 quoted above. The proposed amended Charter Hire rates were on average lower than the original rate of US$13,500.00.

28

Despite this forbearance on the Owners' part, the Charterers continued to default on their payment obligations, and from 1 December 2015 they stopped paying Charter Hire altogether. A spreadsheet detailing the monthly Charter Hire due in accordance with the amended rates, and the payments actually made by Charterers, is annexed marked Annexure "CVP.3".

29

By 17 May 2016, the aggregate amount of hire (on the "amended" and reduced values) then due and unpaid was in the amount of US$5,355,048.33.

30

On or about 26 May 2016, Geden, which had been involved in the protracted discussions and negotiations around the amendment to the Charterparty (and in fact dealing negotiations relating to amendments to the charterparties of all 3 vessels, Amazing, Fantastic and Center on behalf of its subsidiaries), indicated that neither Geden nor its subsidiaries, Amazing Shipping Ltd, Fantastic Shipping Ltd and Center Navigation Ltd, were going to finally agree to amend the charterparties  or make any further payments of amount owing under the charterparties.





31

In the course of a telephonic discussion with a Mr Jason Braunstein of the Icon Group on 26 May 2016, and in response to an indication that Geden's attitude would inevitably result in termination of the charterparties, Geden's representative recorded that this was obviously appreciated and that the three vessels would all be redelivered by the charterers.

32

The non-payment of hire constituted an "Event of Default" under Clause 46(a)(i) of the Amazing Bareboat Charter. By letter dated 26 May 2016 (a true copy of which is annexed hereto marked "CVP.4"), Icon Amazing LLC gave formal notice of this and other Events of Default to Amazing Shipping Ltd.

33

True to the indication given by Geden on 26 May 2016, Amazing Shipping Ltd did not make any payment in response to the notice of default. Arrangements were made for the inevitable redelivery of the "Amazing" (and the other two vessels).

34

Once arrangements had been put in place for the" Amazing" to be redelivered on 6 July 2016, Icon Amazing LLC, formally, by letter dated 4 July 2016 (a true copy of which is annexed hereto marked as annexure "CVP.5") , as it was entitled to do:

34.1    terminated the Amazing Bareboat Charter pursuant to Clause 47(a) thereof with immediate effect; and

34.2    declared the Agreed Termination Value under Clause 61.1.4 in the amount of US$36,558,215.00 to be immediately due and payable, together with interest thereon pursuant to clause 35(e); and

34.3    demanded payment of the aforesaid sum by 5 July 2016.




**24**

35

The Vessel was redelivered to the First Applicant on 6 July 2016.

36

The Agreed Termination Value under Clause 61.1.4 in the amount of US$36,558,215.00 referred to in the notice of termination of 4 July 2016 was based on the amended and restated terms which, as I have indicated above, were not ultimately agreed.

37

Calculated by reference to the Charterparty in its original and binding form, the Agreed Termination Value payable on termination of the Charterparty was in fact the sum of US$23,982,317.00. The calculation is set out in a schedule annexed hereto marked as Annexure "CVP.6".

38

In the premises, Amazing Shipping Ltd was, at the date of termination, indebted to the First Applicant (Icon Amazing LLC) in the following sums:

38.1    US$7,017,015.32, being unpaid Charter Hire for the period up the date of termination of the Charterparty on 4 July 2016 (which is calculated in accordance with the new (and effectively reduced) rates of hire which Icon Amazing LLC began to accept from around October/November 2013 as dealt with above); and

38.2    US$23,982,317 pursuant to clause 47(a)(i) of the Charterparty, representing the Agreed Termination Value for year 6 as defined in clause 60.1.1 and calculated to the date of termination.

39

In anticipation of the redelivery of the "Amazing", since, as dealt with above, the charterer, Amazing Shipping Ltd, had indicated that the arrear hire would not be paid and the "Amazing" would be redelivered to Icon Amazing LLC on 6 July 2016, Icon Amazing LLC concluded an agreement of sale of the "Amazing" at a



purchase price of US$8,500,000.00. I annex a true copy of the Memorandum of Agreement dated 4 July 2016 hereto marked as annexure "CVP.7".

40

The sale was effected pursuant to the rights of Icon Amazing LLC in terms of Clause 47 of the Charterparty. As a result of the sale, and in terms of Clause 47(g) of the Charterparty, the amount of the purchase price fell to be credited against the Agreed Termination Value, with the result that the shortfall due by Amazing Shipping Ltd to Icon Amazing LLC in that respect was reduced to a capital amount of US$15,482,317.00. In this regard:

40.1    the Icon Group invests monies deposited by various investors in investment funds in, among other things, ships which are then bareboat chartered to ship operators, as was the case with the bareboat charter by Icon Amazing LLC to Amazing Shipping Ltd;

40.2    rather than simply disposing of the "Amazing" on the open market, Icon Amazing LLC sold it to a company within the Icon Group, Icon Bulk Progress Ltd.;

40.3    In order to ensure that the purchase price was a fair market price representative of the value of the vessel if sold at arm's length on a willing buyer-willing seller basis, the purchase price was determined by reference to the advice of, not only internal research, but independent expert ship valuers; and

40.4    The purchase price of US$8,500,000.00 accordingly represents the reasonable market value of the vessel on redelivery.

41

Amazing Shipping Ltd is further liable to Icon Amazing LLC for payment of contractual interest in terms of Clause 35(e) of the Charterparty.

**26**

42

These are claims in terms of the Charterparty contract. I am advised that the claims can also be advanced on the basis that they constitute damages flowing from the Charterers' breach, alternatively repudiatory breach of contract.

43

As regards interest on outstanding Charter Hire and/or other sums payable by Charterers, the Charterparty provided:

> 35. *PAYMENTS*
> ...
> (e) *In the event of failure by the Charterers to pay on the due date for payment thereof, or in the case of a sum payable on demand, the date of the demand therefor, any hire or other amount payable by them under this Charter, the Charterers will pay to the Owners interest on such amount from the date of such failure to the date of actual payment (both before and after any relevant judgment or winding-up of the Charterers) at the rate equal to the default rate in Clause 7.8 of the Facility Agreement computed form the relevant due date. Interest payable by the Charterers as aforesaid shall be payable on demand.*
> (f) *Any interest payable under this Charter shall accrue from day to day and shall be calculated on the actual number of days elapsed and a three hundred and sixty (360) day year.*

44

Pursuant to clause 60.1.25, "Facility Agreement" had the meaning given in clause 54(a) of the Charterparty:

> 54. *OWNERS' REFINANCING*
> *... the facility agreement (as from time to time amended, varied or supplemented) dated [28 September] 2010 between, amongst others, the Owners the Related Bareboat Charterers, (ii) DVB and NordLB as lenders and co-arrangers... and (iii) DVB in various capacities...*

45

The default rate of interest under clause 7.8 of the Facility Agreement was the





standard rate of interest under clause 7.5 of the Facility Agreement (the aggregate of LIBOR plus an agreed Margin of 3.85% per annum), plus 2%:

> *7.8   **Default interest**. If a borrower fails to pay any amount payable by it under a Finance Document on its due date, interest shall accrue on the overdue amount from the due date up to the date of actual payment (both before and after judgment) at a rate which is two per cent (2%) higher than the rate which would have been payable if the overdue amount had, during the period of non-payment, constituted the Loan in the currency of the overdue amount for successive Interest Periods [as defined in clause 7.1], each selected by the Agent (acting reasonably). Any interest accruing under this Clause 7.8 shall be immediately payable by the Borrower on demand by the Agent. If unpaid, any such interest will be compounded with the overdue amount at the end of each Interest Period applicable to that overdue amount but will remain immediately due and payable.*

46

The First Applicant is accordingly further entitled to recover contractual interest on the sums found due to it from Amazing Shipping Ltd pursuant to clause 35(e) of the Charterparty calculated as set out above.

47

I am instructed that, since the proceedings dealt with below are not defended, a final judgment could be expected to be granted approximately within three months of today.   Interest calculated on the total capital amount at the contractual rate from date of termination to 31 December 2018 will be US$4,831,884.05.

48

I am also advised that the costs which could reasonably be expected to be incurred in the action in England total the amount of US$45,606.36 as dealt with in the schedule of costs annexed hereto marked "CVP.8".

**28**

## THE PROCEEDINGS

### 49

The First Applicant's claims are subject to the Courts of England and Wales, and English law in terms of clause 56 of the Charterparty.

### 50

Such proceedings have been commenced by the service out of the Claim Form annexed hereto marked "CVP.9".

### 51

Those proceedings have been served but have not been defended and the First Applicant shall shortly serve its detailed Particulars of Claim.

## CLAIM ENFORCEABLE IN NOMINATED FORUM

### 52

I am advised by Mr Charles Weller of the London office of Reed Smith, the applicant's London solicitors trained and practicing in English law and High Court procedure, that the claims of the First Applicant are *prima facie* made and enforceable in that forum.

