IN THE HIGH COURT OF SOUTH AFRICA

KWAZULU - NATAL LOCAL DIVISION, DURBAN

(Exercising its admiralty jurisdiction)

CASE NO: A50/2018

NAME OF SHIP: VLCC "ADVANTAGE SKY"

In the matter between:

**ADVANTAGE SKY SHIPPING LLC**　　　　　　　　　　First Applicant

**VLCC "ADVANTAGE SKY"**　　　　　　　　　　　　Second Applicant

and

**ICON AMAZING, LLC**　　　　　　　　　　　　　First Respondent

**ICON FANTASTIC, LLC**　　　　　　　　　　　Second Respondent

**ICON OCTAVIAN CENTER, LLC**　　　　　　　　Third Respondent

*In the application to set aside the order of this Court granted on 30 August 2018 under Case No.: A50/2018, pursuant to which the Second Applicant was arrested in terms of Section 5(3) of the Admiralty Jurisdiction Regulation Act, 105 of 1983*

---

### CERTIFICATE OF URGENCY

---

I, the undersigned

### MICHAEL FITZGERALD SC

an advocate of this Honourable Court, do hereby certify that I have read the papers in this matter and that in my view they disclose a sufficient degree of urgency to justify this matter being enrolled as set out in the Notice of Motion.

DATED at CAPE TOWN on this $/0$ day of SEPTEMBER 2018.

_____

M. FITZGERALD SC

**IN THE HIGH COURT OF SOUTH AFRICA**

**KWAZULU-NATAL LOCAL DIVISION, DURBAN**

(Exercising its admiralty jurisdiction)

**CASE NO: A50/2018**

**NAME OF SHIP: VLCC "ADVANTAGE SKY"**

In the matter between:

| | |
|---|---|
| **ADVANTAGE SKY SHIPPING LLC** | First Applicant |
| **VLCC "ADVANTAGE SKY"** | Second Applicant |

and

| | |
|---|---|
| **ICON AMAZING, LLC** | First Respondent |
| **ICON FANTASTIC, LLC** | Second Respondent |
| **ICON OCTAVIAN CENTER, LLC** | Third Respondent |

*In the application to set aside the order of this Court granted on 30 August 2018 under Case No.: A50/2018, pursuant to which the Second Applicant was arrested in terms of Section 5(3) of the Admiralty Jurisdiction Regulation Act, 105 of 1983*

---

## NOTICE OF MOTION

---

TO:     THE REGISTRAR OF THE ABOVE HONOURABLE COURT
        DURBAN

AND

TO:     **EDWARD NATHAN SONNENBERGS INC.**
        Respondents' Attorneys
        Suite 2302, 23rd Floor
        Durban Bay House

**2**

333 Anton Lembede Street
Durban
Tel:    +27 82 787 9492
Email:  tnorton@ensafrica.com
        kpitman@ensafrica.com
Ref:    Kate Pitman / Tony Norton

**TAKE NOTICE** that at **09h30** on _____ **2018**, or as soon thereafter as the matter may be heard, the Applicants shall make application to this Honourable Court for an order in the following terms:

1.      That the matter be heard as a matter of urgency in terms of Rule 6(12).

2.      That, in the event that the Respondents oppose this application, they are ordered to file their answering affidavit/s in the application to set aside the arrest and for further ancillary relief, by 19 September 2018.

3.      That the Applicants are directed to file their replying affidavit/s, if any, by 28 September 2018.

4.      That in the event that the Respondents fail to file their answering affidavit/s by 19 September 2018, the Applicants may apply to this Honourable Court on the same papers, supplemented where necessary, for an order dismissing the Respondents' opposition to the application to set aside the arrest and for certain ancillary relief.

5.      That the Respondents shall pay the costs of this application on the attorney and client scale.

6.      Further and/or alternative relief.

**TAKE NOTICE FURTHER** that the founding affidavit of **ANDREW CRAIG CLARK** annexed hereto, will be used in support of this application.

3

**KINDLY PLACE THE MATTER ON THE ROLL FOR HEARING ACCORDINGLY.**

DATED at DURBAN on this 10th day of SEPTEMBER 2018.

_____
APPLICANTS' ATTORNEYS

**COX YEATS**
Applicants' Attorneys
21 Richefond Circle
Ridgeside Office Park
Umhlanga Ridge, DURBAN
Ref:    A Clark/T Simpson/ts/09 A179 001
Email:  aclark@coxyeats.co.za/tsimpson@coxyeats.co.za
Tel:    082 924 3948

1357418



**IN THE HIGH COURT OF SOUTH AFRICA**

**KWAZULU - NATAL LOCAL DIVISION, DURBAN**

(Exercising its admiralty jurisdiction)

**CASE NO: A50/2018**

**NAME OF SHIP: VLCC "ADVANTAGE SKY"**

In the matter between:

| | |
|---|---|
| **ADVANTAGE SKY SHIPPING LLC** | First Applicant |
| **VLCC "ADVANTAGE SKY"** | Second Applicant |

and

| | |
|---|---|
| **ICON AMAZING, LLC** | First Respondent |
| **ICON FANTASTIC, LLC** | Second Respondent |
| **ICON OCTAVIAN CENTER, LLC** | Third Respondent |

*In the application to set aside the order of this Court granted on 30 August 2018 under Case No.: A50/2018, pursuant to which the Second Applicant was arrested in terms of Section 5(3) of the Admiralty Jurisdiction Regulation Act, 105 of 1983*

---

**FOUNDING AFFIDAVIT**

---

I, the undersigned,

**ANDREW CRAIG CLARK**



do hereby make oath and say that:

1.

I am an attorney of this Honourable Court and practise as such as a partner of Cox Yeats at 21 Richefond Circle, Ridgeside Office Park, Umhlanga Ridge, Durban, KwaZulu-Natal.

2.

Cox Yeats are the attorneys of record for the Applicants in South Africa.

3.

I am authorised to institute this application and to depose to this affidavit on behalf of the Applicants.

4.

The facts contained herein are, save where the context indicates to the contrary, within my personal knowledge and belief and are true and correct.

5.

Those facts not within my personal knowledge have been conveyed to me through correspondence and communication with:

5.1     Mr Michael Posemann, an attorney and consultant at Cox Yeats, who has been working together with me in regard to this matter;



5.2     Mr Michael Lax, a solicitor qualified in England and Wales and a partner in the firm Lax & Co of 78 Cornhill, London, United Kingdom.

6.

I am informed by Mr Michael Lax that he has received information directly from Mr Ali Tugrul Tokgöz who is a minority shareholder in Forward Holdings LLC ("Forward Holdings"), the ultimate holding company in Advantage Sky Shipping LLC ("Advantage Sky Shipping") and who is also a director of Advantage Tankers LLC ("Advantage Tankers") (and who is ergo a director of Advantage Sky Shipping), as well as Forward Holdings.

7.

Confirmatory statements of Mr Tokgöz and Ms Gulsun Nazli Karamehmet-Williams are annexed marked "**AC1(a)**" and "**AC1(b)**" respectively. Confirmatory affidavits of Mr Tokgöz and Ms Williams will be filed in due course, confirming the contents of this affidavit as well as their respective statements. The Applicants have approached the matter in this manner in view of the urgency of the matter and as Ms Williams is currently on holiday abroad and it has therefore not been possible for her to sign a confirmatory affidavit at the time of commissioning of this founding affidavit.

8.

In regard to the facts that have been conveyed to me, I verily believe such facts to be true and correct.




**The Parties**

9.

The First Applicant is **Advantage Sky Shipping LLC**, a company duly incorporated and registered in accordance with the company laws of Marshall Islands which has its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands and its principal place of business is Yapi Kredi Plaza A Blok K 12 34330 Levent, Istanbul, Turkey. The First Applicant is the registered owner of the Second Applicant.

10.

The Second Applicant is the **VLCC "Advantage Sky"**.  The Second Applicant is presently under arrest at the anchorage off the port of Durban.

11.

The First Respondent is **ICON Amazing, LLC**, a company duly incorporated and registered in accordance with the company laws of the Marshall Islands and which has its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands and its place of business care of ICON Capital Corporation CC, 3 Park Avenue, 36th Floor, New York, New York, United States of America.

12.

The Second Respondent is **ICON Fantastic, LLC**, a company duly incorporated and registered in accordance with the company laws of the Marshall Islands and which has its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands and its place of business care of ICON




Capital Corporation CC, 3 Park Avenue, 36th Floor, New York, New York, United States of America.

13.

The Third Respondent is **ICON Octavian Center**, LLC, a company duly incorporated and registered in accordance with the company laws of the Marshall Islands and which has its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands and its place of business care of ICON Capital Corporation CC, 3 Park Avenue, 36th Floor, New York, New York, United States of America.

14.

In this application, and for ease of reference, I shall refer to the parties as follows:

14.1    the First Applicant as "Advantage Sky Shipping";

14.2    the Second Applicant as "*Advantage Sky*";

14.3    the First Respondent as "ICON Amazing";

14.4    the Second Respondent as "ICON Fantastic; and

14.5    the Third Respondent as "ICON Octavian".

15.