## SECURITY REQUIRED

### 53

I record that the security set out below is, in relation to the unpaid Charter hire, calculated by reference to the reduced Charter hire which, as dealt with above, was not ultimately agreed as part of an overall amendment to the Charterparty. The First Applicant records that it reserves the right to seek to recover the unpaid hire on the original unamended basis.



**29**

54

The security which the First Applicant requires in respect of its claim, together with interest amounts and a provision for costs to:

| | | |
|---|---|---|
| 54.1 | Arrear unpaid Charter hire | US$7,017,015.32 |
| 54.2 | Agreed Termination Value (adjusted) | US$15,482,317.00 |
| 54.3 | Provision for interest | US$4,831,884.05 |
| 54.4 | Provision for costs | US$45,606.36 |

the sum thereof being US$ 27,376,822.73.


**The claim: mv "Fantastic": Icon Fantastic LLC v Fantastic Shipping Ltd.**


55

The Second Applicant, Icon Fantastic LLC, concluded a Bareboat Charter on 29 September 2010 (the "Fantastic Charter") in terms of which the Second Applicant agreed to charter the mv "Fantastic", call sign 9HA2329, flagged and registered in Malta, to Fantastic Shipping Ltd.

56

I annex a true copy of the aforesaid Fantastic Charter, in the form signed on behalf of the Charterer, Fantastic Shipping Ltd, hereto marked as annexure "CVP.10". I do not include the lengthy schedule of spare parts and equipment which is not material to this application.

57

The mv "Fantastic" was a "newbuilding" having been constructed in China by the Cosco Shipyard Group Co. Ltd and completed for delivery in 2010.

**58**

The charterparty was on the amended BIMCO Standard Bareboat Charter ("Barecon 2001") form, and included option to purchase provisions.

**59**

Terms of the Fantastic Charter as are material hereto were:

59.1  **Clause 34: Charter Hire**, which provided that, from the delivery date (which was in 2010) the Charterers (Fantastic Shipping Ltd) was to pay charter hire to the Owners (Icon Fantastic LLC) monthly in advance at a net rate of US$13,500 per day, payable at one monthly intervals thereafter for the duration of the Charterparty.

59.2  **Clause 46: Event of Default**, which identified and dealt with various "Events of Default" for the purposes of the Charterparty.

59.2.1  In terms of clause 46(a), failure to by the Charterers pay any instalment of hire or other sum payable on the due date (with certain exceptions which are not here material) would constitute an Event of Default.

59.2.2  In terms of clause 46(b) it was provided that:

> *"The Owners and the Charterers agree that it is a fundamental term and condition of this Charter that no Event of Default shall occur during the Charter Period and that the occurrence of an Event of Default shall entitle (but not oblige) the Owners at any time during the continuation of such Event of Default to accept the repudiation by the Charterers of this Charter constituted by the occurrence of such Event of Default."*

59.3  **Clause 47: Owner's Rights**, which provided that, in circumstances where there was an Event of Default as dealt with in clause 46(b) of the Charter:

59.3.1  in terms of clause 47(a)(i), the Owners would be entitled at their option, *inter alia*, to:




> *"Declare by notice given to the Charterers the aggregate amount of (i) The Agreed Termination Value and (ii) The Indemnity Sum to have been immediately due and payable whereupon the same shall become immediately due and payable and the Charterer shall be obliged to pay the actual balance to the Owners together with any interest accrued in accordance with clause 35(e)"*

59.3.2   in terms of clause 47(a)(ii) – (iii), unless the Charterers had paid the full amount of the Agreed Termination Value and other sums dealt with in the preceding subparagraph, the Owners would be entitled to retake possession of the mv "Fantastic" or call for the prompt redelivery thereof by the Charterers.

59.3.3   in terms Clause 47(b) if the Owners were to make the declaration under Clause 47(a)(i) and the Charterers pay to the Owners the full amount as mentioned in the clause, and subject to various conditions specified in the sub-clause, including *inter alia* that the Owners have not contracted to sell the Vessel, the Charterers would be entitled to transfer of title in the Vessel.

59.3.4   in terms of Clause 47(g), if (i) the Owners make a declaration under Clause 47(a)(i) and (ii) the Charterers fail to pay the amount required to be paid within the time period specified therein, and (iii) the Owners sell the Vessel pursuant to its rights under Clause 47(a)(v), and (iv) the nett sale proceeds amount to less than the aggregate of the Agreed Termination Value which should have been paid under Clause 47(a)(i), the Charterers would be liable to pay the shortfall to the Owners within 30 days of demand.

59.4   **Clause 61.1.1**: "**Agreed Termination Value**", in terms of which the said Agreed Termination Value at any particular time was fixed by reference to a formula set out in the said sub-clause.

59.5   **Clause 58: Jurisdiction,** in terms of which:

59.5.1   the Charterparty and any non-contractual obligations arising from or in connection therewith would in all respects be governed by and interpreted in accordance with English Law;

59.5.2   the Owners and the Charterers irrevocably agreed that the courts of England would have jurisdiction to settle any dispute arising from or in connection with the Charterparty and any proceedings might be brought in those courts; and

59.5.3   the parties appointed process agents for service of process in relation to such proceedings.

60

Pursuant to the Fantastic Charter, the mv "Fantastic" was delivered to Fantastic Shipping Ltd on 1 October 2010.

61

I will hereafter on occasion refer to the parties as "Owners" and "Charterers" respectively.

62

From the outset of the charter, the Charterers did not always make payments of Charter Hire in strict conformity with clause 34 of the Charterparty. On some occasions, they paid more than was required to cover the upcoming month's hire, whilst on other (increasingly regular) occasions, they paid less than was due.

63

During October or November 2013, the Owners and the Charterers entered into negotiations to amend the rider clauses to the Charterparty, including in relation to the rate of Charter Hire. To this end, draft "Amended and Restated Rider Clauses" were prepared, which stipulated that new daily hires were apply with retrospective effect.



33

64

Provisions dealing with Charter hire, were reflected in such "amended and restated" provisions as follows-

> 34. _CHARTER HIRE_
> Commencing from the Delivery Date, the Charterers shall pay charter hire ("**Charter Hire**") to the Owners monthly in advance calculated by reference to the then Applicable Daily Hire Rate. The first payment of Charter Hire shall be payable on the Delivery Date with subsequent payments of Charter Hire being paid at one monthly intervals thereafter (each a "**Hire Payment Date**").
> ...
> 61.1.8 "**Applicable Daily Hire Rate**" means:
>> in relation to the period from the Delivery Date until 30 September 2013 [sic], USD 13,500;
>>
>> in relation to the period from 1 October 2012 until 30 June 2013, USD 8,775 per day;
>>
>> in relation to the period from 1 July 2013 until 31 December 2013, USD 2.500 per day;
>>
>> in relation to the period from 1 January 2014 until 31 December 2014, USD 3,000 per day;
>>
>> in relation to the period from 1 January 2015 to 30 September 2015, USD 8,000 per day;
>>
>> in relation to the period from 1 October 2015 until the end of the Charter Period, USD 17,750 per day.

65

I attach hereto marked as annexure "CVP.11", copies of the extracts from the draft amended Charterparty setting out the clauses dealt with above.

66

Although the parties never signed and/or reached agreement in relation to the draft "Amended and Restated Rider Clauses", such that the Charterparty as originally negotiated remained in place, the Owners from that time forward began accepting the new rates of Charter Hire set out in the proposed amended




34

clause 61.1.8 quoted above. The proposed amended Charter Hire rates were on average lower than the original rate of US$13,500.00.

67

Despite this forbearance on the Owners' part, the Charterers continued to default on their hire payment obligations, and from 1 December 2015 they stopped paying Charter Hire altogether. A spreadsheet detailing the monthly Charter Hire due in accordance with the amended rates, and the payments actually made by Charterers, is annexed marked Annexure "CVP.12".

68

By 17 May 2016, the aggregate amount of hire (on the "amended" and reduced values) then due and unpaid was in the amount of US$5,418,603.40.

69

On or about 26 May 2016, Geden, which had been involved in the protracted discussions and negotiations around the amendment to the Charterparty (and in fact dealing negotiations relating to amendments to the charterparties of all 3 vessels, Amazing, Fantastic and Center on behalf of its subsidiaries), indicated that neither Geden nor its subsidiaries were going to finally agree to amend the charterparties or make any further payments of amount owing under the charterparties.

70

In the course of a telephonic discussion with a Mr Jason Braunstein of the Icon Group on 26 May 2016, and in response to an indication that Geden's attitude would inevitably result in termination of the charterparties, Geden's representative recorded that this was obviously appreciated and that the three vessels would all be redelivered by the charterers.

71

The non-payment of hire constituted an "Event of Default" under Clause 46(a)(i) of the Fantastic Bareboat Charter. By letter dated 26 May 2016 (a true copy of




**35**

which is annexed hereto marked "CVP.13"), Icon Fantastic LLC gave formal notice of this and other Events of Default to Fantastic Shipping Ltd. True to the indication given by Geden on 26 May 2016, Fantastic Shipping Ltd did not make any payment in response to the notice of default. Arrangements were then commenced for redelivery of the "Fantastic" (and the other two vessels).