Where appropriate, I shall refer to Advantage Sky Shipping and *Advantage Sky* collectively as "the Applicants" and ICON Amazing, ICON Fantastic and ICON Octavian as "the Respondents".

 

**9**

**Nature of this Application**

16.

This is an urgent application to set aside the arrest of the *Advantage Sky*.

17.

On 30 August 2018, pursuant to one *ex parte* application, this Honourable Court granted three orders for the arrest of the *Advantage Sky* under case number A50/2018.  Copies of the arrest orders are annexed marked "**AC1**", "**AC2**" and "**AC3**" respectively.

18.

The arrest orders were granted in terms of section 5(3) of the Admiralty Jurisdiction Regulation Act, 105 of 1983 ("the Admiralty Act") and were for the purposes of providing security as follows:

18.1    to ICON Amazing in the sum of USD27,376,822.73 for a claim which ICON Amazing has brought against Amazing Shipping Limited by way of proceedings before the High Court of Justice, Business and Property Court of England and Wales, Commercial Court;

18.2    to ICON Fantastic in the sum of USD27,794,899.55 for a claim which ICON Fantastic has brought against Fantastic Shipping Limited by way of proceedings before the High Court of Justice, Business and Property Court of England and Wales, Commercial Court; and

18.3    to ICON Octavian in the sum of USD19,873,572.25 for a claim which ICON Octavian has brought against Center Navigation Limited by way of



proceedings before the Supreme Court of the State of New York, County of New York.

19.

In each instance, the alleged claim pursued in the foreign proceedings is described in the orders as:

"*for amounts owing and damages for breaches of the bareboat charterparty by Amazing Shipping Limited [Fantastic Shipping Limited] [Center Navigation Limited] as bareboat charterer.*"

20.

Paragraphs 3 and 4 of the Court Orders are identical and provide as follows:

"*3.   THAT the Respondent be in is hereby granted leave to apply for this order and any arrest effected in terms hereof to be set aside.*

*4.   THAT any such application or application for reduction in the quantum of the security provided brought after security has been furnished to the First [Second] [Third] Applicant for the release of the vessel from arrest shall, together with the affidavits founding such application, be filed at Court and served on the First [Second] [Third] Applicant's attorneys within one calendar month of the arrest of the Respondent or within such extended period as this Court may on good cause shown allow.*"

21.

This application to set aside the arrest of the *Advantage Sky* is brought in terms



of paragraph 3 of the Court Orders.

## **Grounds for Setting Aside the Arrest**

### 22.

It is settled law[1] that for a party to succeed in an application for an arrest of a vessel in terms of section 5(3) of the Admiralty Act, the following must be established:

22.1    that such party has a claim enforceable by an action *in personam* against the owner of the property concerned or an action *in rem* against such property, or against a ship which is an associated ship of the ship concerned;

22.2    that it has a *prima facie* case in respect of such claim which is *prima facie* enforceable in the nominated *forum*, or *fora*; and

22.3    that it has a genuine and reasonable need for security on the ordinary standard of proof, namely, on a balance of probabilities.

### 23.

The arrest of the *Advantage Sky* falls to be set aside on the following discrete grounds, each of which, on its own, constitutes a ground upon which to set aside the arrest.  These grounds are the following:

---

[1] *Cargo laden and lately laden on board the MV Thalassini AVGI v MV Dimitris* [1989] 2 All SA 436 (A) and *Imperial Marine Company v MV Pasquale Della Gatta & another; Imperial Marine Company v MV Filippo Lembo & another* [2011] JOL 27769 (SCA).



23.1    when moving their *ex parte* application to arrest the *Advantage Sky*, ICON Amazing, ICON Fantastic and ICON Center failed to make full and frank disclosure of all material facts relevant to the grant of the Orders and breached their *uberrima fides* obligations to this Honourable Court in doing so;

23.2    the underlying claims which ICON Amazing, ICON Fantastic and ICON Center seek to enforce in the foreign proceedings are not maritime claims as defined in section 1(1) of the Admiralty Act in that, at their core, they are claims for the enforcement of amounts allegedly due under loan financing agreements;

it follows that the purported reliance on the so-called charterparty claims are misleading and do not record the true nature of the underlying transaction.

23.3    moreover, the Respondents (Applicants in the arrest application) have not discharged the onus that rests upon them to establish that the *Advantage Sky* is an associated ship of the mv "Amazing", the mv "Fantastic" and the mt "Center" at the time of the arrest of the *Advantage Sky* in that:

(a)    the alleged charterparties upon which the Respondents have based their arrest applications are simulated documents, not reflecting the true underlying nature of the transaction between the parties, with the result that the factual basis upon which the Respondents seek to rely for the deeming provision in section 3(7)(c) of the Admiralty Act to operate, does not exist; and

(b)    on the facts, as opposed to inuendo, speculation and assumptions, there is no evidence to support the Respondents' contention that ultimate control of Advantage Sky Shipping, and



hence *Advantage Sky*, rests in the hands of Mehmet Emin Karamehmet ("MEK").

**Introduction**

24.

The contents of this affidavit are premised to some degree upon facts which are common cause save to the extent that there has a been a non-disclosure of certain facts which may have led the court to a different assessment of the probabilities of association between the vessel and the mv "Amazing", mv "Fantastic" or the mt "Center".

25.

For this reason, I do not consider it necessary to deal seriatim with each allegation contained in the affidavit of Ms Pitman filed of record in the arrest application. Furthermore, this affidavit is in the form of a supporting affidavit in this application, it is not an answering affidavit to Ms Pitman's affidavit. To the extent that the facts are not common cause or additional facts should have been put before the court, I have made reference to the particular paragraphs of Ms Pitman's affidavit where the Respondent's version of the facts, or conclusion arrived therefrom, are incorrect and disputed.

26.

I do, however, deny that the contents of Ms Pitman's affidavit are in all respects true and correct.





27.

Moreover, to the extent that the contents of Ms Pitman's affidavit are inconsistent with the contents of this affidavit, they must be deemed to be denied.

28.

I deny, moreover, that the affidavit of Ms Pitman establishes a legal and/or factual basis for the arrest of the *Advantage Sky* and deny, in particular, that Respondents have established the requirements for a section 5(3) arrest of the vessel on the basis that it has failed to establish a *prima facie* maritime claim and moreover, that it has not, on a balance of probabilities established any association between the *Advantage Sky,* on the one hand, and the mv "Amazing", mv "Fantastic" or the mt "Center" on the other.

**Background Facts and Context**

29.

During or about June 2013, a vessel by the name of the mv "Hero" was arrested in Houston, Texas.   Those proceedings involved ICON Amazing, Amazing Shipping Ltd and Geden Holdings Ltd ("Geden Holdings").  The proceedings were in the United States District Court for the Southern District of Texas, Houston Division, in Civil Action number:  H-13-1449.

30.

I annex the following in regard to those proceedings:

30.1     marked "**AC4**", a copy of the Court Order dated 18 June 2013;




30.2     marked "**AC5**" a copy of the judgment of that court referred to as a "*Memorandum Opinion*";

30.3     marked "**AC6**", a copy of the final judgment of that court.

31.

For ease of reference, I shall refer to the above as the "*Hero Judgment*".

32.

As will become apparent from what is set out below, the *Hero Judgment* is relevant to a number of issues relating to the arrest of the *Advantage Sky*. Whilst appreciating that the *Hero Judgment* itself is not *per se* evidence of the facts referred to therein, to the extent that those representing Advantage Sky Shipping have been able to obtain source documentary evidence referred to in the *Hero Judgment*, it is apparent that such documentary evidence is consistent with how it has been summarised in the *Hero Judgment*.

33.

Furthermore, whilst the *Hero Judgment* itself relates to only one of the vessels against which the Respondents' alleged claims lie, documents sourced by those representing Advantage Sky Shipping reveal that what occurred in regard to the mv "Amazing" equally occurred in regard to the mv "Fantastic" and mt "Center".

34.

The history of this matter accordingly dates back to 2007 when the three vessels were purchased by Amazing Shipping Ltd, Fantastic Shipping Ltd and Center Navigation Ltd, respectively. DVB Bank had provided financing in respect of the





construction costs of the vessels. My understanding is that Geden Holdings experienced financial difficulties such that, the owning companies needed to refinance the vessels in order to pay off what was owed to DVB Bank, failing which they would lose the vessels. This led to discussions taking place between Geden Holdings and ICON Capital Corporation ("ICON Capital" or "ICON", interchangeably).

35.

I annex marked "**AC7**", a letter from ICON Capital to Geden Holdings.  In that letter, ICON describes itself as:

> "... the third largest independent equipment leasing and financing company in the United States according to the 2009 Monitor 100 Report, and the largest privately-held independent equipment leasing and finance company in the United States."

and further:

> "ICON provides business with an array of speciality finance solutions that range from traditional leasing of equipment types such as construction, furniture, fixtures and equipment, information technology, manufacturing, marine, materials handling, medical, rolling stock and telecom to highly structured financial products for unusual types and emerging companies. ... While its funds have a diversified investment strategy, ICON has a particular specialty in maritime and offshore assets."

36.