72

Once arrangements had been put in place for the "Fantastic" to be redelivered on 6 July 2016, Icon Fantastic LLC, formally, by letter dated 4 July 2016 (a true copy of which is annexed hereto marked as annexure "CVP.14"), Icon Fantastic LLC, as it was entitled to do:

72.1    terminated the Fantastic Bareboat Charter pursuant to Clause 47(a) thereof with immediate effect; and

72.2    declared the Agreed Termination Value under Clause 61.1.4 in the amount of US$36,558,215.00 to be immediately due and payable, together with interest thereon pursuant to clause 35(e); and

72.3    demanded payment of the aforesaid sum by 5 July 2016.

73

The Vessel was redelivered to the Second Applicant on 6 July 2016.

74

The Agreed Termination Value under Clause 61.1.4 in the amount of US$36,558,215.00 referred to in the notice of termination of 4 July 2016 was based on the amended and restated terms which, as I have indicated above, were not ultimately agreed.

75

Calculated by reference to the Charterparty in its original and binding form, the Agreed Termination Value payable on termination of the Charterparty was in fact

the sum of US$23,982,317.00. The calculation is set out in a schedule annexed hereto marked as Annexure "CVP.6" (being the identical calculation to that which applied in respect of the mv "Amazing").

76

In the premises, Fantastic Shipping Ltd was, at the date of termination, indebted to the Second Applicant (Icon Fantastic LLC) in the following sums:

76.1    US$6,990,886.41, being unpaid Charter Hire for the period up the date of termination of the Charterparty on 4 July 2016 (which is calculated in accordance with the new (and effectively reduced) rates of hire which Icon Fantastic LLC began to accept from around October/November 2013 as dealt with above); and

76.2    US$23,982,317 pursuant to clause 47(a)(i) of the Charterparty, representing the Agreed Termination Value for year 6 as defined in clause 60.1.1 and calculated to the date of termination.

77

In anticipation of the redelivery of the "Fantastic", since the charterer, Fantastic Shipping Ltd, had indicated that the arrear hire would not be paid and the "Fantastic" would be redelivered to Icon Fantastic LLC on or about 6 July 2016, Icon Fantastic LLC concluded an agreement of sale of the "Fantastic" at a purchase price of US$8,500,000.00. I annex a true copy of the Memorandum of Agreement dated 4 July 2016 hereto marked as annexure "CVP.15".

78

The sale was effected pursuant to the rights of Icon Fantastic LLC in terms of Clause 47 of the Charterparty. As a result of the sale, and in terms of Clause 47(g) of the Charterparty, the amount of the purchase price fell to be credited against the Agreed Termination Value, with the result that the shortfall due by Fantastic Shipping Ltd to Icon Fantastic LLC in that respect was reduced to a capital amount of US$15,482,317.00. In this regard:

**37**

78.1    the Icon Group invests monies deposited by various investors in investment funds in, among other things, ships which are then bareboat chartered to ship operators, as was the case with the bareboat charter by Icon Fantastic LLC to Fantastic Shipping Ltd;

78.2    rather than simply disposing of the "Fantastic" on the open market, Icon Fantastic LLC sold it to a company within the Icon Group, Icon Bulk Progress Ltd. (i.e. the same company which acquired the sister ship, the "Amazing");

78.3    In order to ensure that the purchase price was a fair market price representative of the value of the vessel if sold at arm's length on a willing buyer-willing seller basis, the purchase price was determined by reference to the advice of, not only internal research, but independent expert ship valuers; and

78.4    The purchase price of US$8,500,000.00 accordingly represents the reasonable market value of the vessel on redelivery.

79

Fantastic Shipping Ltd is further liable to Icon Fantastic LLC for payment of contractual interest in terms of Clause 35(e) of the Charterparty.

80

These are claims in terms of the Charterparty contract. I am advised that the claims can also be advanced on the basis that they constitute damages flowing from the Charterers' breach, alternatively repudiatory breach, of contract.

81

As regards interest on outstanding Charter Hire and/or other sums payable by Charterers, the Charterparty provided:

35. _PAYMENTS_
...

(e)   *In the event of failure by the Charterers to pay on the due date for payment thereof, or in the case of a sum payable on demand, the date of the demand therefor, any hire or other amount payable by them under this Charter, the Charterers will pay to the Owners interest on such amount from the date of such failure to the date of actual payment (both before and after any relevant judgment or winding-up of the Charterers) at the rate equal to the default rate in Clause 7.8 of the Facility Agreement computed form the relevant due date. Interest payable by the Charterers as aforesaid shall be payable on demand.*

(f)   *Any interest payable under this Charter shall accrue from day to day and shall be calculated on the actual number of days elapsed and a three hundred and sixty (360) day year.*

82

Pursuant to clause 60.1.25, "Facility Agreement" had the meaning given in clause 54(a) of the Charterparty:

54.  *OWNERS' REFINANCING*
*… the facility agreement (as from time to time amended, varied or supplemented) dated [28 September] 2010 between, amongst others, the Owners the Related Bareboat Charterers, (ii) DVB and NordLB as lenders and co-arrangers… and (iii) DVB in various capacities*

83

The default rate of interest under clause 7.8 of the Facility Agreement was the standard rate of interest under clause 7.5 of the Facility Agreement (the aggregate of LIBOR plus an agreed Margin of 3.85% per annum), plus 2%:

**7.8     Default interest**. *If a borrower fails to pay any amount payable by it under a Finance Document on its due date, interest shall accrue on the overdue amount from the due date up to the date of actual payment (both before and after judgment) at a rate which is two per cent (2%) higher than the rate which would have been payable if the overdue amount had, during the period of non-payment, constituted the Loan in the currency of the overdue amount for successive Interest Periods [as defined in clause 7.1], each selected by the Agent (acting reasonably). Any interest accruing under this Clause 7.8 shall be immediately payable by the Borrower on demand by the Agent. If unpaid, any such interest will be compounded with the*

**39**

*overdue amount at the end of each Interest Period applicable to
that overdue amount but will remain immediately due and
payable.*

### 84

The Second Applicant is accordingly further entitled to recover contractual interest on the sums found due to it from the Fantastic Shipping Ltd pursuant to clause 35(e) of the Charterparty calculated as set out above.

### 85

I am instructed that, since the proceedings dealt with below are not defended, a final judgment could be expected to be granted approximately within three months of today. Interest calculated on the total capital amount at the contractual rate from date of termination to date is an amount of not less than US$2,499,957.99.

### 86

I am also advised that the costs incurred and to be incurred in connection with the action relating to the mv "Fantastic" are the same as those in relation to the mv "Amazing", namely the sum of US$45,606.36.

### THE PROCEEDINGS

### 87

The Second Applicant's claims are subject to the Courts of England and Wales, and English law in terms of clause 56 of the Charterparty.

### 88

Such proceedings have been commenced by the service out of the Claim Form annexed hereto marked "CVP.16".

### 89

Those proceedings have been served but have not been defended and the Second Applicant shall shortly serve its Particulars of Claim.



## CLAIM ENFORCEABLE IN NOMINATED FORUM

### 90

I am advised by Mr Charles Weller of the London office of Reed Smith, the Second Applicant's London solicitors trained and practicing in English law and High Court procedure. that the claims of the Second Applicant are *prima facie* made and enforceable in that forum.

### 91

I record that the security set out below is, in relation to the unpaid Charter hire, calculated by reference to the reduced Charter hire which, as dealt with above, was not ultimately agreed as part of an overall amendment to the Charterparty. The Second Applicant records that it reserves the right to seek to recover the unpaid hire on the original unamended basis.

### 92

The security which the Second Applicant requires in respect of its claim, together with interest amounts and a provision for costs, amounts to:

| 92.1 | Arrear unpaid Charter hire | US$ 6.990.886.41 |
| 92.2 | Agreed Termination Value (adjusted) | US$15,482,317.00 |
| 92.3 | Provision for interest | US$5.276.089.78 |
| 92.4 | Provision for costs | US$45.606.36 |

the sum thereof being US$ 27.794,899.55



**The claim: mt "Center": Icon Octavian Center LLC v Center Navigation Ltd.**

93

The Third Applicant, Icon Octavian Center LLC, concluded a Bareboat Charter on 14 June 2011 (the "Center Charter") in terms of which the Third Applicant agreed to charter the mt "Center", a crude oil tanker with a gross ton of 83,850 metric tons, flagged and registered in Malta, to Center Navigation Ltd.

94

I annex a true copy of the aforesaid Center Charter, in the form signed on behalf of the Charterer, Center Navigation Ltd, and the Owners, hereto marked as annexure "CVP.17".

95

The mt "Center" was a "newbuilding" having been constructed in China by the Jiangsu Rongsheng Heavy Industries Group Co. Ltd and completed in 2011.