ICON is therefore an equipment leasing and financing company.  It does not operate any ships or fleets of ships.





**Commercial Structure of Transaction**

37.

The ICON letter dated 28 July 2010 summarises the commercial structure of the transaction.  In summary, this was the following:

37.1    the transaction involved the purchase of one Supramax bulk carrier and subsequent bareboat charter back to Geden Holdings or a wholly-owned subsidiary thereof;

37.2    the vessel consisted of one 57,000 DWT (deadweight) bulk carrier built at COSCO Zhoushan Shipyard, China;

37.3    the purchase price was USD30 million;

37.4    the purchaser would be a special purpose subsidiary owned by one or more funds managed by ICON Capital;

37.5    the seller would be Geden Holdings or a wholly owned subsidiary thereof;

37.6    the charterer would be Geden Holdings or a wholly-owned subsidiary thereof;

37.7    Geden Holdings would guarantee all obligations of the seller and the charterer;

37.8    the purchaser would agree to charter the vessel to the charterer and the seller agreed to cause the charterer to charter the vessel from the purchaser for a period of seven years commencing on the closing date, 1 October 2010;



37.9    a "charter hire" rate of USD12,700.00 per day would apply under the charterparty;

37.10   the charterer would have an option to purchase the vessel as is, where is, on certain anniversary dates of the closing date;

37.11   upon expiry of the charter terms, the charterer would be obliged to purchase the vessel as is, where is, for USD21,150.00;

37.12   if the fair market value of the vessel fell below 125% of the purchaser's non-recourse finance during years one and two of the charter term or 130% thereof, the charterer would have to provide additional security or make an additional charter hire payment within thirty days in order to satisfy the relevant ratio; and

37.13   in the event that an additional charter hire payment was made, the purchase option and purchase obligation amounts would be reduced by the amount of such additional charter hire payment.

37.14   the letter that is annexed marked "**AC7**" relates to the transaction in respect of the mv "Amazing". The transactions in respect of the mv "Amazing" and mt "Center" were contracted upon similar terms.

38.

This is commonly known as a "sale-leaseback-sale" arrangement. In truth, as will become apparent in what is set out below, it is nothing more than an arrangement in terms of which a financier, in return for obtaining ownership in the financed property (i.e. the vessel) as security, advances funding to the purchaser of such property. Importantly, the monthly instalment payments due by the purchaser are

nothing more than instalment payments under the loan and finance agreement and do not equate to market-related hire in the context of a charterparty.

39.

Pursuant to the ICON letter dated 28 July 2010, the following documents were executed in respect of each of the three vessels:

39.1    a Memorandum of Agreement ("MOA");

39.2    Rider Clauses to the MOA ("Rider Clauses");

39.3    a Guarantee and indemnity from Geden Holdings ("Geden Guarantee");

39.4    a Protocol of Delivery and Acceptance ("PDA"); and

39.5    a bill of sale ("bill of sale").

40.

For ease of reference and for purposes of a proper analysis of the commercial nature of the transaction, I have annexed the relevant documents referred to above in regard to the sale of the mv "Amazing".

41.

The MOA in respect of the mv "Amazing" is annexed marked "**AC8(a)**" and "**AC8(b)**" respectively.  The documents are identical, save that the first version is signed for and on behalf of the sellers, Amazing Shipping and the second version is signed on behalf of the buyers, ICON Amazing.



42.

The Rider Clauses are annexed marked "**AC9(a)**" and "**AC9(b)**", respectively. These documents are likewise identical, save that the former has been signed by the sellers and the latter by the buyers.

43.

Clause 17 of the Rider Clauses provides:

> "*The Buyers (as owners) and the Sellers (as charterers) have entered into a bareboat charterparty (the "**Charter**") of even date herewith pursuant to which the Buyers have agreed to charter the Vessel to the Sellers on the terms and conditions contained in the Charter. On delivery of the Vessel to the Buyers under this Agreement, the Vessel shall be simultaneously delivered by the Buyers to the Sellers under the Charter.*"

44.

I annex marked "**AC10(a)**" a copy of the bareboat charter between ICON Amazing, as owners, and Amazing Shipping, as bareboat charterers, dated 29 September 2010. For ease of reference, I shall refer to this document as the "Amazing Bareboat Charter".

45.

I annex marked "**AC10(b)**", the Rider Clauses to the Amazing Bareboat Charter. For ease of reference, I shall refer to this document as the "Amazing Bareboat Rider Clauses".

46.

I annex marked Annexure "**AC10(c)**", the Bill of Sale evidencing acknowledgement by Amazing Shipping of the transfer of 100% of the shares of the vessel in mv "Amazing" and in her boats and her appurtenances, to ICON Amazing.

47.

It is apparent from a perusal of the Amazing Bareboat Charter that a number of the standard "Barecon 2001" clauses were deleted and replaced with an extensive number of additional provisions contained in the Amazing Bareboat Rider Clauses. Furthermore, in terms of the Amazing Bareboat Rider Clauses:

47.1 if the "Fair Market Value", defined in clause 60.1.26 fell below the "Permitted LTV", defined in clause 60.1.54, the charterers, Amazing Shipping, would have an option to provide additional security to the owners, ICON Shipping or to pay additional charter hire within thirty days of the breach of the "Permitted LTV" sufficient to satisfy the "Permitted LTV" (clause 40(c));

47.2 Amazing Shipping would have options to purchase the mv "Amazing" on the anniversary dates of the delivery date (clause 50);

47.3 Upon expiry of the charter period and provided that Amazing Shipping had not exercised the purchase option, Amazing Shipping were obliged to purchase the vessel for a price of USD21,5 million (clause 51).

48.

Having regard to these provisions, the Houston Court found as follows in the *Hero*




*Judgment:*

> "*Documents submitted for the Court's consideration show that from the start, the transaction was regarded as a vessel sale / financing, not as a conventional maritime charter. ICON repeatedly referred to its transaction with Defendants as a 'secured financing', and stressed that the transaction is not a bareboat charter, but a vessel sale / financing.*"[2]

49.

In analysing the documents and evidence before it, the Houston Court attached weight to the following evidence:

49.1    written communication from ICON's managing director, head of Shipping & Offshore, Tobias Backer, and his characterisation of the transaction and the role of ICON therein;

49.2    ICON's own amortisation schedule, which set out that the monthly payments due under the Amazing Bareboat were in fact repayments of capital and interest under the loan agreement and did not constitute market related "charter hire" as that term is understood in the maritime industry;

49.3    the Loan-to-Value clause (the "LTV" clause), relating to the residual value of the vessel which, the court found, placed the risk of loss of the vessel value on Amazing Shipping and was consistent with Amazing Shipping becoming the ultimate owner of the vessel; and

49.4    the obligation on Amazing Shipping to purchase the vessel for a "balloon payment" of USD21,5 million at the end of the period.

---

[2] *Hero Judgment*, paragraph 5 (page 7).



50.

It is respectfully submitted that the Houston Court was entirely correct in its assessment of the facts in this regard.  I refer to the email communication set out below.

51.

I annex marked "**AC11**", a copy of an email from Tobias Backer to Mehmet Mat dated 1 May 2013 (23:44) in which he says the following:

> "*We have evaluated your proposal and believe that there must be a misunderstanding.  ICON's financings of the Center, Amazing & Fantastic* **are secured financings, not time charter arrangements.**  *As such, any restructuring proposal would have to* **reflect the legal structure of the contracts supporting the financing.**"

(emphasis added)

52.

This appears to be the email communication referred to in footnote 23 on page 9 of the *Hero Judgment*.  Whilst that email is said to be dated 2 May 2013, it would appear from an email string, annexed marked "**AC12**", that it is reflected in such string as having been sent on 2 May 2013 at 00:44. What appears to have happened is that the email was in fact sent on 1 May 2013 shortly before midnight.

53.

I annex marked "**AC13(a)**" an email from Tobias Backer to Mehmet Mat dated 28




May 2013 (16h00) in which the following is stated:

> "*Our agenda is very transparent and has been consistently communicated to you and to Alix Partners. We do not expect any special treatment, but rather to be treated the same as the* **other secured lenders** *to Geden.*"

(emphasis added)

### 54.

It is apparent that this is the email referred to in footnote 22 on page 9 of the *Hero Judgment*.

### 55.

I annex marked "**AC13(b)**", an email from Tobias Backer to Mehmet Mat dated 19 April 2013 (23h59), in which the following is stated:

> "*I just thought about one thing you mentioned on the phone when we just spoke. One cannot look upon our deals as* **conventional charters**. *The fact that ICON bought its vessel at a level which today looks high is irrelevant.*
>
> **From a legal perspective, a capital lease – such as our deals – is no different than a loan. As such your lease with us is in reality a senior / junior loan.** *This is the way ICON approached us from day one and it is a way it would be address* (sic) *in any kind of insolvency proceedings.* **As such, we are perplexed by why these deals would be dealt with differently than the loans.**"

(emphasis added)






56.

It is apparent that this is the email communication referred to in footnote 24 on page 9 of the *Hero Judgment*.

57.