96

The Charterparty was on the amended BIMCO Standard Bareboat Charter ("Barecon 2001") form, and included option to purchase provisions.

97

Terms of the Center Charter as are material hereto were:

97.1    **Clause 2: Box 21,** which provided that the charter was for a period of 60 months from delivery.

97.2    **Clause 32(b)(i): Charter Hire,** which provided, in the respects relevant, that. from the delivery date (which was in 2011) the Charterers (Center Navigation Ltd) was to pay charter hire to the Owners (Icon Octavian Center LLC) monthly in advance at a net rate of US$22,000 per day, payable at one monthly intervals thereafter for the duration of the charterparty.

97.3    **Clause 32(b)(ii),** which provided that:



"If for any reason whatsoever this Charter shall be terminated in whole or in part by operation of law or otherwise, the Charterers nonetheless, notwithstanding any other provision of this Charter, agreed to pay to the Owners an amount equal to the aggregate of all hire payments, but for the termination of the Charter, through to the end of the Charter period. Such payment shall be final and Charterers shall not seek to recover all or any part of such payment from the Owners for any reason whatsoever".

97.4    **Clause 39: Termination Events**, in terms of which:

97.4.1  various events as described were constituted as "Termination Events" in particular including non-payment of any amount due on the due date under the Charter (Clause 39(a)(i));

97.4.2  it was provided that, at any time after a Termination Event shall have occurred and the continuing, the Owners may at their option and by notice in writing to the Charterers terminate the Charter with immediate effect and withdraw the Vessel from service, in which event the Charterers were obliged to redeliver the Vessel to the Owners (Clause 39(b) and (c));

97.4.3  in terms of clauses 39(e) and 39(f), in the event of a termination of the charter in accordance with Clause 39(c), the Charterers would be obliged, on the Termination Payment Date, to pay to the Owners an amount equal to:

(A)    all hire due and outstanding as at the Termination Payment Date; plus

(B)    an amount equal to the Termination Payment Amount; plus

43

(C)     any and all costs, including legal fees and expenses
incurred in connection with enforcing its rights related to
the Termination Event(s).

97.4.4   The same clause 39(f) which provided that:

> "Upon receipt of the Termination Payment and of any and all
> other amounts due under this Charter at that time, all right, title
> and interest in the Vessel shall be transferred by the Owners to
> the Charterers."

97.5     **Clause 40: Interest**, which provided that:

> Any amount due under this Charter, whether by acceleration or
> otherwise, not paid when due, shall be interest thereafter from
> the due date thereof until payment at a rate equal to one month
> LIBOR plus 5.30%.

97.6     **Clause 56: definitions**: in terms of which:

97.6.1   the **Termination Payment Amount** was defined to mean:

> "The aggregate amount of (i) the amount set out for the relevant
> period of the Charter in the schedule below; and (ii) an amount
> equal to thirty percent (30%) of the difference, by which the fair
> market value (as defined in Clause 52(a)(iii)) of the Vessel (up to
> a maximum of $73,000,000) exceeds the amount set out for the
> relevant period in the schedule below:

| | |
|---|---|
| From the Delivery Date through 24 months | $73,000,000 |
| months 26-36 | $67,500,000 |
| months 37-48 | $66,000,000 |
| months 49-60 | $65,000,000 |

97.6.2   **Clause 52(a)(iii)**, which included the definition of "fair market value" as:

"the charter free, fair market value of the Vessel on the basis of prompt delivery between a willing buyer and a willing seller in an arms length transaction which shall be the arithmetic mean of two (2) broker valuations, one (1) such broker selected by Owners and one (1) selected by Charterers."

97.7   **Clause 49: Law and Jurisdiction,** in terms of which *inter alia*:

97.7.1  the Charter was "to be construed and the relations between the parties determined in accordance with the laws of New York, without reference to conflict of law principles".

97.7.2  The parties submitted to the non-exclusive jurisdiction of any New York State court or Federal Court of the United States of America sitting in New York County, and any appellate court thereof, in any action or proceedings arising out of or relating to the Charter.

98

Pursuant to the Center Charter, the mt "Center" was delivered to Center Navigation Ltd on or around 21 June 2011.

99

I will hereafter on occasion refer to the parties as "Owners" and "Charterers" respectively.

100

From the outset of the Charter, the Charterers did not always make payments of Charter Hire in strict conformity with clause 34 of the Charterparty. On some occasions, they paid more than was required to cover the upcoming month's hire, whilst on other (increasingly regular) occasions, they paid less than was due.

101

During September 2013, the Owners and the Charterers entered into






negotiations to amend the rider clauses to the Charterparty, including in relation to the rate of Charter Hire. To this end, draft "Amended and Restated Rider Clauses" were prepared, which stipulated that new daily hires were apply with retrospective effect.

102

Provisions dealing with Charter hire, were reflected in such "amended and restated" provisions as follows:

102.1   The Charter Hire would no longer be fixed at US$22,000 per day but would vary:

"Applicable Daily Hire Rate" means:

in relation to the period from the Delivery Date until 19th December 2012 US$20,000 per day;

in relation to the period from 20th December 2012 until 19th June 2013, US$13,000 per day;

in relation to the period from 20 June 2013 until 19th December 2014, US$7000 per day;

in relation to the period from 20th December 2014 until 19 June 2015, US$17,500 per day;

in relation to the period from 20th June 2015 until the end of the Charter Period, US$28,000 per day.

102.2   The schedule to the Termination Payment Amount was also varied to read:

| | |
|---|---|
| From the Delivery Date through 24 months | $73,000,000 |
| months 26-36 | $64,000,000 |
| months 37-48 | $65,700,000 |
| months 49-60 | $67,100,000 |



103

I attach hereto marked as annexure "CVP.18", copies of the extracts from the draft amended charterparty setting out the clauses dealt with above.

104

Although the parties never signed and/or reached agreement in relation to the draft "Amended and Restated Rider Clauses", such that the charterparty as originally negotiated remained in place, the Owners from that time forward began accepting the new rates of Charter Hire set out in the proposed amended clause quoted above. The proposed amended Charter Hire rates were on average lower than the original rate of US$22,000.00.

105

A spreadsheet detailing the monthly Charter Hire due in accordance with the amended rates, and the payments actually made by Charterers, is annexed marked Annexure "CVP.19".

106

By at 10 May 2016, the aggregate amount of hire then due and unpaid was in the amount of US$2,576,000.00.

107

On or about 26 May 2016, Geden, which had been involved in the protracted discussions and negotiations around the amendment to the Charterparty (and in fact in negotiations relating to amendments to the charterparties of all 3 vessels, Amazing, Fantastic and Center on behalf of its subsidiaries), indicated that neither Geden nor its subsidiaries, were going to finally agree to amend the charterparties or make any further payments of amount owing under the charterparties.

108

In the course of a telephonic discussion with a Mr Jason Braunstein of the Icon



Page 35

Group on 26 May 2016, and in response to an indication that Geden's attitude would inevitably result in termination of the charterparties, Geden's representative recorded that this was obviously appreciated and that the three vessels would all be redelivered by the charterers.

### 109

The non-payment of hire constituted an "Event of Default" under Clause 39 of the Center Charter. In addition, there were a number of other Events of Default. By letter dated 26 May 2016 (a true copy of which is annexed hereto marked "CVP.20"), Icon Octavian Center LLC gave formal notice of these various Events of Default to Center Navigation Ltd.

### 110

Center Navigation Ltd failed to make payment in accordance with the notice of default, although as is apparent from the schedule which is annexure "CVP.19", a claim which reduced the Hire arrears was made on 9 June 2016. Nevertheless, since Geden had already indicated on 26 May 2016, that the "Center" would be redelivered, arrange were commenced for inevitable redelivery of the vessel.

### 111

Once arrangements had been put in place for the "Center" to be redelivered on 17 June 2016, Icon Fantastic LLC, formally, by letter dated 13 June 2016 (a true copy of which is annexed hereto marked as annexure "CVP.21"), Icon Octavian Center LLC, as it was entitled to do:

111.1   terminated the Center Charter pursuant to Clause 39(c) thereof with effect from 15 June 2016;

111.2   demanded payment of the hire due and outstanding then projected to be US$1,616,246.96;



48

111.3   demanded payment of the Termination Payment Amount being US$67,100,000.00 (which was the amount reflected in the amended Rider clauses of September 2013); and

111.4   made a general demand for other costs and the like as provided for in the Charterparty.

### 112

The Vessel was redelivered to the Third Applicant on 17 June 2016.

### 113

Determined by reference to the original unamended charterparty, the Termination Payment Amount was US$65,000,000.00.

### 114

I point out, as dealt with below, that the fair market value of the mt "Center" at the time of the termination and redelivery was not more than US$48,000,000.00, so that this figure did not fall to be adjusted in accordance with the definition of the Termination Payment Amount.