Based on *inter alia* the abovementioned emails from Tobias Backer, the Houston Court went on to find as follows in the *Hero Judgment*:

> "*(17)  … The Court finds that the 'true objective' of the parties was the payment of a loan and the eventual sale of the Amazing to Amazing Shipping.*
>
> *…*
>
> *(19)  Based on the foregoing, and after analyzing the relevant agreements and other documents submitted by the parties, hearing the oral arguments of counsel, and having its questions answered by counsel for the parties, the Court finds that the Barecon 2001, including the day-rate charterhire contained therein, is not a conventional maritime charter party, but is instead one inseparable component of a larger non-maritime vessel sale / financing transaction.   The Court finds that the charter party cannot be severed from the overall vessel sale / financing transaction between the parties and is therefore non-maritime in nature.*"

and further:

> "*Lastly, the loan transaction was structured in such a way that ICON owns the title to the Amazing.  This was intentional.  Had ICON wanted to take a true maritime mortgage, it could have.  Rather, it chose to structure the*




*arrangement as a sale / lease-back / sale so that it would own the Amazing as collateral.*

*Having determined that the character of the putative 'charter party' was fixed from the outset as a sale contract and not as a conventional bareboat charter, the Court need proceed no further.  Because the transaction is a single, integrated vessel sale / financing agreement, it is a non-maritime contract and this Court lacks subject-matter jurisdiction."*

58.

Consistent with its finding that the true nature of the claim was a dispute based on the sale and financing of a ship, which is not a maritime claim under US law, the Houston Court, found that it lacked jurisdiction and it therefore uplifted the attachment of the mv "Hero" and it dismissed the complaint filed by ICON Amazing.

59.

The maritime claim issue under South African law is dealt with in more detail below.  The important point to note in regard to the *Hero Judgment* is that, having regard to the evidence before it, it determined that the true nature of the transaction was a sale contract and *not* a conventional bareboat charter.  It is submitted that this characterisation of the transaction is plainly correct.

60.

Furthermore, I annex the following documents that are relevant in this issue that do not appear to have been referred to by the Judge in the *Hero Judgment*.

60.1    an email from Sybille Andaur of ICON Investments to Mehmet Mat dated



26 December 2012 (23h54), marked "**AC14**";

60.2   a Discussion Term Sheet in respect of the mt "Center" dated 21 December 2012, marked "**AC15**";

60.3   a Discussion Term Sheet in respect of the mv "Amazing" and mv "Fantastic" dated 21 December 2012, marked "**AC16**";

61.

This email and the attached Discussion Term Sheets provide further evidence of the true nature of the transaction between ICON, Geden Holdings and the owning companies which are described as "*lenders*" and in respect of which purchase options were provided to the owning companies and a purchase obligation was included, consistent with the "*Existing Transaction*".

## Non-Disclosure of Material Facts

62.

The rule with regard to making proper disclosure of all material facts in an *ex parte* application is described in *Wisdom C*[3] with reference, *inter alia to Schlesinger v Schlesinger*[4] as follows:

62.1   in *ex parte* applications all material facts must be disclosed which *might* influence the Court in coming to a decision;

62.2   the non-disclosure or suppression of facts need not be wilful or *mala fide* to incur the penalty of rescission; and

---

[3] 2008 (3) SA 585 (SCA) at [17].
[4] 1979 (4) SA 342 W at 349A-B.



62.3    the court, apprised of the true facts, has a discretion to set aside the former order or to preserve it.

63.

In the *Rizcun Trader*[5], this is referred to as the "*uberrima fides* rule".  The rule was applied by this Honourable Court in the *Doxa*[6].

64.

In the founding affidavit of Ms Pitman furnished on behalf of the Respondents in support of their *ex parte* application for the arrest of the vessel, there is no proper disclosure of the following:

64.1    correspondence and other documents referred to above which refer to the true nature of the underlying transaction between ICON Capital and the owning companies of the mv "Amazing", mv "Fantastic" and mt "Center";

64.2    the *Hero Judgment* of the Houston Court.

65.

In paragraph 3 of her affidavit, Ms Pitman, in disclosing the source of her knowledge of facts deposed to in her affidavit, refers to:

"... and, as will be seen, much of it has been drawn from certain legal proceedings that have taken place in the United States of America in

---

[5] 2000 (3) SA 776 C at 794.
[6] *Qatar Steel Co Ltd & Another v mv "Doxa"* (2005) JOL 14984 (D).

*relation to the control of, inter alia, the respondent vessel."*

66.

This notwithstanding, the *Hero Judgment* of the Houston Court was not disclosed in the *ex parte* application papers.

67.

In regard to the nature of the transaction, the following appears in Ms Pitman's affidavit:

> "*10.    The Applicants are special purpose companies of the 'ICON' Group, incorporated for the purpose of acquiring new building vessels and chartering them on long-term bareboat charters which, as in this case, including provision for the ultimate acquisition of ownership of the vessels by the bareboat charterers.*
>
> *11.    The three bareboat charterers, Amazing Shipping Limited, Fantastic Shipping Limited and Center Navigation Ltd, were the special purpose companies of Mr Mehmet Emin Karamehmet ("MEK") incorporated for the purpose of taking the new building vessels on bareboat charter from the individual Applicants.  The obligations of the bareboat charterers were further guaranteed by Geden Holdings, Ltd, the parent company of the bareboat charterers and a company also controlled by MEK."*

68.

Respectfully, this does not properly disclose the true nature of the transaction nor




does it provide a proper context of the bareboat charters as part of the overall sale and financing transaction. The result is that the impression that is created is that this is a "usual" enforcement of claims under bareboat charters whereas, as can be seen from what is set out above, this was not the case on the version of Tobias Backer.

69.

It is submitted that in order to have met its obligations relating to the making of full and frank disclosure under the *uberrima fides* rule, the Respondents, at the very least, ought to have put up the *Hero Judgment*, provided a proper explanation of the nature of the transaction and explained to the Judge hearing the *ex parte* application why, on the Respondents' version, they were nevertheless entitled to orders for the arrest of the *Advantage Sky* under section 5(3) of the Admiralty Act.

70.

In this respect, it is important to bear in mind the *dicta* of Didcott J in *the Paz*[7]:

> "*It is a serious business to attach a ship. To stop or delay its departure from one of our ports, to interrupt its voyage for longer than the period was due to remain, can have and usually has consequences which are commercially damaging to its owner or charterer, not to mention those who are relying upon its arrival at other ports to load or discharge cargo. Especially when the attachment is sought ex parte, as can be and almost always is done, the court must therefore be given sufficient information to show that a measure which results so harmful to others is nevertheless necessary for the protection of the applicant's legitimate interests.*"

---

[7] *Katagum Wholesale Commodities Co Ltd v mv "Paz"* 1984 (3) 261 (N) at 269.




71.

These *dicta* were endorsed by Corbett CJ in the Appellate Division, as it then was, in *Bocimar*[8].

72.

The *Advantage Sky* is presently on time charter to Shell Western Supply and Trading ("Shell Western").  The daily hire rate is USD17,500.00.  With effect from the arrest of the *Advantage Sky* on 30 August 2018, the vessel has been, and continues to be, off hire and Advantage Sky Shipping is losing this revenue.

73.

Moreover, having regard to the quantum of the claims asserted by the Respondents in the arrest application papers and the value of the *Advantage Sky*, it is not practicable for Advantage Sky Shipping to procure the release of the vessel from arrest through the provision of security.  The arrest of the *Advantage Sky* by the Respondents has already had, and will continue to have, extremely prejudicial commercial consequences for Advantage Sky Shipping.

74.

It is submitted that the arrest falls to be set aside on the grounds of a material non-disclosure by the Respondents in their *ex parte* application for the arrest orders.

**No Maritime Claim**

75.

---

[8] *Bocimar NV v Kotor Overseas Shipping Ltd* 1994 (2) SA 563 (a) at 581.




In paragraph 14 of Ms Pitman's founding affidavit, she states that the Respondents rely upon paragraph (j) of the definition of "maritime claim" in section 1(1) of the Admiralty Act which provides:

> "*Any charter party or the use, hire, employment or operation of a ship, whether such claim arises out of any agreement or otherwise*'"

76.

Having regard to what is set out above, it is submitted that the true nature of the transaction was a financing agreement in respect of the sale of the vessels.  For the reasons set out above, these were not conventional charterparties and the rates of hire had nothing to do with market related rates but were a reflection of the repayment of capital and interest instalments under loan agreements.

77.

In the premises, it is submitted that, properly understood, the Respondents' claims are not claims for outstanding hire or damages under the so-called charterparties but are rather for alleged unpaid amounts under loan agreements. The Respondents elected not to secure their positions as financiers by way of mortgages over the vessels.  In the premises, the Respondents cannot rely upon paragraph (d) of section 1(1) of the Admiralty Act to assert a maritime claim.

78.

It is submitted that the Respondents find themselves in the same position as the arresting parties in the *El Shaddai*[9] in which, Lopes J, commented as follows:

---

[9] *Oxacelay and Another v El Shaddai and Others* 2015 (3) SA 55 (KZD).