### 115

Subsequent to the termination, and on 28 June 2016, the charterer made a final payment of arrear hire in the sum of US$1,664,800.00. This left a balance of arrear are hire owing in the sum of US$152,516.46.

### 116

In the premises, Center Navigation Ltd was, at the date of termination, indebted to the Third Applicant (Icon Octavian Center LLC) in the following sums:

116.1   US$103,516.46, being unpaid Charter Hire for the period up the date of termination of the Charterparty on 15 June 2016 (which is calculated in accordance with the new - and effectively reduced - rates of hire which Icon Octavian Center LLC began to accept from around the end of 2013 as dealt with above); and

49

116.2   US$65,000,000.00 being the Termination Payment Amount in terms of the original unamended Charterparty.

117

Following the redelivery of the "Center", and given the clear indication from Geden and Center Navigation Ltd that the payment would not be made, Icon Octavian Center LLC concluded an agreement of sale of the "Center" at a purchase price of US$48,000,000.00. I annex a true copy of the Memorandum of Agreement dated 4 July 2016 hereto marked as annexure "CVP.22". In this regard:

117.1   the Icon Group invests monies deposited by various investors in investment funds in, among other things, ships which are then bareboat chartered to ship operators, as was the case with the bareboat charter by Icon Octavian Center LLC to Center Navigation Ltd;

117.2   rather than simply disposing of the "Center" on the open market, Icon Octavian Center LLC sold it to a company within the Icon Group, Icon Shamrock Ltd.;

117.3   In order to ensure that the purchase price was a fair market price representative of the value of the vessel if sold at arm's length on a willing buyer-willing seller basis, the purchase price was determined by reference to the advice of, not only internal research, but independent expert ship valuers; and

117.4   The purchase price of US$48,000,000.00 accordingly represents the reasonable market value of the vessel on redelivery.

118

Clause 39(f) of the Centre Charterparty provides that, on payment in full by the charterer of all amounts owing on termination, "all right, title and interest in the

vessel shall be transferred by the Owners to the Charterers". In the present case, however, Centre Navigation Ltd and its parent  Geden, had made it abundantly clear that the payment was not going to be made, so that the Third Applicant could not be expected to merely retain the vessel the basis that, in due course, if it should transpire that recovery was effected, it could transfer ownership in the vessel to Center Navigation Ltd. Thus, in order to avoid both unjust enrichment and to afford Centre Navigation Ltd the benefit of a credit in respect of the value of the vessel on redelivery, the Third Applicant disposed of the vessel (as dealt with above) and credited the purchase price in favour of Center Navigation Ltd.

119

The balance owing by Centre Navigation Ltd to Icon Octavian Centre LLC in respect of the adjusted Termination Payment and the arrear hire (calculated on the lower revised figures, notwithstanding that final agreement on these reduced amount was not reached) is the sum of 17,152,516.46 . The sum is made up of termination payment amount of US$65m less the selling price of the vessel, being US$48m plus the arrear hire of US$152,516.46.

120

Center Navigation Ltd is further liable to Icon Octavian Center LLC for payment of contractual interest in terms of Clause 40 of the Charterparty.

121

These are claims in terms of the charterparty contract. I am advised that the claims can also be advanced on the basis that they constitute damages flowing from the charterers' breach, alternatively repudiatory breach, of contract.

122

I am instructed that the proceedings relating to the mt "Center" are defended.  I have not been advised how long those proceedings are expected to run to finality but have been advised that the interest on the claims to date calculated at the default contractual rate are not less than US$2,526,773.79.

5 1

123

I am also advised that the costs that have already been incurred with reference to the mt "Centre" amount to US$194,282.00.  I do not have details of the estimated future recoverable legal costs but reserve the right to supplement these papers and seek greater security in that respect.

## THE PROCEEDINGS

124

The Third Applicant's claims are subject to the non-exclusive jurisdiction of any New York State court or Federal Court of the USA, and the laws of New York in terms of clause 49 of the Charterparty.

125

Icon Octavian Center LLC has commenced proceeding against Center Navigation Ltd and Geden Holdings Ltd before the Supreme Court of the State of New York, County of New York: index number 655154/2016 on 29 September 2016, by the service out of a summons and complaint. I annex hereto marked "CVP.23" a true copy thereof.

126

On 10 November 2017, Third Applicant filed and served an amended complaint, asserting additional claims against Center Navigation Ltd and Geden Holdings, Ltd, such amended complaint being annexed hereto marked "CVP.24".

127

Those proceedings have been served and are defended by both Center Navigation Ltd and Geden Holdings, Ltd.  The parties are presently engaged in discovery related to Third Applicant's claims, as well as motion practice regarding the sufficiency of certain of the claims asserted in Third Applicant's amended complaint dated 10 November 2017.




**52**

## CLAIM ENFORCEABLE IN NOMINATED FORUM

### 128

I am advised by Mr Tom Johnston of Johnston Law Office LLC, the Third Applicant's New York lawyer trained and practicing in New York law and procedure, that the claims of the Third Applicant are *prima facie* made and enforceable in that forum.

## SECURITY REQUIRED

### 129

I record that the security set out below is, in relation to the unpaid Charter hire, calculated by reference to the reduced Charter hire which, as dealt with above, was not ultimately agreed as part of an overall amendment to the Charterparty. The Third Applicant records that it reserves the right to seek to recover the unpaid hire on the original unamended basis. The Third Applicant has other claims arising under the charterparty, but security is not sought in respect thereof in these proceedings.

### 130

The security which the Third Applicant requires in respect of its claim, together with interest amounts and a provision for costs amounts to:

| | | |
|---|---|---|
| 130.1 | Arrear unpaid Charter hire | US$152,516.46 |
| 130.2 | Termination Payment Balance | US$17,000,000.00 |
| 130.3 | Interest to date | US$2,526,773.79 |
| 130.4 | Legal costs | US$194,282.00 |

giving a total security of US$ 19,873,572.25.

Page 41

## MARITIME CLAIM

### 131

The applicants' claims are maritime claims as defined in section 1(1)(j) of the Admiralty Jurisdiction Regulation Act, No 105 of 1983, as amended, ("the Act") and, consequently, the court has jurisdiction in terms of section 2(1) of the Act.

## ENFORCEMENT OF THE CLAIMS AGAINST THE VLCC "ADVANTAGE SKY" AS AN ASSOCIATED SHIP

### 132

In terms of section 5(3) of the Admiralty Act, the Applicants are entitled to arrest the VLCC "Advantage Sky" for the purpose of obtaining security for claims to be advanced elsewhere if, *inter alia*, the Applicants' claims could be enforced by action *in rem* against the defendant vessel in South Africa.

### 133

In terms of section 3(7)(c) of the Admiralty act, it is specifically provided that:

> *"If at any time a ship was the subject of a charter-party and the charterer or sub-charterer, as the case may be, shall for the purposes of subsection (6) and this subsection be deemed to be the owner of the ship concerned in respect of any relevant maritime claim for which the charterer or the sub-charterer, and not the owner, is alleged to be liable."*

### 134

The claims of the Applicants against Advantage Shipping Ltd, Amazing Shipping Ltd, and Center Navigation Ltd are all "maritime claims" claims in respect of the chartered vessels, the "Amazing", the "Fantastic", and the "Center", for which the charterers (and not the owners) are alleged to be liable.

### 135

For the purposes of identifying an associated ship against which the Applicants'






claims could be enforced *in rem*, the former charterers of the three vessels are deemed to be the owners thereof. The Applicants would accordingly be entitled to enforce their claims *in rem* against any ship, to quote section 3(7)(a)(iii) "*owned, at the time when the action is commenced, by a company which is controlled by a person who owned the ship concerned, or controlled the company which owned the ship concerned, when the maritime claim arose*".

### 136

The amounts owing in respect of arrear Charter Hire became due and payable prior to termination of the Charterparties. The amounts due in respect of the Agreed Termination Value became due on termination of the Charterparty.

### 137

I respectfully submit that the deeming provision in section 3(7)(c) operates to deem the charterer to be the owner of the chartered vessel for the purposes of the associated ship provisions not only during the currency of the Charterparty at all relevant times without limitation. In other words, even if it were to be contended that the claims in relation to the shortfall of the Agreed Termination Value are claims which "arose" only on termination of the relevant Charterparty, the deeming provision would nevertheless still have application to the enforcement of the claim.

### 138

That is the position according to the judgment in the F Elephant   2012 (3) SA 633 (WCC).

### 139

I respectfully further submit that, on the basis of the decision of the Supreme Court of Appeal in the Cape Courage [2009] 4 All SA 189 (SCA) and 2010 (1) SA 53 (SCA), the aforesaid claims "arose" prior to the termination of the Charterparty. The charterparties (as is common to bareboat charters of this nature) all made express provision for the liability of the charterer for the payment of an "Agreed Termination Value" or "Termination Payment Amount" in

55

the event that the Charterparty was terminated prematurely. As dealt with expressly in clause 47(g)(iv) of the Amazing and Fantastic Charterparties, the amount is "*a reasonable pre-estimate of the damages suffered by the Owners arising from termination of the chartering of the Vessel and represent liquidated damages*".