> *"(15)  … There is no need, nor should there be any desire to extend admiralty jurisdiction to matters which have what the learned author refers to as 'no meaningful maritime connection', and by which I understand him to mean the extension of admiralty jurisdiction to matters which can otherwise easily be dealt with within the usual jurisdiction of the High Court."*

and further:

> *"(18)  The question which must ultimately be considered is whether the claim is such that its relationship with 'marine or maritime' matters is sufficiently close that it is necessary for it to be heard as a maritime claim in this court.*
>
> *…*
>
> *(25)  The nature of the agreement between the parties was a loan and its purpose was to finance a company.  The nature and purpose are not altered by the fact that the company was to repay the loan out of the proceeds of its fishing operations.  As the underlying loan would not constitute a 'maritime claim' in terms of the Act, the applicant cannot rely upon the judgment of the Montevideo court to establish a claim in terms of sub-s 1(1)(aa) or sub-s 1(1)(ee) of the Act.  In my view it would be both unnecessary and undesirable to extend the jurisdiction of the Admiralty Court to include loans of this nature as maritime claims."*

79.

It is submitted that having regard to the true nature of the Respondents' claims, these are claims arising out of a loan agreement and that the loan is not sufficiently closely connected to the vessels to constitute maritime claims.




**34**

80.

Finally, in this regard, given the failure of Ms Pitman to have disclosed the true basis of the alleged claim of the Respondents, it should not now be open to the Respondents to rely on any other maritime claim in terms of the Admiralty Act.

81.

More particularly, by failing to disclose the true nature of the underlying transaction, and the finding of the Houston Court in regard thereto in the *Hero Judgment*, ICON effectively misled this Honourable Court and it must stand or fall by the election it made.

## Association Not Established

82.

The Respondents' case on association fails at two levels, namely:

82.1    it is not possible for the Respondents to rely upon the deeming provision contained in section 3(7)(c) of the Admiralty Act as the charterparties are simulated and do not constitute *bona fide* and conventional charterparties;

82.2    the factual position with regard to the ultimate control of the *Advantage Sky* makes it clear that MEK is not ultimately in control of its owning company, Advantage Sky Shipping.

## Deeming Provision Does Not Operate




83.

The Respondents' case on association commences at paragraph 132 of Ms Pitman's founding affidavit through to paragraph 201 thereof.  It is apparent from paragraph 133 of Ms Pitman's affidavit that the Respondent relies on the deeming provision contained in section 3(7)(c) of the Admiralty Act.  Indeed, this is the "first leg" of the Respondents' case on association.

84.

Section 3(7)(c) of the Admiralty Act provides:

> "*If at any time a ship was the subject of a charter-party the charterer or sub-charterer, as the case may be, shall for the purposes of subsection (6) and this subsection be deemed to be the owner of the ship concerned in respect of any relevant maritime claim for which the charterer or the sub-charterer, and not the owner, is alleged  to be liable.*"

85.

The reference to sub-section (6) is a reference to the provision that entitles a party to enforce an action *in rem* against an associated ship instead of the ship in respect of which the maritime claim arose.

86.

It is submitted that upon a proper construction of section 3(7)(c) of the Admiralty Act it is necessary, jurisdictionally, to establish that there is in existence a valid and enforceable charterparty giving rise to a legally enforceable *in personam* claim against the charterer.



87.

As can be seen from the evidence referred to above, in particular, the emails from Tobias Backer who, it should be remembered, served as the managing director, head of Shipping & Offshore, for ICON Capital and whose advertised area of expertise was vessel finance, the nature of the financing was:

> "... *secured financings, not time charter arrangements.*"[10]

88.

As pointed out in the *Hero Judgment* of the Houston Court, ICON Capital repeatedly referred to its transaction with the Respondents as "secured financing" and stressed that the transaction was not a bareboat charter but was a vessel sale and financing arrangement.

89.

In the premises, it is submitted that the jurisdictional fact necessary for the Respondents to rely upon the deeming provision under section 3(7)(c) of the Admiralty Act, namely a valid and legally enforceable charterparty in each instance, does not exist and that, on this ground alone, the Respondents have failed to establish association.

90.

Again, given its failure properly to describe the true nature of the underlying transaction, ICON cannot benefit from its own default and seek to rely on section 3(7)(c) of the Admiralty Act.

---

[10] Annexure "**AC11**".

**Evidence of Association**

91.

It is settled law that the Respondents bear the onus to establish that at the time of the arrest of the *Advantage Sky*, it was, on a balance of probabilities, an associated ship of the mv "Amazing", mv "Fantastic" and mt "Center", in accordance with the provisions of sections 3(6) and (7) of the Admiralty Act[11].

92.

The Respondents' case on association is set out in paragraphs 132 to 201 of Ms Pitman's founding affidavit. Distilling the Respondents' argument in this regard, it may be summarised as follows:

92.1    at the time that the Respondents' *in personam* claims arose against Amazing Shipping, Fantastic Shipping and Center Navigation, respectively, these companies were ultimately controlled by MEK, through Buselten Finance S.A. (Buselten Finance) and Geden Holdings; and

92.2    at the time of the arrest of the *Advantage Sky*, Advantage Sky Shipping was ultimately controlled by MEK.

93.

The Applicants do not make any admissions in regard to either the nature or the timing of the Respondents' alleged claims. This issue has already been dealt with

---

[11] *Golden Sea Bird Incorporated vs Alam Tengirri SDN BHD and Another,* Case No. 2001(4) SA 1329 (SCA) and *MV Silver Star; Owners of the MV Silver Star v Hilane Ltd* 2015 (2) SA 331 (SCA).






at length in this affidavit.

94.

The Applicants do not dispute that between 2010 and 2016, MEK was the sole shareholder in Buselten Finance, which was in turn the majority shareholder of Geden Holdings.

95.

The Applicants however deny that either MEK or Buselten Finance or Geden Holdings has any shareholding, let alone a controlling interest, in Advantage Sky Shipping or any of its holding companies.

96.

In the premises, the Respondents have not discharged the onus that rests on them to establish association between the mv "Amazing", mv "Fantastic" and mt "Center" at the time of the alleged claims arising and the *Advantage Sky* at the time of the arrest, on a balance of probabilities. This is fatal to the arrest of the *Advantage Sky* by the Respondents.

97.

The Applicants propose to deal with this issue in the following two ways:

97.1    first, by showing that on the Respondents' own version, as set out in Ms Pitman's affidavit, there is simply no evidence to support the allegations that the Respondents have made in regard to association; there is only conjecture, speculation and innuendo based on flimsy grounds and unsupported supposition;




97.2    second, by highlighting that the documents relied upon by the
        Respondents in fact support the opposite contention, namely that the
        vessels are not associated, and by providing additional evidence on
        certain issues.

**The Respondents' Case**

99. [98.]

Annexed to Ms Pitman's affidavit, marked "CVP 37", is a diagram purportedly
representing the structure of the relationships involved. In paragraph 161, Ms
Pitman states:

> *"from the foregoing, it evident that many facts and allegations are either
> common cause or not capable of being disputed."*

99.

This is not an accurate contention in regard to what the diagram purports to
convey. In particular, the reference to "*daughter*" is presumably a reference to
MEK's daughter, Gulsun Nazli Karamehmet-Williams ("Ms Williams"). The line
drawn between MEK and Ms Williams suggests that MEK controls Ms Williams.
There is no evidence to show that this is the case and, as the judge in the case
of *Tank Punk, Inc v Spike Shipping, Ltd and Others* correctly held in the United
States District Court for the Southern District of Texas, which judgment was
annexed as "CVP 32" to Ms Pitman's affidavit:

> *"Tank Punk also makes much of the fact that Williams is Karamehmet's
> daughter and suggests that such a familial relationship, coupled with broad
> ownership references to the Karamehmet family in Geden Group
> Defendant documents, suggests either that Williams and Karamehmet*




*should be considered one and the same for purposes of this case, or that Karamehmet has control over Williams and the Advantage Defendants. There is, however, no evidence in the record that there is any financial unity between Karamehmet and Williams, no evidence in the record that Karamehmet exerted any influence or control over Williams with respect to her purchase of the 11 tankers, and no evidence that the Geden Group Defendants have dominion and control over the Advantage Defendants. The evidence is simply that Williams is extremely wealthy and was born wealthy. Williams' deposition at 61-63 (Document number 41-2 at 63-65). **Any argument that her father (Karamehmet) controls her, the funds she used to purchase those 11 tankers or any of the Advantage Defendants is nothing more than mere speculation."***

(emphasis added)

100.

For ease of reference, I shall refer to the above judgment as the "*Tank Punk*" judgment. The Respondents have not provided any evidence to suggest anything different to what is set out in the above judgment extract.

101.

In the premises, the suggestion that what is contained in the diagram at annexure "CVP 37" is "common cause or not capable of being disputed", is denied by the Applicants.

102.

In paragraph 173 of Ms Pitman's affidavit, it is suggested that the





recommendations contained in the "Project Hermitage Report"[12] dated 6 March 2013 were "substantially adopted and implemented". This suggestion is incorrect and is denied.

103.