### 140

As dealt with above, tried to the formal termination of the charterparties, each of the charterers (and Geden) had accepted that termination was inevitable and had agreed to and arranged for the redelivery of the chartered vessels. It was accordingly clear in advance of the termination that the Termination Payments would become immediately due on formal termination taking place. The claims accordingly "arose" once it was clear that the breaches of the charterparty (the events of default) were not going to be cured and that redelivery and liability for the Termination Payments was inevitable.

### 141

In the circumstances I respectfully submit that, on the basis that the VLCC "Advantage Sky" is owned by a company which, at the time of the issue of these proceedings or the granting of an order in this application, is controlled by the same person who controlled the chartering companies (Amazing Shipping Ltd, Fantastic Shipping Ltd and Center Navigation Ltd) when the claims arose, the VLCC "Advantage Sky" is liable to be arrested as an associated ship for the purpose of providing security for the claims.

### 142

The annual returns for those companies for 2017 are annexed hereto marked "CVP.25", "CVP.26" and "CVP.27" and reflect all past and present members of those companies and in each case the only member cited is Geden Holdings, Ltd.



56

Page 44

### 143

The annual return for Geden Holdings, Ltd for 2017 is annexed hereto marked "CVP.28" and reflects all past and present members of those companies and the only member cited is Buselten Finance S.A.

### 144

On 5 December 2005 MEK and various other interested parties, including Buselten Finance S.A. filed with the US Securities and Exchange Commission certain reports for the stock listed telecommunications company "Turkcell Illetism Hizmetleri A.S, a copy of which is annexed hereto marked "CVP.29".

### 145

It will be noted from page 20 thereof that the report was signed on 5 December 2005, that MEK signed both on behalf of Buselten Finance S.A. and for himself and that  MEK confirmed on page 11 thereof that he was then the holder of 100% of the outstanding shares in Buselten Finance S.A.

### 146

Furthermore, in a deposition of the testimony of Mr Ali Tugrul Tokgoz, who is a director and was the CEO of Geden Holdings Ltd, a wholly owned subsidiary of Buselten Finance S.A., taken in London on 13 January 2016 he confirmed on page 48 thereof that the Geden Holdings fleet was ultimately owned by MEK.  I annex hereto marked "CVP.30" a copy thereof.

### 147

It will be noted from that deposition that such had been taken for the purposes of a number of different proceedings before the United States District Court for the Southern District of Texas, Houston Division in which the different Plaintiffs were Eclipse Liquidity Inc, Psara Energy, Ltd and Tank Punk, Inc and common defendants were Advantage Arrow Shipping, LLC, Genel Denizcilik Nakliyati A.S also known as Geden Lines, Advantage Tankers, LLC, Advantage Holdings, LLC and Forward Holdings, LLC.




148

The applicants are aware of other proceedings in Houston and in the Eastern District of Louisiana in which the same common defendants are involved aside from the English and New York proceedings commenced by the applicants previously referred to.

149

With regard to the Houston and Louisiana proceedings referred to, save for further proceedings commenced by Psara Energy, Ltd in 2018 in Houston and Louisiana, all of the proceedings were for what is referred to in the United States as Rule B attachments on an *alter ego* basis.

150

A Rule B attachment is similar to an attachment to found or confirm jurisdiction in South Africa and is warranted if four requirements are met: 1) the plaintiff has a valid *prima facie* admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment.

151

In addition, the *alter ego* principle extends that jurisdiction to attachments of property owned by other parties in circumstances where the party relying on those allegations for a Rule B attachment must allege and show: "(1) the owner exercised complete control over the corporation with respect to the transaction at issue and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil.

152

Those principles have been drawn from the judgment of the Magistrate Judge in the Tank Punk, Inc matter at pages 5 and 6. I annex hereto marked "CVP.31" the verified complaint by Tank Punk, Inc in that matter and marked "CVP.32" the judgment referred to.





**58**

153

The principles pertaining to "control" in respect of the test for *alter ego* jurisdiction are similar but not the same as the test for control required for the purposes of the South African associated ship provisions in sections 3(6) and (7) of the Act.

154

For that reason the facts alleged and allegations made in the litigation referred to and the judgments granted are of relevance to these proceedings.

155

With regard to the further proceedings commenced by Psara Energy Ltd in 2018, it seems that such were advanced on the principles of successor corporation relationship and fraudulent transfer rather than *alter ego* jurisdiction but once again, central to the enquiry was the nature of the relationships between the various parties and for that reason, again, the facts and allegations in those proceedings are also of relevance to these proceedings.

156

I annex hereto marked "CVP.33" the Verified Complaint in the Psara Energy Ltd 2018 Houston proceedings with exhibits 2, 3, 4, 5 and 9.

157

The Advantage interests then filed an application to vacate the attachment on which the jurisdiction of the court was based. On issues relating, *inter alia*, to the control of the entities concerned, the deposition of Ali Tugrul Tokgoz, annexed hereto marked "CVP.30", was relied on by the Advantage interests and for that reason it is annexed in full, notwithstanding its length.

158

I also annex hereto marked "CVP.34" a copy of the response by Psara Energy Ltd to the application to vacate the attachment in that matter together with exhibits 4 and the Bacha Declaration and marked "CVP.35" a copy of a

**59**

transcript of the hearing for the motion to vacate the attachment heard on 30 April 2018.

159

The applicants have not been able to ascertain whether a judgment has been granted in that application or not but notes that an order was made by the Louisiana Court on 23 July 2018 transferring proceedings before it dealing with the same issues to the Texas court for determination on the basis that it "has made substantial progress and findings in an identical claim, ..." I annex hereto marked "CVP.36" a copy of that order and reasons. On that basis the attachment it is clear that the attachment has not been vacated.

160

In order to provide an overall diagrammatic view of the relationships involved I also annex hereto marked "CVP.37" a copy of a diagram with endnotes indicating where the information concerned has been drawn from the various documents annexed hereto.

161

From the foregoing it is evident that many facts and allegations are either common cause or not capable of being disputed.

162

What is undisputed is that at all times relevant to the applicant's claims MEK was and remains the sole shareholder in Buselten Finance S.A., which was and remains the sole shareholder in Geden Holdings, Ltd, which was and remains the sole shareholder in a number of special purpose companies each of which until the early part of 2015 owned a vessel.

163

Ali Turgrul Tokgoz was at all times relevant to the applicants' claims the Chief Executive Officer of Geden Holdings, Ltd and remains a director of that entity and Mehmet Mat was and remains the Chief Financial Officer and director.



60

164

Buselten Finance S.A. was also and remains the sole shareholder in various chartering entities, including Amazing Shipping, Center Navigation and Fantastic Shipping.

165

MEK was at that time and remains the sole shareholder in Cukurova Holdings which in turn was and remains the sole shareholder in Geden Lines.  Geden Lines was the manager of, inter alia, the vessels owned by the special purpose companies referred to and the chartered in vessels.

166

Ali Turgrul Tokgoz was at all times relevant to the applicants' claims the Chief Executive Officer of Geden Lines and remains a director of that entity and Mehmet Mat was and remains the Chief Financial Officer.

167

All the companies either directly or indirectly controlled by MEK through shareholding as aforesaid have been commonly referred to as the Geden Group.

168

During 2012 and 2013 as a result of a faltering tanker market, the high prices that the Geden Group had paid for the construction of eleven tankers and the acquisition of other vessels it experienced severe economic difficulties and pressing demands by various creditors that included the attachment of vessels owned by the Group.

169

In consultation with the group's lending banks Geden Lines commissioned business restructuring specialist AlixPartners UK LLP to develop a proposed plan for the restructuring of their business. A report was prepared by Alix




Partners, dated 6 March 2013 under the title "Project Hermitage Restructuring", which is exhibit 9 to the document annexed hereto marked "9".

### 170

Project Hermitage recommended the replacement of Geden Holdings, Ltd as the group's holding company by another new business entity - a "newco" - which, under the recommended plan, "[p]rovides for recategorization of exposure from "Geden Holdings Ltd." to Newco where equity is "in-the-money" and shareholders are better incentivized to provide ongoing support.

### 171

The plan of Project Hermitage also recommended the sale of the vessels or the one-ship-companies to "Newco"; the continuation of the management of the vessels by Geden Line; the rollover financing of the existing debt to the financing banks; the retention of the equity of Geden Holdings, Ltd; the transfer of the surplus of equity in the assets to Newco; and the ring-fencing of potential sources of disruption (such as arrests and sister-ship arrests). Indeed, on page 15 of the report South African sister-ship arrests are specifically mentioned.

### 172

It has alleged by the Geden Group that the recommendations of Project Hermitage were not adopted.