The suggestion in paragraph 173.2 that Geden Holdings and Geden Lines "made arrangements for the rollover financing of the loans of Geden Holdings" is likewise incorrect and is denied. To the extent that this is a reference to Mr Tokgöz and Mr Mehmet Mat, it should be noted that neither of them held a controlling interest in either Geden Holdings or Geden Lines. Furthermore, neither of them hold a controlling interest in the Advantage Group.

104.

In paragraph 173.3 of her affidavit, Ms Pitman uses the word "sell" in inverted commas. To the extent that what is implied in that regard is that the sale of the 11 tankers from the Geden Group to the Advantage Group was not an arms-length transaction, this is denied. In this regard, I refer to the statement of Ms Williams dated 7 September 2018 fully explaining the circumstances in which the sale occurred and the involvement of Mr Tokgöz in regard thereto, given his knowledge and skill in shipping matters. This is clear evidence that the sales were genuine, arm's-length transactions at market-related prices.

105.

Furthermore, the Judge in the *Tank Punk* judgment, held as follows:

> *"in addition to this uncontroverted deposition testimony that Karamehmet did not control Williams' acquisition of the 11 tankers, there is documentary*

---

[12] P679 – 730, Volume 7, Item 39 – arrest application papers.





*evidence which shows that Williams, in 2015, **paid the fair market value for the 11 tankers that were purchased by the Advantage Defendants**, using USD200,000,000.00 and securing hundreds of millions more in loans."*

(emphasis added)

106.

To put the issue beyond any doubt, I annex marked "**AC17**" a copy of sight unseen valuations prepared for Geden Holdings by Clarkson Valuations Limited, an independent ship broking company based in London, in respect of the *Advantage Sky* (previously the mt "Blue") dated 2 June 2014. The valuation of the *Advantage Sky* is USD48,5 million which compares closely to the actual sale price in respect of the *Advantage Sky* of USD50,25 million, in 2015. A copy of the Bill of Sale is annexed marked "**AC18**".

107.

In paragraph 173.4 of Ms Pitman's affidavit, the reference to Geden Holdings and Geden Lines arranging "for the management of the 11 tanker vessels to continue being performed by Geden Lines under new five-year contracts" is incorrect and is denied. It is not disputed that Geden Lines (but **_not_** Geden Holdings) participated in the management of the 11 tanker vessels following their sale to the Advantage Group, but this was pursuant to a Ship Management Agreement with the Advantage Group. A copy of the Ship Management Agreement is annexed marked "**AC19**".

108.

Once again, neither Mr Tokgöz nor Mr Mat had any controlling interest in either





Geden Holdings or Geden Lines. As explained by Ms Williams in her accompanying statement, it was Mr Tokgöz who told her that if she was prepared to invest her own money in the purchase of the 11 tankers in question, Mr Tokgöz would be able to use his connections with Shell Western to fix long-term charters for the vessels. Mr Tokgöz explains that it was a requirement of Shell Western that Geden Lines remain on as managers of the 11 vessels.

109.

In the deposition of Mr Tokgöz given on 13 January 2016, annexed at pages 456 – 590 of the arrest application papers, the following exchange appears on page 99 of the deposition transcript (page 553 of the indexed papers):

> *"Q. This is a document that is a Ship Management Agreement, would you agree?*
>
> *A.  Yes.*
>
> *Q.  Which is between the owners of Advantage Arrow who are Advantage Arrow Shipping and the manager Genel Denizcilik AS. And would you agree that a similar agreement with the same manager has been signed on behalf of each owner of every vessel in the fleet of Advantage Tankers?*
>
> *A.  Correct.*
>
> *Q.  With the same manager?*
>
> *A. Correct.*
>
> *Q.  And you have signed on behalf of the owner?*






A.   Correct. The vessels after the change of ownership didn't change the management as per the agreement with Shell.

Q.   And I was just about to ask you that question and you just answered. You anticipated it. Before these vessels were sold to the Advantage Tankers fleet...

A.   Under the same management.

Q.   Under the same management while their sole shareholder was Geden Holdings?

A.   Correct, **it was a requirement by the charter of Shell that the management should be kept the same.**"

(emphasis added)

110.

In paragraph 173.5 of Ms Pitman's affidavit, the suggestion is that Geden Holdings "*made every attempt to 'ringfence' them* [the 11 tanker vessels] *from creditors.*" As is apparent from the accompanying statement of Ms Williams, this is not correct and it is denied. Once again, to the extent that this constitutes an insinuation by the Respondents that the sale of the 11 tankers from the Geden Group to the Advantage Group was anything other than a valid, arms-length transaction, at market-related prices, this is denied. The evidence demonstrates that the vessels owned by Geden Holdings were replaced by the cash amounts to the value of each vessel. It is thus incorrect to suggest that the sale of the vessels was an attempt to "ring-fence" the vessels or the equity which they represented.






111.

In paragraphs 174 and 175 of her affidavit, Ms Pitman makes reference to Future Holdings, Ltd ("Future Holdings"), it is important to note that Future Holdings is **not** part of the Advantage Group.

112.

It is true (but irrelevant, because of Future Holdings' lack of involvement in the Advantage Group) that Ms Williams held 75% of the shares in Future Holdings with Mr Tokgöz holding the remaining 25% of the shares. It is also true (but irrelevant) that Mr Tokgöz is a director of Future Holdings. But Future Holdings is not the sole shareholder, or indeed any shareholder, of Advantage Product Tankers LLC or any other Advantage Group company.

113.

As Ms Williams explains in her accompanying statement, it had at one stage been contemplated that Future Holdings would be part of the Advantage Group structure, together with a company controlled by a US hedge fund, Centerbridge. But when Centerbridge dropped out, prior to the acquisition of the 11 tankers from Geden Holdings, Future Holdings also dropped out and a new holding company, Forward Holdings, was incorporated as the holding company of the Advantage Group.

114.

In the premises, any references by the Respondents to Future Holdings are irrelevant to the issue of the alleged association of the vessels.

115.

In regard to paragraph 176 of Ms Pitman's affidavit, I set out below the ownership structure of Advantage Sky Shipping:

115.1   Mr Tokgöz holds 15% of the shares and Ms Williams holds 85% of the shares in Forward Holdings;

115.2   Forward Holdings holds 100% of the shares in Advantage Holdings;

115.3   Advantage Holdings holds 100% of the shares in Advantage Tankers and 100% of the shares in Advantage Product Carriers LLC ("Advantage Product Carriers"); and

115.4   Advantage Tankers holds 100% of the shares in Advantage Sky Shipping.

116.

I annex marked "**AC20**" – "**AC 23**" copies of the relevant certificates confirming this structure.

117.

It is clear that the ultimate control in Advantage Sky Shipping, and hence in the *Advantage Sky* rests with Ms Williams. MEK has <u>no interest at all</u> in any of the abovementioned entities, let alone a controlling interest.

118.

In paragraphs 178, 179 and 180 of her affidavit, Ms Pitman comments on an





alleged "re-restructuring" and "re-financing". There was no re-restructuring and re-financing: simply arm's-length sales of 11 tankers by Geden Holdings companies at market prices to the Advantage Group companies. The money for these purchases came in part from Ms Williams and in part from banks who took mortgages over the vessels in question. She also sets out part of the contentions of the Advantage Group. However, the reference in paragraph 180 to "on that basis" is incorrect. The factual position with regard to the ownership structure of Advantage Sky Shipping has been explained above, from which it is clear that MEK has no interest at all in any of the relevant companies.

119.

In paragraph 181 of her affidavit, there is an attempt by Ms Pitman to summarise the *Tank Punk* judgment. However, much information that is contained in the *Tank Punk* judgment that is relevant to disproving the association is not referred to. I deal with this in further detail below.

120.

In paragraph 182 of her affidavit, Ms Pitman suggests that "there are, however, a number of matters that belie the explanation given by the Advantage Group." These may conveniently be summarised as follows:

120.1   a declaration of one Ms Desponia Bacha of Psara Energy Ltd, made on 26 April 2018[13] in proceedings in the United States District Court for the Eastern District of Texas, Beaumont Division ("the *Psara Energy* proceedings");

120.2   suspicion (unsupported by evidence) that the payment of around USD200 million was not in fact made by Ms Williams from her own funds;

---

[13] Pages 750 – 764, Volume 8, Item 40, of the arrest application papers.

and

120.3   certain deposition evidence of one David Chapman of Shell Western taken on 30 November 2016[14], certain deposition evidence of Mr Tokgöz taken on 13 January 2016[15] and the Consent Letter of Geden Holdings dated 6 February 2015 annexed marked "AC24".

I deal with each of these issues in turn.

**Bacha Declaration**

121.

On any basis, the declaration of Ms Bacha needs to be treated with caution and considered in context. First, she is not an employee of any of the companies within the Advantage Group, or the Geden Group, and it is therefore unclear how she can have personal knowledge of the matters that she purportedly attests to.

122.

In any event, I submit that, absent a confirmatory affidavit by Ms Bacha in regard to her deposition statement, such statement does not constitute evidence and to that extent is inadmissible, notwithstanding the provisions of section 6(3) of the Admiralty Act.

123.