### 173

However, although not adopted in their exact proposed form, they were nonetheless substantially adopted and implemented as evidenced by the following:

173.1   Geden Holdings, Ltd and Geden Lines, acting by and through their common chief executive officer and chief financial officer, caused the incorporation of Advantage Tankers, LLC, in the Marshall Islands, *i.e.* the "Newco" contemplated by Project Hermitage;



173.2 Geden Holdings, Ltd and Geden Lines, acting by and through their common chief executive officer and chief financial officer, made arrangements for the rollover financing of the loans of Geden Holding, Ltd's one-ship-companies with Advantage Tankers, LLC taking on the role of corporate guarantor;

173.3 Geden Holdings, Ltd and Geden Lines, acting by and through their common chief executive officer and chief financial officer, caused the one-ship-companies controlled by Geden Holdings, Ltd to "sell" their vessels to newly incorporated Marshall Islands corporate entities that comprise the Advantage-Group as set out in the following table-

| VESSEL FORMER NAME | FORMER OWNER | VESSEL NEW NAME | NEW OWNER |
|---|---|---|---|
| PROFIT | Profit Shipping Ltd | ADVANTAGE SOLAR | Advantage Solar Shipping, LLC |
| TARGET | Target Shipping, Ltd. | ADVANTAGE ARROW | Advantage Arrow Shipping, LLC |
| TRUE | True Shipping, Ltd. | ADVANTAGE AVENUE | Advantage Avenue Shipping, LLC |
| BLUE | Blue Shipping, Ltd. | ADVANTAGE SKY | Advantage Sky Shipping, LLC |
| PINK | Pink Shipping, Ltd. | ADVANTAGE SUMMER | Advantage Summer Shipping, LLC |
| BLANK | Blank Shipping, Ltd. | ADVANTAGE START | Advantage Start Shipping, LLC |



**63**

| REEF | Reef Shipping, Ltd. | ADVANTAGE SPRING | Advantage Spring Shipping, LLC |
|------|------|------|------|
| BRAVO | Bravo Shipping, Ltd. | ADVANTAGE ATOM | Advantage Atom Shipping, LLC |
| POWER | Barbaros Maritime, Ltd. | ADVANTAGE ANTHEM | Advantage Anthem Shipping, LLC |
| VALUE | Value Shipping, Ltd. | ADVANTAGE AWARD | Advantage Award Shipping, LLC |
| ROYAL | Prima Shipping, Ltd. | ADVANTAGE SUN | Advantage Sun Shipping, LLC |

173.4   Geden Holdings, Ltd and Geden Lines, acting by and through their common chief executive officer and chief financial officer, arranged for the management of the 11 tanker vessels to continue being performed by Geden Lines under new five year contracts;

173.5   by transferring all of the tangible operating assets of Geden Holdings, Ltd to the Advantage Tankers one-ship-companies, i.e. the 11 tanker vessels, it made every attempt to "ringfence" them from creditors.

174

The Advantage Group was structured on the basis that Ms Gulsun Nazli Karamehmet-Williams ("Ms Williams"), the only daughter of MEK, was and remains the 85% shareholder in Forward Holdings, LLC and 75% shareholder in Future Holdings, Ltd with Mr Ali Turgrul Tokgoz holding the balance of the shares in each of those companies and being the President, Secretary and Director of Future Holdings, Ltd.




64

175

Future Holdings, Ltd is the sole shareholder in Advantage Product Tankers, LLC, which appears to be the holding company for special purpose entities that own the product tankers that were owned by companies that were a part of the Geden Group.

176

Forward Holdings, LLC is the sole shareholder in Advantage Holdings, LLC which in turn is the sole shareholder in Advantage Tanker, LLC of which Ali Turgrul Tokgoz is the Chief Executive Officer and Mehmet Mat is the Chief Financial Officer.

177

Advantage Tankers, LLC is the sole shareholder in the new owning companies set out in the table above.

178

The explanation given by the Advantage group to this restructuring is that Ms Williams is and was a wealthy person in her own right and that after the various financiers declined to accept the Project Hermitage recommendations and the Geden Group having decided to sell its assets, Mr Ali Turgrul Tokgoz, without reference to MEK, approached Ms Williams to invest in the vessels on the basis that they would be refinanced by their existing financiers on the strength of their current charters being renewed with the new owning entities and Geden Lines continuing with the management of the vessels.

179

This arrangement was accepted by Ms Williams who paid around US$200m of her own funds for the purchase of the vessels.

180

On that basis, the Advantage group claims, MEK has no control over the new owning companies.

CVP.31 at page 591

CVP.32 at 606

181

The Magistrate Judge in the Tank Punk proceedings (the Verified Complaint being annexed as "7" and the judgment being annexed as "8") on that basis found that Tank Punk, Inc had not met its burden of proving the requirements of an *alter ego* attachment and recommended that the motion to vacate and dismiss the attachment be granted.

182

There are, however, a number of matters that belie the explanation given by the Advantage group. Some of these matters had been raised in the Tank Punk, Inc proceedings and others only came to light after the motion to vacate had been concluded.

183

Taken together it is submitted that MEK continues to ultimately control the owning companies of the Advantage ship owning entities, including Advantage Sky Shipping, LLC, being the company that owns the respondent vessel.

184

Such matters as well as the background to them are set out in detail in the Bacha Declaration exhibited to the Psara Energy, Ltd response to the owners motion to vacate and dismiss the attachment in that matter.

185

First, Ms Bacha points out from paragraph 37 onwards how the eleven crude oil tankers, including the Respondent, were transferred in accordance with the Project Hermitage Report and, most importantly, that when pressed with documentary discovery in other proceedings to disclose further specifics of the money from Ms Williams in payment for those vessels, the Advantage group "was unwilling or unable to respond" (paragraph 41).

186

Indeed, the Magistrate Judge in the Tank Punk proceedings had accepted such




66

money payments without proof thereof and it was only after those proceedings were concluded that Ms Williams was pressed with documentary discovery in other proceedings and failed to respond.

CVP.34 at 895

### 187

This point is also dealt with at page 33 onwards of the transcript of the hearing of the motion to vacate the attachment in the Psara Energy, Ltd matter, annexed hereto marked "11" where it was pointed out that the matter in which discovery was pressed on those payments was settled at that point.

### 188

In the circumstances it is submitted that it is highly unlikely that payment was made by Ms Williams, as alleged, and that, as always suspected, the position is that the real controlling interest behind the Advantage Group is, indeed, MEK.

### 189

Second, the Magistrate Judge in the Tank Punk proceedings was aware of the consent letter given by Geden Holdings, Ltd to Shell Western Supply and Trading Limited as charterers of certain of the vessels owned by companies controlled by Geden Holdings, Ltd. That letter is exhibit 4 to the Psara Energy, Ltd 2018 Texas proceedings, annexed hereto marked "9".

### 190

In paragraph 2 of that letter it will be noted that Geden Holdings, Ltd (defined as "the Shareholder") represented that the new owning companies would each be wholly owned by it. ie., Geden Holdings, Ltd.

### 191

The Judge Magistrate did not have the benefit of the oral deposition of David Chapman of Shell Western Supply and Trading Limited, exhibit 5 to the Psara Energy, Ltd Verified Complaint annexed hereto marked "9".  In that deposition he confirmed his understanding that Geden Holdings, Ltd was to control the new owning companies and that this was clear to him.

67

### 192

In the circumstances it was perfectly clear to both the Geden Group and the Advantage Group, with their overlapping officers, and their customers that there would be no change of control under the new structure.

### 193

Furthermore, the consent letter does not refer to the sale of the vessels but rather to the transaction between the Geden Group and the Advantage Group as "reorganisation efforts".

### 194

Third, the nature of the involvement of Geden Holdings, Ltd in the transaction in respect of the vessels is pointed out at paragraph 45 onwards of the Bacha exhibit. That involvement is clearly inconsistent with the interests of a seller of vessels to an arm's length purchaser and again points to the fact that in reality MEK remained the ultimate controlling interest behind the owning companies of the Advantage Group.

### 195

Finally, in deposition evidence in earlier proceedings in Texas Ms Williams, Mr Ali Turgrul Tokgoz and Mehmet Mat were probed in relation to the role played by Future Holdings, Ltd in the restructuring of Geden Holdings, Ltd and Ms Williams and Mr Mat deposed that it was a non-operative company, that it did not hold any assets or have any property or money (paragraph 31 onwards) and Mr Ali Turgrul Tokgoz, the CEO, director and substantial shareholder in that company deposed that he did not know (paragraph 34).

### 196

As pointed out by Ms Bacha, after discovery in response to a subpoena of bank transfer records by an intermediary bank in the United States, that proved to be false and the records showed transfers from June through October 2014 of funds in excess of US$2m.





197

In the transcript of the court hearing to vacate the attachment in the Prasa Energy, Ltd 2018 proceedings in Texas annexed hereto marked "11" at the bottom of page 40 counsel for the Advantage interests tries to explain away this issue. It is, however, submitted that it is clear that the testimony of Ms Williams, Mr Ali Turgrul Tokgoz and Mr Mat was inaccurate.