I point out that Ms Bacha was a witness in both the *Tank Punk* and the *Psara* matters and thus she has represented two companies which, like the

---

[14] Pages 671 – 677, Volume 7, Item 39, of the arrest application papers.
[15] Annexure "CVP 30" pages 454 – 590, Volume 5 and 6, Item 36, of the arrest application papers.



Respondents, is seeking to foist onto Advantage the liabilities of Geden Holdings.

124.

In paragraph 31 of Ms Bacha's declaration, she makes reference to "*substantial payments in and out of the bank accounts of Future Holdings Ltd*". Furthermore, she says:

> "*These bank transfers show that Future Holdings Ltd dealt with substantial funds at all times it was far from an inactive business entity, contrary to what Karamehmet-Williams testified to during her deposition.*"

125.

First, for reasons already explained, Future Holdings is not part of the Advantage Group and is irrelevant to the issue of association.

126.

Second and, in any event, as Ms Williams explains in her accompanying statement:

> "*It is claimed in paragraphs 195 to 197 of Ms Pitman's affidavit that these answers were "false" or "inaccurate" because bank records and other documents show money passing through the accounts of Future Holdings. However, this has nothing to do with Advantage.  Another, different, business that Future Holdings had been involved in since 2013 (i.e. some-time before Advantage was incorporated) was to manage a number of Product Carriers that had formerly been owned by the Geden Group but which, since 2013, had been acquired by two banks, DVB and Nord LB. The banks brought in Future Holdings in 2013 to manage these product*






*carriers and it was in the course of that management that monies (i.e. the vessel's earnings coming in and expenses going out) flowed through the bank account of Future Holdings. But that had nothing whatsoever to do with Advantage which is what I thought I was being asked about when describing Future Holdings (accurately, I believed) as being non-operative and having no assets.*"

127.

In the premises, any suggestion that the Bacha declaration discredits Ms Williams' deposition evidence is without any substance.

128.

In regard to paragraph 185 of Ms Pitman's affidavit, dealing first with paragraphs 37 and 38 of Ms Bacha's declaration, it is quite apparent that Ms Bacha's testimony is flawed when one considers that in paragraph 39 of her declaration she states the following:

"*Advantage Tankers LLC is a creature of Geden Holdings Ltd. It was put together by the management of Geden Holdings Ltd and Geden Lines to take over and operate the assets of the 11 crude oil tankers.*"

129.

Ms Pitman cites no evidence in support of this assertion and from the evidence set out in this affidavit and the accompanying statements of Mr Tokgöz and Ms Williams, it is quite clear that Geden Holdings and  Advantage Tankers are entirely separate entities, the only connection being that Mr Tokgöz and Mr Mat, neither of whom is suggested to have control over either entity, were employed by both of them.




130.

The second reference in paragraph 185 of Ms Pitman's affidavit is to paragraph 41 of Ms Bacha's declaration, the suggestion being that proof of payment in respect of the acquisition of the 11 vessels was not provided. That suggestion is inconsistent with the cross-examination of Ms Williams on 14 January 2016 from which it is apparent (see in particular pages 55 – 60 of the transcript annexed marked "**AC25**") that the bank statements evidencing payment by Ms Williams were in evidence at that time. The answers given then by Ms Williams are consistent with her current accompanying statement and the attached bank statements. The sum of USD195,350,000.00 (one hundred and ninety-five million, three hundred and fifty thousand United States Dollars), was in fact paid by Ms Williams from her own funds in her personal capacity, consistent with her deposition testimony.

131.

It is wrong therefore to suggest that Ms Williams or the Advantage Group was "unwilling or unable to respond" (paragraph 185 of Ms Pitman's affidavit) and as for *subsequent* requests for information and documents (referred to in "Exhibit P"[16] to paragraph 41 of the Bacha Declaration), no court order had been made for their production, or breached, by the time that matter was settled.

132.

I would also point out that Ms Pitman's reliance on the Bacha Declaration is in parts confused and confusing because the Bacha Declaration does not confine itself to the 11 tankers acquired by the Advantage Group from Geden Holdings in the first half of 2015, but also refers to 7 product carriers which had been acquired

---

[16] Page 874 – 883, Volume 9, Item 41, of the arrest application papers.




by certain banks from Geden Holdings in mid-2013 some time before the Advantage Group had even been incorporated, in December 2014.

133.

It must be understood that the transaction relating to the acquisition by the Advantage Group of 11 tankers in 2015 was a different and unrelated transaction to that in which certain banks acquired 7 product carriers from Geden Holdings in mid-2013. The latter transaction has nothing whatsoever to do with the Advantage Group.

134.

Those 7 product carriers were managed by Future Holdings in 2013 for the owning banks. Thus, the "vessels" referred to in paragraphs 198 and 199 of Ms Pitman's affidavit are the 7 product carriers listed at paragraph 12 of the Bacha Declaration, which are unconnected with the Advantage Group and not the 11 Advantage tankers which include the *Advantage Sky*. Although the Advantage Group does own *different* product carriers, acquired in 2017, they are not the 7 product carriers referred to by Ms Bacha.

**Suspicion around payment by Ms Williams**

135.

In paragraph 186, Ms Pitman suggests that:

> *"the Magistrate Judge in the Tank Punk proceedings had accepted such money payments without proof thereof…"*

136.




This is patently incorrect, as is evident from the following extract from the judgment:

> "In addition to this uncontroverted deposition testimony that Karamehmet did not instigate or control Williams' acquisition of the 11 tankers, there is **documentary evidence which shows that Williams, in 2015, paid the fair market value for the 11 tankers that were purchased by the Advantage Defendants, using nearly USD 200 million and securing hundreds of millions more in loans**. Exhibits 1 and 2 to Supplemental Declaration of Neil A. Quartaro (Document No. 52-1 at 4-75). The documentary evidence also shows that the Geden Group Defendants received in cash, their equity interests in each of the 11 tankers that were sold to the Advantage Defendants – totalling nearly USD200 million – cash that was paid by Williams to Geden Holdings LTD through its subsidiaries. Exhibit 1 to Declaration of Neil A. Quartaro (Document No. 44-1 at pp. 2-44); Exhibit 1 to Supplementary Declaration of Neil A. Quartaro (Document No. 52-1 at 4)."

(emphasis added)

137.

In the premises it is quite clear that, in reaching her decision in the *Tank Punk* judgment, the judge had documentary evidence before her of payment of the sum of USD195,350,000.00 (one hundred and ninety-five million, three hundred and fifty thousand United States Dollars) by Ms Williams.

138.

In any event, this issue is put to rest by the evidence contained in the






accompanying statement of Ms Williams, which contains copies of the relevant documentary proof of payment. These documents include an extract from a bank statement of Forward Holdings dated 16 December 2015, which reflects the following inbound payments received from Ms Williams:

138.1   18 February 2015 USD52 million;

138.2   29 April 2017 USD75 million;

138.3   11 May 2015 USD48,35 million; and

138.4   22 May 2015 USD20 million.

139.

As is evident from the bank statement of Forward Holdings, shortly after receipt of these payments from Ms Williams, payments were made out of the account of Forward Holdings to Advantage Tankers, for purposes of partly funding the purchase of the 11 tankers by the Advantage Group between February and May 2015. The source of these payments was Ms Williams in her personal capacity.

**Deposition of David Chapman – 30 November 2016**

140.

First, in regard to Mr Chapman's deposition, I submit that, absent a confirmatory affidavit by Mr Chapman in regard to his deposition, such deposition does not constitute evidence and to that extent, is inadmissible, notwithstanding the provisions of section 6(3) of the Admiralty Act.






141.

Second, this issue arises from a letter, referred to as the "Consent Letter", from Geden Holdings and addressed to Shell dated 6 February 2015.  Mr Tokgoz signed that letter on behalf of Geden Holdings.  Mr Chapman was the recipient of that letter on behalf of Shell Western. In the Texas proceedings in 2016, Psara apparently sought to make the same point now adopted by ICON in this action, namely that the Consent Letter indicated that Geden Holdings had been intended to be the shareholder of Advantage Sky Shipping.  The Texas Court dealt with that submission in this way:

> "Neither the terms of the Consent Letter nor the Advantage Defendants' subsequent charter agreements with Shell Western in any way evidence that the Geden Group Defendants retained control over any of the tankers following their sale. In fact, the terms of the Consent Letter indicate to the contrary. Paragraph 3(c) of the Consent Letter contemplates Shell Western's agreement to charter nine of the oil tankers to be sold to the Advantage Defendants, upon the "New Owners being acceptable" to Shell Western following its "KYC and other relevant checks." Exhibit 5 to Amended Complaint (Document No. 47-1 at 37). While Tank Punk is correct that Geden Lines continued to act as the technical manager/operator of the tankers after they were sold, Geden Lines' continued role as a manager/operator of the tankers does not equate to the type of dominion and/or control over the Advantage Defendants that is required to pierce the corporate veil."

142.

Ms Pitman seeks to impugn that finding by reference to the later deposition of Mr Chapman.  First, it should be noted that Mr Chapman is an employee of Shell Western, not of Geden Holdings.  He does not claim in his deposition to have any






personal or inside knowledge of the structure of the Advantage Group.

143.