198

Indeed, in that declaration Ms Bacha at paragraph 12 onwards sets out the transfer of the Geden product tankers registered in Malta from special purpose entities controlled by that Group to special purpose entities apparently controlled by financiers of the Advantage Group with the vessels registered in the Marshall Islands from approximately June to August 2013 and produces the corporate documentation in proof thereof. Indeed, in deposition taken from Mr Mehmet Mat in New York on 22 June 2017 ("the Mat New York deposition) in the proceedings brought by the Second Applicant he confirmed that the seven product tankers were sold to affiliates of DVB Bank.

199

Ms Bacha further points out at paragraph 14B that notwithstanding the transfer of the vessels a ship mortgage over the vessels remains in the Maltese register and there are no ships mortgages registered in the Marshall Islands registry and at paragraph 15 that at least three of the new owning companies are subsidiaries of DVB Bank group and chartered to companies controlled by Future Holdings, Ltd with Mr Ali Turgrul Tokgoz as officer with hire paid to the bank account of Future Holdings, Ltd.

200

In the charterparties in respect of the vessels there are clauses that entitle the owning companies to sell the vessels to the charterers thereof.

201

Against that background and the fact that all operational matters relating to the




**69**

Page 57

vessels owned by subsidiaries of Advantage Tankers are dealt with by Geden Lines and the financing and long term employment of the vessels were all arranged by Geden Holdings, Ltd, leaving no active role for Ms Williams, the alleged controller of Advantage Tankers, it is submitted that on balance the owning company of the respondent vessel, Advantage Sky Shipping, LLC is actually ultimately controlled by MEK and that, as MEK ultimately controlled Amazing Shipping, Center Navigation and Fantastic Shipping at the time the applicants' claims against those respective charterers arose, the applicants have a right to arrest the respondent vessel for security in respect of their claims.

## GENUINE AND REASONABLE NEED FOR SECURITY

### 202

Section 3(10)(a) of the Admiralty Jurisdiction Regulation Act, No. 105 of 1983 is inapplicable as neither security nor an undertaking have been provided to the applicants in respect of their claims and, furthermore, the applicants cannot obtain such security in the proceedings in which they have advanced their claims.

### 203

Furthermore, given that Amazing Shipping, Center Navigation and Fantastic Shipping have been unable to pay the hire respectively due to the applicants since May 2015, the obvious inference is that they cannot pay an admitted debt.

### 204

It is respectfully submitted that the failure to pay an undisputed debt in itself sufficient to found the genuine and reasonable apprehension on the part of the applicants that Amazing Shipping, Center Navigation and Fantastic Shipping will not satisfy judgments made in favour of the applicants.

### 205

In any event the applicants do not believe that Amazing Shipping, Center




70

Navigation and Fantastic Shipping, as charterers, have any assets at all and Mr Mehmet Mat confirmed in the Mat New York deposition that Center Navigation has no assets and that liquidation proceedings had been commenced against Geden Holdings, Ltd and a liquidator appointed.

### 206

For those reasons it is submitted that the applicants has a genuine and reasonable need for security in respect of their claims.

## URGENCY

### 207

By viewing the AIS data of the respondent she is currently at anchor at the Durban anchorage at position -Lat 29.75459, Long 31.1952, which is within twelve nautical miles of the shoreline and, therefore, within the territorial waters of this Honourable Court.

### 208

She is due to proceed to moor at the Single Buoy Mooring (SBM) off Prospection south of Durban to discharge her cargo of crude oil through the SBM pipeline system.  Presently another vessel is discharging through that pipeline but it is not known how long it will take her to complete and sail, at which time the respondent will be able to sail to the SBM to discharge her cargo and then sail.

### 209

A security zone exists around the SBM in terms of the Marine Traffic Act, No 2 of 1981 and in terms of the International Port Facility Security Code (ISPS) no vessel may enter this exclusion zone.

### 210

Consequently, it is necessary to arrest the vessel at the anchorage before she sails for the SBM.

### 211

It is, accordingly, imperative that the Applicants obtain the arrest of the vessel as soon as possible and I submit that they have demonstrated the necessity of moving the application on an urgent basis.

### 212

In any event in order to avoid delaying the vessel inordinately it is submitted that the arrest should be effected as soon as is possible to give sufficient time for the respondent to arrange security for the claim before she completes loading.

## FORM OF ORDERS

### 213

The draft orders are in standard form.

### 214

The owner of property arrested by a claimant in terms of section 5(3) of the Act has the right to establish security in order to obtain the release of the property arrested and thereafter to apply to set aside the arrest, which, if successful, renders the security of no effect.

### 215

For the security to be effective, it must be unimpeachable.

### 216

It is, consequently, essential that the respondent be obliged to bring any application for the setting aside of the arrest within a limited time in order to establish the unimpeachability or otherwise of that security. It is for that reason that paragraph 4 has been included in the draft orders prayed.




**72**

## CONFIDENTIALITY PENDING THE ARREST BEING EFFECTED

### 217

It has become a practice in the local maritime law community for practitioners to examine the court register or discuss with the sheriff to establish whether orders have been taken against existing clients.

### 218

Notification to the Advantage interests of any order granted in this matter may well result in the respondent being diverted to avoid the consequences of an arrest.   For that reason it is submitted that it is meet that paragraph 7 be included in any order granted in this matter.

## EX PARTE

### 219

Applications in terms of section 5(3) of the Act are invariably brought on an *ex parte* basis. The reason is that if the respondents are notified of the application it would be an easy matter to take steps which would frustrate the purpose of the arrest.

### 220

It is for this reason that these sorts of applications are typically not moved in the normal motion court, but rather before a Judge in chambers.

### 221

I accordingly request that this Honourable Court dispense with the normal rules in relation to the form and service to the extent necessary.

## SERVICE AND PRESERVATION AND CUSTODY OF THE VESSEL UNDER ARREST

### 222

The provisions of rule 4(1)(c) of the Uniform Rules of Court provide that no service of any civil summons, order or notice and no proceeding or act required in any civil action, except the issue or execution of a warrant of arrest, shall be validly effected on a Sunday unless the court or a judge otherwise directs.  It may well be necessary to effect service of the order and application papers in this matter on a Sunday and, as such, it is necessary to obtain an order authorising the Sheriff to effect such service on a Sunday, if necessary.

### 223

Finally, the costs of an arrest are increased enormously by the Sheriff releasing a vessel or taking steps in respect of the custody and preservation of a vessel that require his or his deputies' attendance on the vessel.  The expense is incurred in the time of the sheriff or his deputy in attending at the vessel outside the harbour mouth and the cost of hiring a launch to so attend.

### 224

Those costs can often be avoided by the simple expedient of avoiding removing items from the vessel that subsequently have to be returned to the vessel at the anchorage or placing security on the vessel that has to be removed from the vessel at the anchorage.

### 225

The Sheriff is often not in as good a position as an Applicants, with their in depth knowledge of the shipping industry, to determine whether commercial constraints, such as it Charterparty obligations, will prevent a vessel from sailing under arrest.

74

226

In the circumstances it is submitted that it is appropriate that provision be contained in the order that the Sheriff :

226.1   consult the Applicants' attorneys in terms of Admiralty Rule 21(2) before taking any steps as to him may appear appropriate in respect of the custody and preservation of the respondent and shall in that respect not place security guards on board her or take any other steps intended to ensure her detention that might require re-attendance on board unless first approved of by the applicant's attorneys; and

226.2   shall, when authorised by the registrar to release the respondent, serve a copy of such release on all parties referred to in Admiralty Rule 4(4)(b) (as directed by Rule 4(5)(b)) and, in lieu of service on the respondent, on the respondent's attorneys or Protection and Indemnity Club ("P&I") representatives located within the jurisdiction of the Court, if any.  In the latter respect a P&I Club is a mutual association formed by shipowners or charterers to provide protection from large financial loss to one member by contribution towards that loss by all members.  The P&I Club covers liabilities not insurable by the shipowner in the running of his ship or a charterer for charterers liabilities.  All P&I Clubs have correspondent representatives in ports around the world that act on behalf of the owners and the P&I Clubs in dealing with the arrest of vessels.

WHEREFORE the applicant humbly prays that it may please this Honourable Court to grant an Order in terms of the draft Orders annexed to the Notice of Motion prefixed hereto, or in such other terms as the Court may deem meet.

CATHERINE VIVIEN PITMAN

75

Page 63

I CERTIFY that the deponent has acknowledged that he knows and understands the contents of this Affidavit which was signed and sworn to before me at DURBAN on this 30 August 2018, the Regulations contained in Government Gazette No. R 1648 of the 19th August 1977 having been complied with.

_____
COMMISSIONER OF OATHS

Full Names:
Address:
Designation:
Area:

```
COMMISSIONER OF OATHS
ROWLAND WATTS
PRACTISING ATTORNEY
REPUBLIC OF SOUTH AFRICA
2301 DURBAN BAY HOUSE
333 ANTON LEMBEDE STREET
DURBAN
```