Secondly, it appears from his deposition testimony that he does nothing more than repeat what he reads *ex facie* the Consent Letter.

> "Q. So if you look at paragraph two again, 'it has been proposed that each Existing Owner will sell, the Vessel Sales, all its title, interest to and right in its Vessel to the relevant companies listed in Annex 1 hereto as new owners, and each wholly owned by the Shareholder, the New Owners.'
> What sense does this make to you? Who owns the New Owners?
>
> A. It says, 'each wholly owned by the Shareholder, the New Owner', I mean, I can't - - interpret it any differently than it says in the paragraph.
>
> Q. Right. And would you - - look at the very first line, please, where it says, "From" - -
>
> A. Yes.
>
> Q. - - "Geden Holdings, Limited" - -
>
> A. Yes.
>
> Q. - - "The Shareholder"?
>
> A. Correct.
>
> Q. Do you have any reason to believe - - this is - - there is anything in




*here that untrue* [illegible] *or inaccurate?*

    *A.   No, I have no reason to believe that."*

144.

That exchange, involving little more than an acknowledgment by Mr Chapman that the Consent Letter says what it says, is hardly any basis for impugning the findings of the Texas Court to the effect that, and as the documentary evidence such as the Certificates of Incumbency establishes, Geden Holdings did not in fact retain control over any of the tankers following their sale to the Advantage Group. Nor would it have made commercial sense for the Advantage Group, through Ms Williams and the banks, to have paid Geden Holdings the full market price for the tankers, yet not gain control over the tankers.

145.

Tellingly, on this issue, the Respondents have chosen to not refer to the evidence of Mr Tokgöz who, as a director of Geden Holdings, and the author of the Consent Letter dated 6 February 2015, had the requisite personal knowledge in regard to the contents of that letter and the proposed structure that was to be in place after the sale of the 11 tankers from the Geden Group to the Advantage Group.

146.

The deposition of Mr Tokgöz was taken on 13 January 2016 and the relevant extract from the transcript appears on page 100[17] thereof as follows:

    *"Q. Have a look at this document, please?*

---

[17] Line 17 page 554 – line 14 page 556, Volume 6, Item 36 of the arrest application papers.

A.  Yes.

Q    This document is headed "Consent Letter", and it is addressed to Shell
Western Supply and Trading Limited?

A.  Yes.

Q.  And would you agree with me that Shell, this Shell, was the charterer
under a long time charterparty of five years or so?

A.  Correct.

Q.  For each vessel was the charterer in this instance of the vessels set
out in Annex 1?

A.  Yes.

Q.  And if you look at the end of this letter, not the Annex, but the end of
this letter?

A.  Yes.

Q.  At page 1250 you have signed as director of Geden Holdings?

A.  Correct.

Q.  And Geden Holdings is referred to as the shareholder of existing
vessels, if you look at the annex?

A.  Yes.




...

*Q. Would you agree with me that Geden Holdings then had complete control over the vessels listed in the appendix in Annex 1?*

*Mr Quartaro: Objection.*

*A. I mean before the sale, yes.*

*Mr Gaitas: Had the complete control?*

*A. Before the sale, yes. Definitely, it was the owner of these vessels."*

### 147.

It is clear that Mr Tokgöz did not concede in his deposition testimony that <u>after</u> the transfer of 11 tankers from the Geden Group to the Advantage Group, Geden Holdings would remain in control of the owning companies of the transferred vessels.

### 148.

Furthermore, it is both interesting and telling from the transcript evidence that counsel for Psara Energy Limited, Mr Gaitas, did not ask Mr Tokgöz whether the reference in the Consent Letter to Geden Holdings as "the Shareholder" read with paragraph 2 of the Consent Letter, meant that the intention was that Geden Holdings would remain an owner of the owning companies of the 11 tankers after such transfer and that intention had been put into effect. It is clear from the documents that that did not happen. Therefore, it would appear that this suggestion has been made as an afterthought by the Respondents in their arrest application.




**Urgency**

149.

In my respectful submission this matter is inherently one of urgency and warrants an expedited hearing.

150.

The vessel remains under arrest for substantial claims alleged against ships which, as has been submitted above, cannot be proved, and were not proved at the time of the arrest, to be associated to the vessel.

151.

No security has been furnished to release the vessel from arrest as the aggregate claims for which security is sought by the Respondents in order to release the vessel amount to, on the Respondent's application papers underlying the arrest, USD 75,045,294.53.

152.

In theory, it is open to the Advantage Sky Shipping to provide security to the value of the vessel but, having regard to the type of vessel, namely a very large crude carrier ("VLCC"), and to the fact that it is a relatively new vessel, having been built in 2010 with a value is in excess of USD30 million, which is clearly a substantial amount of money. It is not practicable to do so.

153.






The nature of the alleged claims are such that they are not covered by the Protection and Indemnity Club of the *Advantage Sky*. Moreover, whilst to the extent that Advantage Sky Shipping holds Freight, Demurrage and Defence Insurance, this is insufficient to meet the value of the *Advantage Sky*.

154.

Finally, it is unreasonable to expect Advantage Sky Shipping to back security in cash for the anticipated duration of, in the first instance, an application to set aside the arrest in South Africa and, in the second instance, the foreign court proceedings. To expect so would cause substantial prejudice to the Applicants' ongoing business commitments and operations.

155.

In the circumstances, the *Advantage Sky* will remain under arrest until this application has been disposed of. I should point out that the vessel was due to discharge part of her cargo at the Single Buoy Mooring facility off the Bluff on 5 September 2018, but this was delayed as a result of the arrest and that facility being outside the territorial jurisdiction of the Durban Coastal Sheriff.

156.

The *Advantage Sky* is presently off-hire under the time charterparty between Advantage Sky Shipping and Shell Western. Advantage Sky Shipping therefore *prima facie* liable for off-hire damages quantified as USD17,500.00 per day from the date of arrest, being 30 August 2018, until the arrest of the *Advantage Sky* is uplifted. The longer that the *Advantage Sky* remains under arrest, the greater these off-hire damages will be, with the added risk that the time charterparty with Shell Western may be terminated.




157.

In any event, as mentioned above, the arrest of a vessel is "a serious matter", with significant detrimental commercial consequences for Advantage Sky Shipping and thus the validity or otherwise thereof should be determined expeditiously on the basis of its inherent urgency.

158.

I have also ascertained that the next available date for the hearing of the matter on the unopposed roll is mid to late November 2018. If compelled to wait until then to enrol this application, the Applicants will clearly be prejudiced as a result of the *Advantage Sky* remaining under arrest for this period of time.

159.

Conversely, no prejudice can be occasioned to the Respondents in the event that this application is dealt with on an urgent basis and the Respondents oppose the application. From my experience in such matters, it is usual for the parties to seek to reach agreement on a short timetable for the filing of answering and replying affidavits, so that Senior Counsel for both parties may then approach the Senior Civil Judge, by consent, for the allocation of an early opposed roll date. In the premises, that Applicants have proposed such a timetable in the Notice of Motion prefixed hereto, in anticipation of a Notice of Opposition being filed by the Respondents and in the interests of time.

160.

Indeed, the arrest order requires the Applicants to bring this application expeditiously in terms of paragraphs 3 and 4 thereof.

 

161.

In the circumstances, I submit and request that an order should be granted by this Honourable Court in accordance with the accompanying Notice of Motion.

162.

The position of Advantage Sky Shipping with regard to the arrest of the *Advantage Sky* by the Respondents is that the arrest is wrongful and that the orders for the arrest have been obtained without reasonable and probably cause. In the circumstances, Advantage Sky Shipping intends bringing legal proceedings against the Respondents to recover all loss and damages suffered as a result of the wrongful arrest, including interest and legal costs.

163.

Separately to this application, Advantage Sky Shipping intends bringing an urgent application for an order directing the Respondents to furnish security for the costs of these proceedings, all loss and damages anticipated to be suffered as a result of the wrongful arrest, including interest and legal costs in the anticipated action based on a wrongful arrest claim. The Applicants will also be serving a notice on the Respondents calling upon them to provide security for costs in respect of the Applicants' costs being incurred in this application.

164.

With regard to the costs of this application, I submit that the effect of the arrest and the unsustainability of the grounds asserted by Respondents to justify such arrest, coupled with the non-disclosure of material facts, warrants an adverse costs order. In the premises, Advantage Sky Shipping seeks an attorney and

client costs order against the Respondents.



DEPONENT

I hereby certify that the deponent this affidavit has acknowledged to me that he/she has read, knows and understands the contents of this affidavit and that in compliance with the Regulations Governing the Administering of an Oath or Affirmation published under GN R1258 of 21 July 1972, as amended by GN R1648 of 19 August 1977, GN R1428 of 11 July 1980 and GN R774 of 23 April 1982, was signed to and before me at UMHLANGA       on this the IO TH day of SEPTEMBER 2018.

COMMISSIONER OF OATHS

1358523

ANTHONY BERNARD EDWARDS
COMMISSIONER OF OATHS
PRACTISING ATTORNEY
24 RICHEFOND CIRCLE, RIDGESIDE OFFICE PARK
UMHLANGA ROCKS 4319