MARK GATTO – 05/23/2018

1

2    SUPREME COURT OF THE STATE OF NEW YORK

3    COUNTY OF NEW YORK

4    ----------------------------------------x

5    ICON OCTAVIAN CENTER, LLC,

6                         Plaintiff,

7                         Index No.

8                         655154/2016

9              v.

10   CENTER NAVIGATION, LTD, and GEDEN
     HOLDINGS, LTD.,
11                        Defendant.

12   ----------------------------------------x

13                   2:00 p.m.
                     May 23, 2018
14
                     599 Lexington Avenue
15                   New York, New York

16

17             CONTINUED DEPOSITION of MARK GATTO, a

18   Witness in the above entitled matter, pursuant to

19   Notice, before Stephen J. Moore, a Registered

20   Professional Reporter, Certified Realtime Reporter

21   and Notary Public of the State of New York.

22

23

24

25

```
                                      Page 51
1                    MARK GATTO
2    A P P E A R A N C E S:
3
4         JOHNSTON LAW FIRM, LLC
5              Attorneys for Plaintiff
6              830 Third Avenue
7              New York, New York  10022
8
9         BY:   THOMAS JOHNSTON, ESQ.
10              tjohnston@johnstonlawfirmllc.com
11
12        WATSON, FARLEY AND WILLIAMS LLP
13              Attorneys for Defendant
14              250 West 55th Street
15              New York, New York   10019
16
17        BY:   NEIL A. QUARTARO, ESQ.
18              nquartaro@wfw.com
19
20
21
22
23
24
25
```

```
                                      Page 52
1                    MARK GATTO
2
3              E X H I B I T S
4
5    GATTO                     PAGE/LINE
6
7    9    Defendants' second request for   55   8
8         discovery and inspection
9    10   Document regarding Icon          59   17
10        Shamrock, LLC
11   11   Memorandum of Agreement          65   5
12   12   May 20, 2014 letter from         68   3
13        Johnston
14   13   Facility agreement               73   10
15   14   Letter dated May 23, 2011        87   11
16   15   E-mail                           92   4
17   16   Amended Complaint                95   19
18
19
20
21
22
23
24
25
```

```
                                      Page 53
1                    MARK GATTO
2    M A R K    G A T T O,  recalled as a witness,
3         having been previously duly sworn by a
4         Notary Public, was further examined and
5         testified as follows:
6
7    CONTINUED EXAMINATION BY
8    MR. QUARTARO:
9
10        Q     This is a continuing deposition
11   from the initial deposition we had on October
12   11 in the Icon Octavian Center, LLC v. Center
13   Navigation, Ltd. and Geden Holdings case.
14        I just wanted to kind of give
15   you a couple of reminders.  I know you heard
16   them the first time first.
17        I remind you you are under oath,
18   it's a formal record of the case, so it's a
19   formal proceeding, but of course we try to be a
20   little informal; it's not -- we are not in
21   court.
22        I just remind you to answer
23   verbally, because our court reporter can't
24   record head shakes.
25        If you need a break or anything
```

```
                                      Page 54
1                    MARK GATTO
2    like that, of course just ask, bathroom break
3    or whatever.
4        If any of the questions I ask
5    are unclear, just ask for a clarification.  The
6    idea is not to trip you up in any way, it's to
7    create an accurate factual record of the case.
8        And if any of my questions seem
9    to reach the substance of any conversation
10   you've had with your attorney, speak up,
11   because none of my questions are intended to
12   reach that, okay, so that's privileged.
13        Now, to the extent that we have,
14   I have a couple of documents I'm going to ask
15   you some questions about, to the extent that
16   there are subsequently produced documents, if
17   we think they are relevant and matter, we will
18   reserve the right to recall you to ask
19   questions about that.
20        I hope that's not the case, but
21   I want to reserve that.
22        And I always ask this and mean
23   no offense, but I take it you are not on any
24   medications or anything that might affect your
25   testimony today?
```

Page 55

MARK GATTO

1
2    A    No.
3    Q    Good, thank you.
4         MR. QUARTARO:  Before we get
5    started, maybe you can just mark that as
6    Gatto 9.
7         (The above described document was
8    marked Gatto Exhibit 9 for identification
9    as of this date.)
10        MR. QUARTARO:  Thank you.
11   Q    I have handed you as Exhibit 9
12   the Defendants' second request for discovery
13   and inspection.
14        And in particular, I direct you
15   to the second to last page of that, which lists
16   some documents that we were seeking.
17        Are you familiar with this, have
18   you seen this before?
19   A    Looks like a standard request
20   for documents.  I can't say specifically I've
21   seen it.
22   Q    You see the series of requests
23   there.  Do those look familiar?
24   A    In terms of what?  That I typed
25   this up and wrote them?

Page 56

MARK GATTO

1
2    Q    No, I prepared it.
3    I'm just asking if you've seen
4    it and had an opportunity to -- well, if you've
5    seen it.  That seems unclear.
6         So what I would ask, then, is if
7    you have had an opportunity to check your files
8    for the documents that are listed?
9    A    I'm sure my attorney has
10   requested from somebody at my company, and they
11   have done their best to provide them if they
12   are available.
13   Q    Right.  But I'm asking if you're
14   familiar with them?
15   A    I don't remember.  I see a bunch
16   of documents all the time.  This is nothing
17   that I worry about.
18   Q    So you don't recall, all right.
19        All right, we are here to talk
20   about the Amended Complaint filed in this case,
21   and before I get to the substance of that, I
22   would like to ask you some questions about the
23   vessel that's at the center of this litigation,
24   it's ex-CENTER, formerly known as CENTER,
25   currently named SHAMROCK.

Page 57

MARK GATTO

1
2    So when I refer to vessel today,
3    that's the vessel that I am referring to.
4         I am just going to pick up from
5    your last deposition, but if there is any
6    background or something that my question seems
7    unclear, again, please speak up.
8         So, at some point in 2016 the
9    Defendant, Center Navigation, redelivered the
10   vessel to Icon Octavian, is that right?
11   A    Sounds about right.
12   Q    What did the Plaintiff do with
13   the vessel when it was redelivered?
14   A    I assume we rechartered it.
15   Q    Do you know what you guys did
16   with it, or no?
17   A    It's been rechartered since the
18   return, yes.
19   Q    Did that involve putting the
20   vessel into a shipping pool of some kind?
21   A    I believe so, yes.
22   Q    And is that the Stena pool?
23   A    It is the Stena pool.
24   Q    So, when the vessel was returned
25   to Icon Octavian she was put to work?

Page 58

MARK GATTO

1
2    A    At some point, yes.
3    Q    Did Icon Octavian receive any
4    charter hire from that work?
5    A    I'm not sure what we received.
6    Q    Would there be documents that
7    show any income that would have been received?
8    A    If there was income received,
9    there would be documents, I believe.
10   Q    Do you know if the Stena pool
11   provided a monthly statement of earnings by the
12   vessel?
13   A    I believe they should have.  I
14   don't know personally, I didn't look at them.
15   Q    So you haven't seen anything?
16   A    Un-hunh.
17   Q    Is there somebody at Icon
18   Octavian that would have seen those documents
19   other than you?
20   A    Sure.
21   Q    And who would that be?
22   A    It could be a number of people,
23   could be our chief accounting officer, it could
24   have been the individual deal person handling
25   these types of transactions at our firm, could

MARK GATTO – 05/23/2018          Pages 59..62

Page 59

MARK GATTO

1
2  have been our accounts receivables department.
3          I don't know specifically who
4  was handling it.
5      Q      Okay.
6              Now, you previously testified, I
7  believe, that Icon Octavian sold the vessel at
8  some point.
9              Do you recall that?
10     A      I don't recall that, no.
11     Q      Are you familiar with the
12 company called Icon Shamrock, LLC?
13     A      Sounds familiar.
14             MR. QUARTARO:  Let's mark this
15     Gatto 10.
16             (The above described document was
17     marked Gatto Exhibit 10 for identification
18     as of this date.)
19     A      Okay.
20     Q      Are you familiar with that
21 document?
22     A      No.
23     Q      You'll note that it, among other
24 things, identifies an entity known as Icon
25 Shamrock, LLC as the registered owner?

Page 60

MARK GATTO

1
2      A      Okay, I see that.
3      Q      Do you see that?
4      A      Um-hum.
5      Q      Do you know if Icon Octavian
6  sold the vessel to Icon Shamrock, LLC?
7      A      I don't know what the
8  transaction was, but we set up a new LLC for
9  the vessel, it appears.
10     Q      Okay.
11             Do you know if that LLC owns any
12 other assets?
13     A      None that I'm aware of.
14     Q      Would that LLC be what is known
15 in the industry as a special purpose company or
16 a special purpose entity?
17     A      Sure.
18     Q      Do you know where Icon Shamrock
19 is organized, what jurisdiction they are
20 organized under?
21     A      The LLC, I do not know where
22 it's organized.
23     Q      Do you know where it has
24 offices?
25     A      I don't know personally, no.

Page 61

MARK GATTO

1
2      Q      Employees?
3      A      I don't know.
4      Q      Do you know where it keeps its
5  records?
6      A      I'm not personally aware.
7      Q      Do you know who owns Icon
8  Shamrock, LLC?
9      A      It would be either one of our
10 funds or a number of our funds.  I don't
11 remember specifically if it's just one of our
12 funds or a combination, because we sometimes do
13 joint ventures.
14     Q      Are you familiar with an entity
15 called Icon Shamrock Holdings?
16     A      Icon Shamrock Holdings, sure.
17     Q      What are they?  What's Icon
18 Shamrock Holdings?
19     A      I assume it's a holding company
20 for the ultimate owners of Icon Shamrock, but I
21 don't know for sure.
22     Q      Are you an officer of Icon
23 Shamrock?
24     A      I could be.  I'm an officer for
25 a lot of entities.

Page 62

MARK GATTO

1
2      Q      Are you a director for Icon
3  Shamrock?
4      A      Do you know?
5      Q      I don't know, I don't know.
6      A      You have the documents, don't
7  you?
8      Q      I don't have any documents from
9  Icon Shamrock, no.
10     A      It's possible, but I don't know
11 exactly if I am or I am not.
12     Q      And do you know -- do you know
13 who owns Icon Shamrock Holdings?
14     A      I just said it could be one or
15 more than one of our funds.  I'm not sure
16 exactly which one it is.
17     Q      Okay.
18             I asked earlier if Icon
19 Shamrock, LLC was a special purpose company,
20 also known as a special purpose entity or
21 vehicle.
22             Do you have an understanding as
23 to what that means, special purpose company,
24 entity or vehicle?
25     A      I believe so.

Page 63

```
1                    MARK GATTO
2         Q      And what's your understanding of
3   that?
4         A      It's an entity set up to do only
5   one activity.
6         Q      And would an example of that
7   activity be hold an asset?
8         A      In this case it is, yes.
9         Q      So Icon Shamrock, your
10  understanding is that it is a special purpose
11  entity?
12        A      There is no other activity of
13  that entity, so I guess it would qualify.
14        Q      Thank you.
15               Why are special purpose entities
16  used in transactions like this?  Is there a
17  reason for it?
18        A      I can't speak to why others use
19  it, but I think in this case we are a finance
20  owner, and because we are a finance owner, and
21  our assets are not commingled, they are owned
22  by different entities and so forth, we would
23  set up a special purpose entity.
24        Q      Okay.
25               Do you know if it's common in
```

Page 64

```
1                    MARK GATTO
2   the shipping industry to use SPEs to hold
3   assets?
4         A      I'm not -- I'm not aware what
5   other people do.
6         Q      Any other industry that you are
7   familiar with?
8               MR. QUARTARO:  Let me rephrase
9         that question.
10        Q      Are you familiar with any other
11  industries that use special purpose entities to
12  hold assets?
13        A      I can't say.  I don't work in
14  any other industries, so I don't know what
15  other people do.
16               I don't know if operating
17  companies use them.  I think finance companies,
18  lenders, use them, but I'm not aware of how
19  other people utilize special purpose entities.
20        Q      Okay.
21               When the vessel was sold by
22  Icon -- Icon Octavian, that transaction was
23  documented, is that correct?
24        A      I assume so.
25        Q      All right.
```

Page 65

```
1                    MARK GATTO
2               MR. QUARTARO:  Mark this as Gatto
3         11.
4               (The above described document was
5         marked Gatto Exhibit 11 for identification
6         as of this date.)
7         Q      Are you familiar with that
8   document?
9         A      Not specifically.
10        Q      Okay.  This was produced by your
11  counsel bearing Bates numbers IO 0768 through
12  IO 0776.
13               And it's captioned Memorandum of
14  Agreement, and it appears to provide for the
15  sale of the vessel CENTER.
16               Do you see name of vessel at
17  line 4 on page 1?
18        A      Yes, yes.
19        Q      If you turn to the very second
20  to last page, you will see a signature on
21  behalf of sellers, second to last.
22               Also -- yes, that's it.
23        A      Okay.
24        Q      Richard Webb, attorney in fact.
25  Do you know who Mr. Webb is?
```

Page 66

```
1                    MARK GATTO
2         A      No, I do not.
3         Q      Looking at paragraph 1 of Gatto
4   11, it provides a purchase price of $48
5   million, do you see that there, that's at line
6   29?
7         A      Yes.
8         Q      Does that reflect the purchase
9   price or, I'm sorry, from Icon Octavian
10  CENTER's point of view, the sale price of the
11  vessel to the buyer?
12        A      It's what the document says.
13        Q      Do you have reason to believe
14  that the sale price is anything other than
15  what's provided here?
16        A      Not at this time.
17        Q      I would like you to look at
18  paragraph 14, which is back on that second to
19  last page.
20        A      The new 14?
21        Q      Yes.  Notices?
22        A      Yes.
23        Q      And you will see the contact
24  details for recipients of notices for buyers
25  are CO Icon Capital.
```

Page 67

```
1                  MARK GATTO
2          Do you see that at line 398?
3      A    Yes.
4      Q    And then for the sellers the
5  same address at line 399?
6      A    Yes.
7      Q    You see that so the seller and
8  the buyer functionally have the same address,
9  is that correct?
10     A    Yes.
11     Q    And that's your offices, is that
12 right?
13     A    Yes.
14     Q    Do you know how the purchase
15 price identified on paragraph 1 of this exhibit
16 was arrived at?
17     A    No.
18     Q    Okay, did Icon Octavian assign
19 or otherwise transfer the entry of the vessel
20 when it was in the Stena pool to the buyer Icon
21 Shamrock, LLC?
22     A    I don't recall how the
23 transaction was facilitated.
24          MR. QUARTARO:  12.
25
```

Page 68

```
1                  MARK GATTO
2          (The above described document was
3          marked Gatto Exhibit 12 for identification
4          as of this date.)
5      Q    Okay, I have handed you as Gatto
6  12 a May 14, 2014 letter from your counsel,
7  Mr. Johnston and this responds to the document
8  that I provided as Exhibit 9 which was our
9  second request for discovery and inspection of
10 documents.
11          Referring to request number 5
12 which goes from the first page to the second
13 page, the response is that Icon -- the response
14 to our request for documents related to
15 marketing of the vessel for sale, is that Icon
16 did not market the vessel for sale and has no
17 documents responsive to this request.
18          Is that also your understanding?
19     A    That's how we responded, and
20 yes.
21     Q    But I'm asking if that's your
22 understanding?
23     A    I didn't write the request, no
24 one asked me, I don't know.
25     Q    So, you don't know if the vessel
```

Page 69

```
1                  MARK GATTO
2  CENTER was marketed for sale by Icon Octavian
3  LLC?
4      A    It was marketed for sale?
5      Q    Yes.
6      A    I don't believe so.
7      Q    Okay.
8          How, then, did the Plaintiff
9  decide -- I'm sorry, how then did the Plaintiff
10 determine that the purchase price on the last
11 Exhibit, 11, was a reasonable price?
12     A    I don't specifically know.
13     Q    Who at Icon Octavian would know?
14     A    It would be someone who was
15 managing the vessels at that time for us.
16     Q    Who was managing the vessel in
17 the first half of 2016?
18     A    First half of 2016, I don't
19 know, I can't -- I can't say for sure.  There
20 were many people that we had or have that
21 handle shipping transactions, so I don't know
22 off the top of my head.
23     Q    Other than -- we will come to
24 that in a minute.
25          So, sitting here today, you
```

Page 70

```
1                  MARK GATTO
2  don't know how the Plaintiff determined the
3  sale price on the MOA?
4      A    No.
5      Q    And you can't identify anybody
6  at your company who would know?
7      A    I can name a number of people,
8  but I'm not specifically -- I don't know
9  specifically who handled this transaction.
10     Q    Okay, how many people are we
11 talking about in this universe that might have
12 handled this transaction?
13     A    Half a dozen.
14     Q    All right.
15          We will get back to that, I
16 guess.
17          Now, when the vessel was sold by
18 the Plaintiff, there was an existing loan
19 facility, is that correct?
20     A    I don't remember.  You have the
21 documents, you just said there is an existing
22 loan facility so you probably know better than
23 I do.
24     Q    Right, but, Mr. Gatto, you
25 signed a Verified Complaint seeking $19 million
```

MARK GATTO - 05/23/2018          Pages 71..74

Page 71

MARK GATTO

1    MARK GATTO
2    in damages from my client.
3         A      Come on Neil, they owe us money.
4    This is all bullshit the stuff you are asking
5    me.
6                This is bullshit.
7                Who cares if I sold the vessel?
8    They owe me at contract, they owe me charter.
9    I mean come on, this is a waste of my fucking
10   time, these stupid questions; did we sell the
11   vessel.
12               MR. QUARTARO:  Do you want to
13          have a word with your client?
14               MR. JOHNSTON:  No.
15        A      I'm a big boy, he doesn't need
16   to talk to me.
17        Q      I will continue asking my
18   questions.
19        A      I run a company with 100
20   employees.  You think I worry about this every
21   single minute of my day?
22               I mean come on, you have the
23   documents.
24               There was a loan, there was a
25   loan.

Page 72

MARK GATTO

1    MARK GATTO
2         Q      Okay.
3                All right, so --
4                MR. JOHNSTON:  I will note the
5          Verified Complaint doesn't address the
6          sale of the vessels, so I object to the
7          form of the question.
8                MR. QUARTARO:  What's the
9          objection to the form?
10               MR. JOHNSTON:  You interjected
11         the fact that he signed the Verified
12         Complaint, but the question was not
13         relevant to the contents of the Verified
14         Complaint, or at least --
15               MR. QUARTARO:  He cut me off.
16               MR. JOHNSTON:  It didn't touch on
17         the allegations in the Verified
18         Complaint.
19               MR. QUARTARO:  Okay, objection is
20         noted.
21        Q      All right, so you're not sure
22   about the existing loan facility, that's what
23   we are hearing, okay.
24               So then I take it you don't know
25   what amount Icon owed under that facility when

Page 73

MARK GATTO

1    MARK GATTO
2    it sold the vessel?
3         A      Not at this time, no.
4         Q      And do you know if the sale of
5    the vessel included the refinancing of that
6    existing facility?
7         A      I don't recall at this time.
8                MR. QUARTARO:  Next in line, 13.
9                (The above described document was
10         marked Gatto Exhibit 13 for identification
11         as of this date.)
12        Q      I ask you to take a minute to
13   familiarize yourself with that?
14        A      Come on, just ask the questions,
15   am I going to familiarize myself with a 100,
16   page 200 page agreement?
17               What kind of question is that?
18        Q      Okay.
19        A      Everybody --
20        Q      Let me find the signature page
21   here.
22               All right, I would ask you to
23   turn to the document numbered IO 0918?
24        A      Okay.
25        Q      Signature at the upper left hand

Page 74

MARK GATTO

1    MARK GATTO
2    page, is that your signature?
3         A      Yes, it is.
4         Q      So you executed this loan
5    agreement?
6         A      Yes.
7         Q      You can see on the face of the
8    agreement at the top it says U.S. $26 million.
9                Does that refresh, or is that
10   how much this loan facility was for?
11        A      At the time of signature, yes.
12        Q      Do you know if that entire
13   amount was drawn down?
14        A      I believe so.
15        Q      So the sale of the vessel had a
16   debt component of $26 million, is that your
17   understanding?
18        A      Repeat the question?
19        Q      The sale of the vessel had a
20   debt component of $26 million, is that your
21   understanding?
22        A      I would assume that there was
23   debt remaining on the vessel.
24        Q      Was that amount credited to the
25   sale price in that memorandum of agreement that

Page 75

MARK GATTO

1  we looked at?
2  we looked at?
3       A       I'm not sure if it says in the
4  agreement.
5               You say it was credited, I don't
6  understand what you mean.
7       Q       Well, this appears to refinance
8  the existing loan facility on CENTER, is that
9  your understanding of what this loan does?
10              I will just note the very last
11 line in case that refreshes your recollection?
12      A       It says relating to the
13 refinancing.
14      Q       So that's $26 million, the
15 vessel sold for $48 million, there was $22
16 million balance, right?
17      A       Okay.
18      Q       So, how was the -- how was the
19 $22 million balance paid?
20      A       I don't know.
21      Q       Okay, if you look at page 10 of
22 this agreement, there was a defined term,
23 existing indebtedness?
24      A       Okay.
25      Q       And that references a term loan

Page 76

MARK GATTO

1
2  facility of up to $44 million.
3               That appears -- do you see that
4  language there?
5       A       I see that language.
6       Q       Do you know if that was the
7  amount that was outstanding on the existing
8  facility that this refinancing agreement
9  repaid?
10      A       From the language I'm reading it
11 appears that that -- it was.
12      Q       Do you know if this $26 million,
13 this refinancing facility paid down the entire
14 $44 million?
15      A       I do not.
16      Q       So, do you know if any debt was
17 forgiven by the lenders as part of this
18 refinancing agreement?
19      A       I don't recall.
20      Q       So, whatever the difference
21 between the refinancing amount and the balance
22 on the original loan was, you don't know how
23 that was treated?
24      A       I do not.
25      Q       Do you know if Icon Octavian

Page 77

MARK GATTO

1
2  would have received any documentation that
3  reflected how that was treated?
4       A       I assume so.
5       Q       Looking at I think the next
6  page, two pages, page 12, there is a defined
7  term Fund Fourteen?
8       A       Okay.
9       Q       And it says, "Fund Fourteen
10 means Icon equipment and corporate
11 infrastructure Fund Fourteen L.P."
12              What do you know about that
13 entity?
14      A       It's a fund that we manage.
15      Q       Do you know what its involvement
16 in this loan facility was?
17      A       Probably no involvement other
18 than it's the ultimate owner of the LLC of the
19 borrower.
20      Q       So that Fund Fourteen is the
21 ultimate beneficial owner of the borrower which
22 in this case is Icon Shamrock, which appears to
23 be wholly owned by Icon Shamrock Holdings?
24      A       I don't recall the corporate
25 structure of the transaction.

Page 78

MARK GATTO

1
2               But it sounds reasonable to me.
3       Q       And I don't know what it is,
4  that's why I am asking, I don't know what this
5  entity is.
6               Page 140 of the same loan
7  agreement, Schedule 1?
8       A       140?
9       Q       Yes.
10      A       Okay.
11              MR. JOHNSTON:  Is that signature
12      pages?
13              MR. QUARTARO:  No, no.
14              MR. JOHNSTON:  I don't see a page
15      140.
16              THE WITNESS:  There is a
17      signature page in between.
18              MR. JOHNSTON:  I've got it.
19      Q       So this Schedule 1 lists the
20 obligors under this facility, Icon Shamrock,
21 LLC and Icon Shamrock Holdings LLC, is that
22 right?
23      A       Yes.
24      Q       And the address for
25 communication for both of those entities is

Page 79

```
                    MARK GATTO
1
2   Icon Capital at 3 Park Avenue?
3        A      Yes.
4        Q      And this indicates that they are
5   both Marshall Islands organizations, do you
6   understand that that's correct?
7        A      That's what the document says.
8        Q      Other than the document, though,
9   do you understand that's correct?
10       A      Seems reasonable that it would
11  be organized there.
12       Q      And is Icon Shamrock Holdings
13  present as the parent of Icon Shamrock, is that
14  why they are in this financing or refinancing?
15       A      I don't know specifically, but
16  sounds reasonable.
17       Q      Do you know, was Icon Shamrock
18  Holdings a guarantor of this loan agreement?
19       A      I'm not aware.
20       Q      Do you know if Icon Shamrock
21  owns anything other than membership interests
22  in Icon -- sorry, let me start that again.
23              Do you know if Icon Shamrock
24  Holdings owns anything other than the
25  membership interest in Icon Shamrock?
```

Page 80

```
                    MARK GATTO
1
2        A      I don't believe it does.
3        Q      The document I gave you earlier
4   that I think we marked as Gatto 10 shows a
5   mortgage for $26 million on the vessel.
6               It's the Marshall Islands CLE,
7   right there.
8        A      Okay.
9        Q      Do you know if that's the only
10  indebtedness on this vessel or if there is
11  other indebtedness?
12       A      At what time?
13       Q      Now, currently?
14       A      Now I'm not aware what
15  indebtedness on that vessel is.
16       Q      Now, I think at your initial
17  deposition you testified that Icon Investments
18  or Icon Investment Group, we will just call
19  them Icon Investments, is the parent Icon
20  entity, is that right?
21              Do I have that right?
22       A      The parent Icon entity of what?
23       Q      Well, I understood of all of the
24  Icon groups, I understood that was sort of the
25  parent organization or the parent company.
```

Page 81

```
                    MARK GATTO
1
2        A      You have to be more specific
3   because we are talking -- you are mentioning
4   funds and there are two different -- those are
5   two different things, I don't know what you are
6   referring to.
7        Q      Okay, was the parent company of
8   Icon Octavian, the Plaintiff in this case, a
9   company called Icon Investments or Icon
10  investment group?
11       A      No.
12       Q      What was the parent company of
13  Icon Octavian?
14       A      The parent company of Icon
15  Octavian would have been a fund that owned --
16  that was the ultimate owner of that entity.
17       Q      Okay that would be some sort of
18  investment fund?
19       A      Yes.
20       Q      And that would have been managed
21  by another Icon entity?
22       A      Yes.
23       Q      So, Icon -- and so Icon manages
24  investment funds that, among other things, that
25  are set up by Icon Investments or the Icon
```

Page 82

```
                    MARK GATTO
1
2   investment group, is that kind of the
3   structure?
4        A      Yes.
5        Q      Do you know if any entity owned
6   by Icon Investments currently holds any equity
7   in the vessel?
8        A      We have a 1 percent interest in
9   all of our equipment funds, so indirectly I
10  guess we do.
11       Q      Other than that 1 percent?
12       A      No.
13       Q      Okay.
14              So, no Icon entity currently has
15  equity in Shamrock?
16       A      Correct.
17       Q      Other than this 1 percent which
18  you've already explained?
19       A      Correct.
20       Q      With the $26 millions in debt
21  that we identified in the refi agreement and
22  the $48 million sale price in the MOA, there is
23  still that $22 million out there.
24              Do you know who holds equity in
25  the vessel?
```

Page 83

MARK GATTO

2  A   It would be the owner of the
3 entity.
4  Q   And by entity you mean Icon
5 Shamrock Holdings?
6  A   Yes.
7  Q   And who's the owner of that?
8  A   I believe it's Fund Fourteen.
9  Q   All right, at the time that the
10 underlying charter here was entered into,
11 right, that's mid-June 2011, Icon had other
12 shipping investments at that time, is that
13 right?
14  A   Yes.
15  Q   At that time Icon shipping
16 investments were either entered into or managed
17 by somebody named Tobias Backer, is that right?
18  A   Repeat the question, please?
19  Q   At that time those investments
20 were either entered into or managed by Tobias
21 Backer?
22  A   Him or one of his staff members.
23  Q   And primarily his staff members
24 were Jason Bronstein and Sebile Andower, is
25 that correct?

Page 84

MARK GATTO

2  A   Sounds right for that time
3 frame.
4  Q   Is there anybody else that you
5 can think of that would have been involved in
6 this matter at that time?
7  A   Could have been in-house
8 counsel.
9  Q   That would be Michael Markowitz?
10  A   Sounds right.
11  Q   Anybody else?
12  A   No one that I remember.
13  Q   But Mr. Backer led the shipping
14 team at that time?
15  A   Yes.
16  Q   Do you know the approximate size
17 of Icon's shipping portfolio in June 2011,
18 roughly?
19  A   I don't recall specifically, but
20 hundreds of millions.
21  Q   Now, I understand that Icon has
22 a committee that reviews prospective
23 transactions, is that right?
24  A   Correct.
25  Q   And that's called the credit

Page 85

MARK GATTO

2 committee?
3  A   Investment committee, more
4 likely.
5  Q   Let's call it the investment
6 committee.
7      And the investment committee
8 determines whether or not Icon Capital or a
9 special purpose entity controlled by Icon
10 Capital enters into a certain transaction or a
11 given transaction?
12  A   It determines if a fund we
13 manage enters into a certain transaction.
14  Q   Were you on the credit committee
15 in the first half of 2011?
16  A   Yes.
17  Q   Do you know who else was on
18 the -- sorry, investment committee.
19      Do you know who else was on the
20 investment committee at that time?
21  A   Michael Reisner for sure, I
22 believe Harry Giovanni, there may have been
23 other members, but I don't recall, but those
24 are the three that I do remember.
25  Q   In 2011 can you describe in

Page 86

MARK GATTO

2 basic terms the process by which the credit
3 committee would make decisions about entering
4 into a proposed deal?
5  A   We would review the investment
6 committee recommendation, ask questions of the
7 deal team that was managing that transaction,
8 and then we would vote to approve or not
9 approve the transaction.
10  Q   And that information would be in
11 writing, would be provided to the investment
12 committee in writing?
13  A   The investment committee
14 memorandum would be in writing, yes.
15  Q   What's the investment committee
16 memorandum?
17  A   It's a document that discusses
18 the transaction and the merits of the
19 transaction and ultimately is a document that
20 the investment committee uses to approve or not
21 approve the transaction.
22  Q   Okay, would that -- would that
23 include typically a term sheet?
24  A   It would include the documents
25 related to the transaction or it would have a

Page 87

1                  MARK GATTO
2   summary of those documents.
3        Q       But this would be before the
4   deal was consummated?
5        A       Correct.
6        Q       And on approval then a proposed
7   transaction could be consummated?
8        A       Correct.
9                MR. QUARTARO: Mark this as 14.
10               (The above described document was
11               marked Gatto Exhibit 14 for identification
12               as of this date.)
13       Q       All right, Gatto 14, have you
14   seen this document before?
15               Let me rephrase that.
16               Do you remember seeing this
17   document before?
18       A       Remember seeing it, not at this
19   time.
20       Q       I am going to represent to you
21   that this is has been produced by Geden as the
22   initial term sheet in the transaction at issue
23   here?
24       A       Okay.
25       Q       And I just would like to -- let

Page 88

1                  MARK GATTO
2   me get to the right question here, assuming
3   that that's correct, this is the term sheet,
4   this is the kind of thing that would have been
5   provided to the investment committee?
6        A       Yes.
7        Q       So you would typically have a
8   copy of this in your files?
9        A       A copy or a summary of it in the
10   investment committee recommendation.
11       Q       Looking at the term sheet first
12   page, it says purchaser, I just ask you to read
13   that to yourself and tell us what your
14   understanding of what the purchaser was
15   supposed to be in terms of the company?
16       A       Says that the purchaser was a
17   Marshall Islands limited liability company
18   owned 50 percent by one or more fund owned by
19   Icon and 50 percent by Octavian.
20       Q       And it actually starts a special
21   purpose Marshall Islands limited liability
22   company, right?
23       A       Yes.
24       Q       And then when we go and we look
25   at the seller, what entity is identified there?

Page 89

1                  MARK GATTO
2        A       It says Geden or a wholly owned
3   subsidiary thereof.
4        Q       And would you expect that wholly
5   owned subsidiary to be a special purpose entity
6   wholly owned by Geden?
7        A       No.
8        Q       How about charterer?
9        A       Geden or a wholly owned
10   subsidiary thereof.
11       Q       And would you expect the
12   reference to wholly owned subsidiary thereof to
13   refer to a Geden special purpose entity?
14       A       Not necessarily.
15       Q       Okay, on page 3 there are some
16   conditions precedent?
17       A       Okay.
18       Q       And the third bullet down is,
19   "Purchaser shall have completed due diligence
20   with respect to the seller, the guarantor, the
21   charterer, the vessel and shall be satisfied in
22   its sole discretion with the result of such due
23   diligence."
24               Do you see that entry there?
25       A       I do.

Page 90

1                  MARK GATTO
2        Q       Do you know if that due
3   diligence was performed?
4        A       Presumably, yes.
5        Q       And what kind of due diligence
6   would you expect to be performed in a
7   transaction like this with respect to the
8   charterer?
9        A       I would expect the
10   transactions -- that there is due diligence
11   related to financial, there is due diligence
12   related to legal, regulatory, condition of the
13   assets; a number of things.
14       Q       How about the corporate
15   structure of the charterer and the guarantor?
16       A       Yes.
17       Q       Do you have an understanding of
18   the corporate structure of the charterer and
19   the guarantor in 2011?
20       A       I don't personally have it.
21       Q       Did you have an understanding of
22   who owned Center Navigation?
23       A       Center Navigation I assume was
24   owned by Geden.
25       Q       And how about Geden Holdings,

Page 91

1                    MARK GATTO
2   did you have an understanding as to who owned
3   Geden Holdings?
4           A    Some rich, rich Turkish guy.
5           Q    And did you have an
6   understanding about what assets Geden Holdings
7   held?
8           A    I understand it was a very large
9   fleet of vessels.
10          Q    And did you think -- did you
11  have an understanding that Geden Holdings
12  directly owned those vessels?
13          A    I don't know if it -- yes,
14  ultimately yes.
15          Q    What do you mean by ultimately
16  yes?
17          A    That they would own and control
18  their vessels.
19          Q    So you understood that Geden
20  Holdings had direct title to its fleet of
21  vessels?
22          A    Absolutely.
23          Q    Do you recall that ever being
24  represented to you?
25          A    Seven years later, no, I don't

Page 92

1                    MARK GATTO
2   remember what was represented or not.
3           MR. QUARTARO:  Gatto 15.
4           (The above described document was
5           marked Gatto 15 for identification as of
6           this date.)
7           Q    So, I would ask you to go to the
8   third page which is G 000664 in the document I
9   just handed you.
10          A    Okay.
11          Q    There is a January 16, 2014
12  e-mail from Mehmet Mat to Tobias Backer, and it
13  says, "Dear Tobias, I thought it would be nice
14  to discuss a new transaction over dinner..
15          Do you know if this e-mail or do
16  you recall if this e-mail was ever forwarded to
17  you?
18          A    I don't recall, it could have
19  been.
20          Q    There is some language following
21  what I just read that says, "We have in mind to
22  establish a New Co for our crude fleet joint
23  venture with new investors with a target to use
24  it as a growth platform; and/or a ready to go
25  IPO platform in the midterm.

Page 93

1                    MARK GATTO
2           "The fleet consists of five
3   aframax plus five suezmax, which eight of them
4   are chartered by Shell and two of them by ST
5   Shipping, the details are attached."
6           That's the second paragraph in
7   that e-mail.
8           And then there is an attachment
9   which starts at G 0665 the next page and goes
10  on through G 00670.
11          The first page, G 00665 has a
12  box on the left-hand side and it says sources,
13  Icon and the number of $75 million appears next
14  to it?
15          A    Okay.
16          Q    Do you recall discussing an
17  investment by Icon of $75 million into a new
18  company that would own these five aframax and
19  five suezmax tankers?
20          A    Not specifically.
21          Q    Go to the next page, this is G
22  00666, there is a list of vessels, there are
23  ten vessels, five each suezmax, and five
24  aframax?
25          A    Okay.

Page 94

1                    MARK GATTO
2           Q    The first page you are holding
3   there, sir?
4           A    Yes, I know, I want to see what
5   I'm reading.
6           Q    That's fine, take your time.
7   Take a look at it?
8           A    Okay, go ahead.  Okay.
9           Q    Do you recall, and this document
10  is captioned indicative term sheet.
11          Do you recall ever seeing this
12  document before?
13          A    No.
14          Q    Do you have any understanding as
15  to what these ten vessels are or who owned them
16  at this time, and this time is January 17,
17  2013?
18          A    I don't believe this is our
19  document, so no, I don't.
20          Q    Okay, do you remember attending
21  a dinner on or about January 20, 2014 with
22  Tobias Backer and Mehmet Mat?
23          A    I do.
24          Q    Do you recall what was discussed
25  at that dinner?

Page 95

1                    MARK GATTO
2        A     Not really, it was in a very
3   noisy place in a basement of a restaurant in
4   London; so not really.
5        Q     Do you recall ever considering a
6   $75 million investment into the New Co that is
7   described in this January 16, 2014 e-mail?
8        A     I'm not sure, I'm sure we would
9   have -- we consider a lot of things, doesn't
10  mean we do them, or like them.
11       Q     I understand that.
12             But do you recall ever
13  considering this specific transaction?
14       A     I don't recall, me specifically,
15  either considering it or spending any, if any,
16  time on it.
17             MR. QUARTARO:  Exhibit 16.
18             (The above described document was
19             marked Gatto Exhibit 16 for identification
20             as of this date.)
21       Q     Okay?
22       A     Okay.
23       Q     Are you familiar with this?
24       A     It appears to be an amended
25  Complaint.

Page 96

1                    MARK GATTO
2        Q     I ask you to turn to the last
3   page of it, page 12.
4        A     Okay.
5        Q     There is a signature line, is
6   that your signature?
7        A     That's me.
8        Q     Now, looking at this Complaint,
9   looking at paragraph 26 of the Complaint which
10  is on page 5?
11       A     Okay.
12       Q     There is an allegation that
13  in -- that Geden fraudulently transferred 11
14  vessels from Geden SPEs to an entity called
15  Advantage Tankers?
16       A     Yes.
17       Q     And that this became known to
18  Icon during Mr. Mat's deposition in June 2017?
19       A     Yes.
20       Q     But isn't it true that on
21  January 20, 2014 you discussed the sale of ten
22  of these 11 vessels with Mr. Mat and
23  Mr. Backer?
24       A     I don't necessarily believe so.
25       Q     You mean you don't recall or you

Page 97

1                    MARK GATTO
2   don't know?
3        A     I don't recall, and I don't
4   understand what that has to do with the fact
5   that they did fraudulently convey their
6   vessels.
7        Q     But you don't recall?
8        A     Because the other ones say, I
9   think I just said they were going to sell above
10  market price and they didn't come to us for any
11  permission, give us any notice that they were
12  going to sell these vessels underneath our
13  nose.
14             So I don't understand what the
15  question has to do with what my conversation at
16  dinner was.
17       Q     Okay.
18             Well, that's fine, but what I am
19  asking is whether or not back in the beginning
20  of 2014 you knew that these vessels were going
21  to be sold?
22       A     No, I didn't know that.
23       Q     Do you understand that the ten
24  vessels that I showed you on the preceding
25  exhibit, the first page of the term sheet, are

Page 98

1                    MARK GATTO
2   ten of the 11 vessels that are referenced in
3   paragraph 26?
4        A     Repeat the question?
5        Q     Do you understand that the
6   vessels that are listed on page 1 of the term
7   sheet that I just showed you, the five suez and
8   five aframax tankers?
9        A     All right.
10       Q     Are 10 of the 11 vessels that
11  you refer to in paragraph 26 of the Complaint?
12       A     And so what?
13       Q     No, I'm asking you are they the
14  same?
15       A     You told me, you told me they
16  are the same.
17       Q     I didn't tell you that.
18       A     I don't care.
19       Q     I'm asking you?
20       A     I don't care if they are the
21  same.
22       Q     I understand this is a difficult
23  process.
24       A     I just don't care if they are
25  the same, so I don't need to answer the

Page 99

```
1                 MARK GATTO
2   question.
3         Q      Okay.
4                Let's look at paragraph 31 of
5   the Complaint.
6         A      Okay.
7         Q      There is an allegation that
8   Geden transferred vessels to advantage for
9   inadequate consideration, that's the first
10  sentence of that paragraph.
11               Do you see that?
12        A      Yes.
13        Q      What's the basis for that
14  allegation?
15        A      The basis is that we didn't
16  receive one dollar from that sale, that's the
17  basis, and there was plenty of equity in the
18  vessels.
19               That's why they sold them, so
20  that's the basis.
21        Q      How do you -- well, do you know
22  what the vessels were worth when they were
23  sold?
24        A      I didn't know they were sold.
25        Q      Well, you just said there was
```

Page 100

```
1                 MARK GATTO
2   plenty of equity in the vessel.
3         A      I am telling you I know there
4   was inadequate consideration because they made
5   money, and we didn't know they were sold, and
6   no one told us.
7                No one paid us, and they owe us
8   millions of dollars; they breached an
9   agreement.
10        Q      Right.
11        A      This is silly questioning, your
12  client breached an agreement; they owe us
13  money.
14        Q      Did Icon Octavian have a
15  mortgage over any of these 11 vessels?
16        A      We had a guarantee from the
17  parent company.
18        Q      Okay, but no mortgage?
19        A      Where does the money go to when
20  they sell these assets?  Where did the money
21  go?
22               Who is paying you?  Can I ask?
23               Who's paying you?  Can I ask
24  who's paying you?
25        Q      Your lawyer can tell you all of
```

Page 101

```
1                 MARK GATTO
2   those things.
3         A      All right.  Because you're
4   getting paid, right?
5                You are not doing this for free.
6         Q      This is not a pro bono case.
7         A      That's what I thought.
8         Q      So this paragraph 31 also refers
9   to a lawsuit in the United States District
10  Court for the Eastern District of Louisiana, do
11  you see that?
12        A      I do.
13        Q      And that is captioned Psara
14  Energy, Ltd. v. Space Shipping, civil action
15  2:16-CV-1305?
16        A      Okay.
17        Q      Are you familiar with that case?
18        A      Not the details.
19        Q      Did you read the Complaint?
20        A      I don't believe I read the
21  Complaint.
22        Q      Do you know the eventual
23  disposition of that action?
24        A      I don't recall at this time.
25               MR. QUARTARO:  Thank you, I have
```

Page 102

```
1                 MARK GATTO
2   no further questions.
3                Reserve my right to recall.
4                MR. JOHNSTON:  Okay, we are done.
5
6         _____
7                 MARK GATTO
8   Subscribed and sworn to before me
9   this _____ day of _____, 2018.
10
11  _____
12        NOTARY PUBLIC
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 103

```
 1                MARK GATTO
 2
 3      C E R T I F I C A T E
 4
 5
 6      I, STEPHEN J. MOORE, a Shorthand
 7  Reporter and Notary Public of the State of
 8  New York, do hereby certify:
 9
10      That, MARK GATTO,
11  the witness whose deposition is
12  hereinbefore set forth, was duly sworn,
13  and that such deposition is a true  and
14  accurate record of the testimony given by
15  such witness.
16
17      I further certify that I am not
18  related to any of the parties to this
19  action by blood or marriage; and that I am
20  in no way interested in the outcome of
21  this matter.
22     _____
23      STEPHEN J. MOORE, RPR, CRR
24
25
```

Page 104

```
 1                MARK GATTO
 2
 3           ERRATA SHEET
 4  PAGE/LINE      CHANGE FROM      CHANGE TO
 5  _____   _____   _____
 6  _____   _____   _____
 7  _____   _____   _____
 8  _____   _____   _____
 9  _____   _____   _____
10  _____   _____   _____
11  _____   _____   _____
12  _____   _____   _____
13  _____   _____   _____
14  _____   _____   _____
15  _____   _____   _____
16  _____   _____   _____
17  _____   _____   _____
18  _____   _____   _____
19  _____   _____   _____
20  _____   _____   _____
21  _____   _____   _____
22  _____   _____   _____
23  _____   _____   _____
24
25
```

## $

**$19**
70:25

**$22**
75:15,19 82:23

**$26**
74:8,16,20 75:14 76:12
80:5 82:20

**$44**
76:2,14

**$48**
66:4 75:15 82:22

**$75**
93:13,17 95:6

## 0

**000664**
92:8

**00665**
93:11

**00666**
93:22

**00670**
93:10

**0665**
93:9

**0768**
65:11

**0776**
65:12

**0918**
73:23

## 1

**1**
65:17 66:3 67:15 78:7,19
82:8,11,17 98:6

**10**
59:15,17 75:21 80:4
98:10

**100**
71:19 73:15

**11**
53:12 65:3,5 66:4 69:11
96:13,22 98:2,10 100:15

**12**
67:24 68:3,6 77:6 96:3

**13**
73:8,10

**14**
66:18,20 68:6 87:9,11,13

**140**
78:6,8,15

**15**
92:3,5

**16**
92:11 95:7,17,19

**17**
94:16

## 2

**20**
94:21 96:21

**200**
73:16

**2011**
83:11 84:17 85:15,25
90:19

**2013**
94:17

**2014**
68:6 92:11 94:21 95:7
96:21 97:20

**2016**
57:8 69:17,18

**2017**
96:18

**2018**
102:9

**26**
96:9 98:3,11

**29**
66:6

**2:16-CV-1305**
101:15

## 3

**3**
79:2 89:15

**31**
99:4 101:8

**398**
67:2

**399**
67:5

## 4

**4**
65:17

## 5

**5**
68:11 96:10

**50**
88:18,19

## 9

**9**
55:6,8,11 68:8

## A

**Absolutely**
91:22

**accounting**
58:23

**accounts**
59:2

**accurate**
54:7 103:14

**action**
101:14,23 103:19

**activity**
63:5,7,12

**address**
67:5,8 72:5 78:24

**advantage**

96:15 99:8

**affect**
54:24

**aframax**
93:3,18,24 98:8

**agreement**
65:14 73:16 74:5,8,25
75:4,22 76:8,18 78:7
79:18 82:21 100:9,12

**ahead**
94:8

**allegation**
96:12 99:7,14

**allegations**
72:17

**amended**
56:20 95:24

**amount**
72:25 74:13,24 76:7,21

**and/or**
92:24

**Andower**
83:24

**answer**
53:22 98:25

**anybody**
70:5 84:4,11

**appears**
60:9 65:14 75:7 76:3,11
77:22 93:13 95:24

**approval**
87:6

**approve**
86:8,9,20,21

**approximate**
84:16

**arrived**
67:16

**asked**
62:18 68:24

**asking**
56:3,13 68:21 71:4,17
78:4 97:19 98:13,19

**asset**
63:7

assets
60:12 63:21 64:3,12
90:13 91:6 100:20

assign
67:18

assume
57:14 61:19 64:24 74:22
77:4 90:23

assuming
88:2

attached
93:5

attachment
93:8

attending
94:20

attorney
54:10 56:9 65:24

available
56:12

Avenue
79:2

aware
60:13 61:6 64:4,18 79:19
80:14

_____

B

back
66:18 70:15 97:19

Backer
83:17,21 84:13 92:12
94:22 96:23

background
57:6

balance
75:16,19 76:21

basement
95:3

basic
86:2

basis
99:13,15,17,20

Bates
65:11

bathroom
54:2

bearing
65:11

beginning
97:19

behalf
65:21

believe
57:21 58:9,13 59:7 62:25
66:13 69:6 74:14 80:2
83:8 85:22 94:18 96:24
101:20

beneficial
77:21

best
56:11

better
70:22

big
71:15

blood
103:19

bono
101:6

borrower
77:19,21

box
93:12

boy
71:15

breached
100:8,12

break
53:25 54:2

Bronstein
83:24

bullet
89:18

bullshit
71:4,6

bunch
56:15

buyer
66:11 67:8,20

buyers
66:24

_____

C

call
80:18 85:5

called
59:12 61:15 81:9 84:25
96:14

can't
53:23 55:20 63:18 64:13
69:19 70:5

Capital
66:25 79:2 85:8,10

captioned
65:13 94:10 101:13

care
98:18,20,24

cares
71:7

case
53:13,18 54:7,20 56:20
63:8,19 75:11 77:22 81:8
101:6,17

center
53:12 56:23,24 57:9
65:15 69:2 75:8 90:22,23

CENTER's
66:10

certain
85:10,13

certify
103:8,17

charter
58:4 71:8 83:10

chartered
93:4

charterer
89:8,21 90:8,15,18

check
56:7

chief
58:23

civil
101:14

clarification
54:5

CLE
80:6

client
71:2,13 100:12

combination
61:12

come
69:23 71:3,9,22 73:14
97:10

commingled
63:21

committee
84:22 85:2,3,6,7,14,18,
20 86:3,6,12,13,15,20
88:5,10

common
63:25

communication
78:25

companies
64:17

company
56:10 59:12 60:15 61:19
62:19,23 70:6 71:19
80:25 81:7,9,12,14
88:15,17,22 93:18
100:17

Complaint
56:20 70:25 72:5,12,14,
18 95:25 96:8,9 98:11
99:5 101:19,21

completed
89:19

component
74:16,20

condition
90:12

conditions
89:16

consider
95:9

consideration
99:9 100:4

considering
95:5,13,15

consists
93:2

consummated
87:4,7

contact
66:23

contents
72:13

continue
71:17

CONTINUED
53:7

continuing
53:10

contract
71:8

control
91:17

controlled
85:9

conversation
54:9 97:15

convey
97:5

copy
88:8,9

corporate
77:10,24 90:14,18

correct
64:23 67:9 70:19 79:6,9
82:16,19 83:25 84:24
87:5,8 88:3

counsel
65:11 68:6 84:8

couple
53:15 54:14

course
53:19 54:2

court
53:21,23 101:10

create
54:7

credit
84:25 85:14 86:2

credited
74:24 75:5

CRR
103:23

crude
92:22

currently
56:25 80:13 82:6,14

cut
72:15

_____

**D**

damages
71:2

date
55:9 59:18 65:6 68:4
73:11 87:12 92:6 95:20

day
71:21 102:9

deal
58:24 86:4,7 87:4

Dear
92:13

debt
74:16,20,23 76:16 82:20

decide
69:9

decisions
86:3

Defendant
57:9

Defendants'
55:12

defined
75:22 77:6

department
59:2

deposition
53:10,11 57:5 80:17
96:18 103:11,13

describe
85:25

described
55:7 59:16 65:4 68:2
73:9 87:10 92:4 95:7,18

details
66:24 93:5 101:18

determine
69:10

determined
70:2

determines
85:8,12

didn't
58:14 68:23 72:16 97:10,
22 98:17 99:15,24 100:5

difference
76:20

different
63:22 81:4,5

difficult
98:22

diligence
89:19,23 90:3,5,10,11

dinner
92:14 94:21,25 97:16

direct
55:14 91:20

directly
91:12

director
62:2

discovery
55:12 68:9

discretion
89:22

discuss
92:14

discussed
94:24 96:21

discusses
86:17

discussing
93:16

disposition
101:23

District
101:9,10

document
55:7 59:16,21 65:4,8
66:12 68:2,7 73:9,23
79:7,8 80:3 86:17,19
87:10,14,17 92:4,8 94:9,
12,19 95:18

documentation
77:2

documented
64:23

documents
54:14,16 55:16,20 56:8,
16 58:6,9,18 62:6,8
68:10,14,17 70:21 71:23
86:24 87:2

doesn't
71:15 72:5 95:9

doing
101:5

dollar
99:16

dollars
100:8

don't
56:15,18 58:14 59:3,10
60:7,25 61:3,10,21 62:5,
6,8,10 64:13,14,16 67:22
68:24,25 69:6,12,18,21
70:2,8,20 72:24 73:7
75:5,20 76:19,22 77:24
78:3,4,14 79:15 80:2
81:5 84:19 85:23 90:20
91:13,25 92:18 94:18,19
95:14 96:24,25 97:2,3,7,
14 98:18,20,24,25
101:20,24

dozen
70:13

drawn
74:13

due
89:19,22 90:2,5,10,11

duly
53:3 103:12

---

**E**

---

**e-mail**
92:12,15,16 93:7 95:7

**earlier**
62:18 80:3

**earnings**
58:11

**Eastern**
101:10

**eight**
93:3

**either**
61:9 83:16,20 95:15

**employees**
61:2 71:20

**Energy**
101:14

**entered**
83:10,16,20

**entering**
86:3

**enters**
85:10,13

**entire**
74:12 76:13

**entities**
61:25 63:15,22 64:11,19
78:25

**entity**
59:24 60:16 61:14 62:20,
24 63:4,11,13,23 77:13
78:5 80:20,22 81:16,21
82:5,14 83:3,4 85:9
88:25 89:5,13 96:14

**entry**
67:19 89:24

**equipment**
77:10 82:9

**equity**
82:6,15,24 99:17 100:2

**establish**
92:22

**eventual**
101:22

**Everybody**
73:19

**ex-center**
56:24

**exactly**
62:11,16

**EXAMINATION**
53:7

**examined**
53:4

**example**
63:6

**executed**
74:4

**exhibit**
55:8,11 59:17 65:5 67:15
68:3,8 69:11 73:10 87:11
95:17,19 97:25

**existing**
70:18,21 72:22 73:6
75:8,23 76:7

**expect**
89:4,11 90:6,9

**explained**
82:18

**extent**
54:13,15

---

**F**

---

**face**
74:7

**facilitated**
67:23

**facility**
70:19,22 72:22,25 73:6
74:10 75:8 76:2,8,13
77:16 78:20

**fact**
65:24 72:11 97:4

**factual**
54:7

**familiar**
55:17,23 56:14 59:11,13,
20 61:14 64:7,10 65:7
95:23 101:17

**familiarize**
73:13,15

**filed**
56:20

**files**
56:7 88:8

**finance**
63:19,20 64:17

**financial**
90:11

**financing**
79:14

**find**
73:20

**fine**
94:6 97:18

**firm**
58:25

**first**
53:16 68:12 69:17,18
85:15 88:11 93:11 94:2
97:25 99:9

**five**
93:2,3,18,19,23 98:7,8

**fleet**
91:9,20 92:22 93:2

**following**
92:20

**follows**
53:5

**forgiven**
76:17

**form**
72:7,9

**formal**
53:18,19

**formerly**
56:24

**forth**
63:22 103:12

**forwarded**
92:16

**Fourteen**
77:7,9,11,20 83:8

**frame**
84:3

**fraudulently**
96:13 97:5

**free**
101:5

**fucking**
71:9

**functionally**
67:8

**fund**
77:7,9,11,14,20 81:15,18
83:8 85:12 88:18

**funds**
61:10,12 62:15 81:4,24
82:9

**further**
53:4 102:2 103:17

---

**G**

---

**Gatto**
53:1 54:1 55:1,6,8 56:1
57:1 58:1 59:1,15,17
60:1 61:1 62:1 63:1 64:1
65:1,2,5 66:1,3 67:1
68:1,3,5 69:1 70:1,24
71:1 72:1 73:1,10 74:1
75:1 76:1 77:1 78:1 79:1
80:1,4 81:1 82:1 83:1
84:1 85:1 86:1 87:1,11,
13 88:1 89:1 90:1 91:1
92:1,3,5 93:1 94:1 95:1,
19 96:1 97:1 98:1 99:1
100:1 101:1 102:1,7
103:1,10

**Geden**
53:13 87:21 89:2,6,9,13
90:24,25 91:3,6,11,19
96:13,14 99:8

**getting**
101:4

**Giovanni**
85:22

**give**
53:14 97:11

**given**
85:11 103:14

**go**
88:24 92:7,24 93:21 94:8
100:19,21

**goes**
68:12 93:9

**going**
54:14 57:4 73:15 87:20
97:9,12,20

**Good**
55:3

**group**
80:18 81:10 82:2

**groups**
80:24

**growth**
92:24

**guarantee**
100:16

**guarantor**
79:18 89:20 90:15,19

**guess**
63:13 70:16 82:10

**guy**
91:4

**guys**
57:15

**H**

**half**
69:17,18 70:13 85:15

**hand**
73:25

**handed**
55:11 68:5 92:9

**handle**
69:21

**handled**
70:9,12

**handling**
58:24 59:4

**Harry**
85:22

**haven't**
58:15

**head**
53:24 69:22

**heard**
53:15

**hearing**
72:23

**held**
91:7

**hereinbefore**
103:12

**hire**
58:4

**hold**
63:7 64:2,12

**holding**
61:19 94:2

**Holdings**
53:13 61:15,16,18 62:13
77:23 78:21 79:12,18,24
83:5 90:25 91:3,6,11,20

**holds**
82:6,24

**hope**
54:20

**hundreds**
84:20

**I**

**I'M**
54:14 56:3,9,13 58:5
60:13 61:6,24 62:15
64:4,18 66:9 68:21 69:9
70:8 71:15 75:3 76:10
79:19 80:14 94:5 95:8
98:13,19

**I'VE**
55:20 78:18

**Icon**
53:12 57:10,25 58:3,17
59:7,12,24 60:5,6,18
61:7,15,16,17,20,22
62:2,9,13,18 63:9 64:22
66:9,25 67:18,20 68:13,
15 69:2,13 72:25 76:25
77:10,22,23 78:20,21
79:2,12,13,17,20,22,23,
25 80:17,18,19,22,24

81:8,9,13,14,21,23,25
82:6,14 83:4,11,15 84:21
85:8,9 88:19 93:13,17
96:18 100:14

**Icon's**
84:17

**idea**
54:6

**identification**
55:8 59:17 65:5 68:3
73:10 87:11 92:5 95:19

**identified**
67:15 82:21 88:25

**identifies**
59:24

**identify**
70:5

**in-house**
84:7

**inadequate**
99:9 100:4

**include**
86:23,24

**included**
73:5

**income**
58:7,8

**indebtedness**
75:23 80:10,11,15

**indicates**
79:4

**indicative**
94:10

**indirectly**
82:9

**individual**
58:24

**industries**
64:11,14

**industry**
60:15 64:2,6

**informal**
53:20

**information**
86:10

**infrastructure**
77:11

**initial**
53:11 80:16 87:22

**inspection**
55:13 68:9

**intended**
54:11

**interest**
79:25 82:8

**interested**
103:20

**interests**
79:21

**interjected**
72:10

**investment**
80:18 81:10,18,24 82:2
85:3,5,7,18,20 86:5,11,
13,15,20 88:5,10 93:17
95:6

**investments**
80:17,19 81:9,25 82:6
83:12,16,19

**investors**
92:23

**involve**
57:19

**involved**
84:5

**involvement**
77:15,17

**IO**
65:11,12 73:23

**IPO**
92:25

**Islands**
79:5 80:6 88:17,21

**isn't**
96:20

**issue**
87:22

**it's**
53:18,20 54:6 56:24
57:17 60:22 61:11,19

62:10 63:4,25 65:13
66:12 77:14,18 80:6 83:8
86:17

**its**
61:4 77:15 89:22 91:20

**J**

**January**
92:11 94:16,21 95:7
96:21

**Jason**
83:24

**Johnston**
68:7 71:14 72:4,10,16
78:11,14,18 102:4

**joint**
61:13 92:22

**June**
84:17 96:18

**jurisdiction**
60:19

**K**

**keeps**
61:4

**kind**
53:14 57:20 73:17 82:2
88:4 90:5

**knew**
97:20

**know**
53:15 57:15 58:10,14
59:3 60:5,7,11,18,21,23,
25 61:3,4,7,21 62:4,5,10,
12 63:25 64:14,16 65:25
67:14 68:24,25 69:12,13,
19,21 70:2,6,8,22 72:24
73:4 74:12 75:20 76:6,
12,16,22,25 77:12,15
78:3,4 79:15,17,20,23
80:9 81:5 82:5,24 84:16
85:17,19 90:2 91:13
92:15 94:4 97:2,22
99:21,24 100:3,5 101:22

**known**
56:24 59:24 60:14 62:20
96:17

**L**

**L.P.**
77:11

**language**
76:4,5,10 92:20

**large**
91:8

**lawsuit**
101:9

**lawyer**
100:25

**led**
84:13

**left**
73:25

**left-hand**
93:12

**legal**
90:12

**lenders**
64:18 76:17

**Let's**
59:14 85:5 99:4

**letter**
68:6

**liability**
88:17,21

**limited**
88:17,21

**line**
65:17 66:5 67:2,5 73:8
75:11 96:5

**list**
93:22

**listed**
56:8 98:6

**lists**
55:15 78:19

**litigation**
56:23

**little**
53:20

**LLC**
53:12 59:12,25 60:6,8,
11,14,21 61:8 62:19
67:21 69:3 77:18 78:21

**loan**
70:18,22 71:24,25 72:22
74:4,10 75:8,9,25 76:22
77:16 78:6 79:18

**London**
95:4

**look**
55:23 58:14 66:17 75:21
88:24 94:7 99:4

**looked**
75:2

**looking**
66:3 77:5 88:11 96:8,9

**Looks**
55:19

**lot**
61:25 95:9

**Louisiana**
101:10

**M**

**manage**
77:14 85:13

**managed**
81:20 83:16,20

**manages**
81:23

**managing**
69:15,16 86:7

**mark**
53:1 54:1 55:1,5 56:1
57:1 58:1 59:1,14 60:1
61:1 62:1 63:1 64:1 65:1,
2 66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1 84:1
85:1 86:1 87:1,9 88:1
89:1 90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1 98:1
99:1 100:1 101:1 102:1,7
103:1,10

**marked**
55:8 59:17 65:5 68:3
73:10 80:4 87:11 92:5
95:19

**market**
68:16 97:10

**marketed**
69:2,4

**marketing**
68:15

**Markowitz**
84:9

**marriage**
103:19

**Marshall**
79:5 80:6 88:17,21

**Mat**
92:12 94:22 96:22

**Mat's**
96:18

**matter**
54:17 84:6 103:21

**mean**
54:22 71:9,22 75:6 83:4
91:15 95:10 96:25

**means**
62:23 77:10

**medications**
54:24

**Mehmet**
92:12 94:22

**members**
83:22,23 85:23

**membership**
79:21,25

**memorandum**
65:13 74:25 86:14,16

**mentioning**
81:3

**merits**
86:18

**Michael**
84:9 85:21

**mid-june**
83:11

midterm
92:25

million
66:5 70:25 74:8,16,20
75:14,15,16,19 76:2,12,
14 80:5 82:22,23 93:13,
17 95:6

millions
82:20 84:20 100:8

mind
92:21

minute
69:24 71:21 73:12

MOA
70:3 82:22

money
71:3 100:5,13,19,20

monthly
58:11

MOORE
103:6,23

mortgage
80:5 100:15,18

**N**

name
65:16 70:7

named
56:25 83:17

Navigation
53:13 57:9 90:22,23

necessarily
89:14 96:24

need
53:25 71:15 98:25

Neil
71:3

new
60:8 66:20 92:14,22,23
93:17 95:6 103:8

nice
92:13

noisy
95:3

nose
97:13

Notary
53:4 102:12 103:7

note
59:23 72:4 75:10

noted
72:20

notice
97:11

notices
66:21,24

number
58:22 61:10 68:11 70:7
90:13 93:13

numbered
73:23

numbers
65:11

**O**

oath
53:17

object
72:6

objection
72:9,19

obligors
78:20

Octavian
53:12 57:10,25 58:3,18
59:7 60:5 64:22 66:9
67:18 69:2,13 76:25
81:8,13,15 88:19 100:14

October
53:11

offense
54:23

officer
58:23 61:22,24

offices
60:24 67:11

okay
54:12 59:5,19 60:2,10
62:17 63:24 64:20 65:10,

23 67:18 68:5 69:7 70:10
72:2,19,23 73:18,24
75:17,21,24 77:8 78:10
80:8 81:7,17 82:13 86:22
87:24 89:15,17 92:10
93:15,25 94:8,20 95:21,
22 96:4,11 97:17 99:3,6
100:18 101:16 102:4

ones
97:8

operating
64:16

opportunity
56:4,7

organization
80:25

organizations
79:5

organized
60:19,20,22 79:11

original
76:22

outcome
103:20

outstanding
76:7

owe
71:3,8 100:7,12

owed
72:25

owned
63:21 77:23 81:15 82:5
88:18 89:2,5,6,9,12
90:22,24 91:2,12 94:15

owner
59:25 63:20 77:18,21
81:16 83:2,7

owners
61:20

owns
60:11 61:7 62:13 79:21,
24

**P**

page
55:15 65:17,20 66:19

68:12,13 73:16,20 74:2
75:21 77:6 78:6,14,17
88:12 89:15 92:8 93:9,
11,21 94:2 96:3,10 97:25
98:6

pages
77:6 78:12

paid
75:19 76:13 100:7 101:4

paragraph
66:3,18 67:15 93:6 96:9
98:3,11 99:4,10 101:8

parent
79:13 80:19,22,25 81:7,
12,14 100:17

Park
79:2

part
76:17

particular
55:14

parties
103:18

paying
100:22,23,24

people
58:22 64:5,15,19 69:20
70:7,10

percent
82:8,11,17 88:18,19

performed
90:3,6

permission
97:11

person
58:24

personally
58:14 60:25 61:6 90:20

pick
57:4

place
95:3

Plaintiff
57:12 69:8,9 70:2,18
81:8

**platform**
92:24,25

**please**
57:7 83:18

**plenty**
99:17 100:2

**plus**
93:3

**point**
57:8 58:2 59:8 66:10

**pool**
57:20,22,23 58:10 67:20

**portfolio**
84:17

**possible**
62:10

**precedent**
89:16

**preceding**
97:24

**prepared**
56:2

**present**
79:13

**Presumably**
90:4

**previously**
53:3 59:6

**price**
66:4,9,10,14 67:15
69:10,11 70:3 74:25
82:22 97:10

**primarily**
83:23

**privileged**
54:12

**pro**
101:6

**probably**
70:22 77:17

**proceeding**
53:19

**process**
86:2 98:23

**produced**
54:16 65:10 87:21

**proposed**
86:4 87:6

**prospective**
84:22

**provide**
56:11 65:14

**provided**
58:11 66:15 68:8 86:11
88:5

**provides**
66:4

**Psara**
101:13

**Public**
53:4 102:12 103:7

**purchase**
66:4,8 67:14 69:10

**purchaser**
88:12,14,16 89:19

**purpose**
60:15,16 62:19,20,23
63:10,15,23 64:11,19
85:9 88:21 89:5,13

**put**
57:25

**putting**
57:19

**Q**

**qualify**
63:13

**QUARTARO**
53:8 55:4,10 59:14 64:8
65:2 67:24 71:12 72:8,
15,19 73:8 78:13 87:9
92:3 95:17 101:25

**question**
57:6 64:9 72:7,12 73:17
74:18 83:18 88:2 97:15
98:4 99:2

**questioning**
100:11

**questions**

54:4,8,11,15,19 56:22
71:10,18 73:14 86:6
102:2

**R**

**reach**
54:9,12

**read**
88:12 92:21 101:19,20

**reading**
76:10 94:5

**ready**
92:24

**really**
95:2,4

**reason**
63:17 66:13

**reasonable**
69:11 78:2 79:10,16

**recall**
54:18 56:18 59:9,10
67:22 73:7 76:19 77:24
84:19 85:23 91:23 92:16,
18 93:16 94:9,11,24
95:5,12,14 96:25 97:3,7
101:24 102:3

**recalled**
53:2

**receivables**
59:2

**receive**
58:3 99:16

**received**
58:5,7,8 77:2

**rechartered**
57:14,17

**recipients**
66:24

**recollection**
75:11

**recommendation**
86:6 88:10

**record**
53:18,24 54:7 103:14

**records**
61:5

**redelivered**
57:9,13

**refer**
57:2 89:13 98:11

**reference**
89:12

**referenced**
98:2

**references**
75:25

**referring**
57:3 68:11 81:6

**refers**
101:8

**refi**
82:21

**refinance**
75:7

**refinancing**
73:5 75:13 76:8,13,18,21
79:14

**reflect**
66:8

**reflected**
77:3

**refresh**
74:9

**refreshes**
75:11

**registered**
59:25

**regulatory**
90:12

**Reisner**
85:21

**related**
68:14 86:25 90:11,12
103:18

**relating**
75:12

**relevant**
54:17 72:13

remaining
74:23

remember
56:15 61:11 70:20 84:12
85:24 87:16,18 92:2
94:20

remind
53:17,22

reminders
53:15

repaid
76:9

Repeat
74:18 83:18 98:4

rephrase
64:8 87:15

reporter
53:23 103:7

represent
87:20

represented
91:24 92:2

request
55:12,19 68:9,11,14,17,
23

requested
56:10

requests
55:22

reserve
54:18,21 102:3

respect
89:20 90:7

responded
68:19

responds
68:7

response
68:13

responsive
68:17

restaurant
95:3

result
89:22

return
57:18

returned
57:24

review
86:5

reviews
84:22

rich
91:4

Richard
65:24

right
54:18 56:13,18,19 57:10,
11 64:25 67:12 70:14,24
72:3,21 73:22 75:16
78:22 80:7,20,21 83:9,
11,13,17 84:2,10,23
87:13 88:2,22 98:9
100:10 101:3,4 102:3

roughly
84:18

RPR
103:23

run
71:19

───────────

S

sale
65:15 66:10,14 68:15,16
69:2,4 70:3 72:6 73:4
74:15,19,25 82:22 96:21
99:16

satisfied
89:21

says
66:12 74:8 75:3,12 77:9
79:7 88:12,16 89:2
92:13,21 93:12

Schedule
78:7,19

Sebile
83:24

second
55:12,15 65:19,21 66:18
68:9,12 93:6

see
55:22 56:15 60:2,3
65:16,20 66:5,23 67:2,7
74:7 76:3,5 78:14 89:24
94:4 99:11 101:11

seeing
87:16,18 94:11

seeking
55:16 70:25

seen
55:18,21 56:3,5 58:15,18
87:14

sell
71:10 97:9,12 100:20

seller
67:7 88:25 89:20

sellers
65:21 67:4

sentence
99:10

series
55:22

set
60:8 63:4,23 81:25
103:12

Seven
91:25

shakes
53:24

Shamrock
56:25 59:12,25 60:6,18
61:8,15,16,18,20,23
62:3,9,13,19 63:9 67:21
77:22,23 78:20,21 79:12,
13,17,20,23,25 82:15
83:5

sheet
86:23 87:22 88:3,11
94:10 97:25 98:7

Shell
93:4

shipping
57:20 64:2 69:21 83:12,
15 84:13,17 93:5 101:14

Shorthand
103:6

show
58:7

showed
97:24 98:7

shows
80:4

side
93:12

signature
65:20 73:20,25 74:2,11
78:11,17 96:5,6

signed
70:25 72:11

silly
100:11

single
71:21

sir
94:3

sitting
69:25

size
84:16

sold
59:7 60:6 64:21 70:17
71:7 73:2 75:15 97:21
99:19,23,24 100:5

sole
89:22

somebody
56:10 58:17 83:17

sorry
66:9 69:9 79:22 85:18

sort
80:24 81:17

sounds
57:11 59:13 78:2 79:16
84:2,10

sources
93:12

Space
101:14

speak
54:10 57:7 63:18

**special**
60:15,16 62:19,20,23
63:10,15,23 64:11,19
85:9 88:20 89:5,13

**specific**
81:2 95:13

**specifically**
55:20 59:3 61:11 65:9
69:12 70:8,9 79:15 84:19
93:20 95:14

**spending**
95:15

**SPES**
64:2 96:14

**ST**
93:4

**staff**
83:22,23

**standard**
55:19

**start**
79:22

**started**
55:5

**starts**
88:20 93:9

**State**
103:7

**statement**
58:11

**States**
101:9

**Stena**
57:22,23 58:10 67:20

**STEPHEN**
103:6,23

**structure**
77:25 82:3 90:15,18

**stuff**
71:4

**stupid**
71:10

**Subscribed**
102:8

**subsequently**
54:16

**subsidiary**
89:3,5,10,12

**substance**
54:9 56:21

**suez**
98:7

**suezmax**
93:3,19,23

**summary**
87:2 88:9

**supposed**
88:15

**sure**
56:9 58:5,20 60:17
61:16,21 62:15 69:19
72:21 75:3 85:21 95:8

**sworn**
53:3 102:8 103:12

---

**T**

**take**
54:23 72:24 73:12 94:6,7

**talk**
56:19 71:16

**talking**
70:11 81:3

**tankers**
93:19 96:15 98:8

**target**
92:23

**team**
84:14 86:7

**tell**
88:13 98:17 100:25

**telling**
100:3

**ten**
93:23 94:15 96:21 97:23
98:2

**term**
75:22,25 77:7 86:23
87:22 88:3,11 94:10
97:25 98:6

**terms**
55:24 86:2 88:15

**testified**
53:5 59:6 80:17

**testimony**
54:25 103:14

**thank**
55:3,10 63:14 101:25

**thereof**
89:3,10,12

**thing**
88:4

**things**
59:24 81:5,24 90:13 95:9
101:2

**think**
54:17 63:19 64:17 71:20
77:5 80:4,16 84:5 91:10
97:9

**third**
89:18 92:8

**thought**
92:13 101:7

**three**
85:24

**time**
53:16 56:16 66:16 69:15
71:10 73:3,7 74:11 80:12
83:9,12,15,19 84:2,6,14
85:20 87:19 94:6,16
95:16 101:24

**title**
91:20

**Tobias**
83:17,20 92:12,13 94:22

**today**
54:25 57:2 69:25

**told**
98:15 100:6

**top**
69:22 74:8

**touch**
72:16

**transaction**
60:8 64:22 67:23 70:9,12
77:25 85:10,11,13 86:7,

9,18,19,21,25 87:7,22
90:7 92:14 95:13

**transactions**
58:25 63:16 69:21 84:23
90:10

**transfer**
67:19

**transferred**
96:13 99:8

**treated**
76:23 77:3

**trip**
54:6

**true**
96:20 103:13

**try**
53:19

**Turkish**
91:4

**turn**
65:19 73:23 96:2

**two**
77:6 81:4,5 93:4

**typed**
55:24

**types**
58:25

**typically**
86:23 88:7

---

**U**

**U.S.**
74:8

**ultimate**
61:20 77:18,21 81:16

**ultimately**
86:19 91:14,15

**Um-hum**
60:4

**Un-hunh**
58:16

**unclear**
54:5 56:5 57:7

**underlying**
83:10

**underneath**
97:12

**understand**
75:6 79:6,9 84:21 91:8
95:11 97:4,14,23 98:5,22

**understanding**
62:22 63:2,10 68:18,22
74:17,21 75:9 88:14
90:17,21 91:2,6,11 94:14

**understood**
80:23,24 91:19

**United**
101:9

**universe**
70:11

**upper**
73:25

**use**
63:18 64:2,11,17,18
92:23

**uses**
86:20

**utilize**
64:19

---

**V**

---

**vehicle**
62:21,24

**venture**
92:23

**ventures**
61:13

**verbally**
53:23

**Verified**
70:25 72:5,11,13,17

**vessel**
56:23 57:2,3,10,13,20,24
58:12 59:7 60:6,9 64:21
65:15,16 66:11 67:19
68:15,16,25 69:16 70:17
71:7,11 73:2,5 74:15,19,
23 75:15 80:5,10,15
82:7,25 89:21 100:2

**vessels**
69:15 72:6 91:9,12,18,21
93:22,23 94:15 96:14,22
97:6,12,20,24 98:2,6,10
99:8,18,22 100:15

**view**
66:10

**vote**
86:8

---

**W**

---

**want**
54:21 71:12 94:4

**wanted**
53:14

**waste**
71:9

**way**
54:6 103:20

**Webb**
65:24,25

**what's**
61:17 63:2 66:15 72:8
86:15 99:13

**who's**
83:7 100:23,24

**wholly**
77:23 89:2,4,6,9,12

**witness**
53:2 78:16 103:11,15

**word**
71:13

**work**
57:25 58:4 64:13

**worry**
56:17 71:20

**worth**
99:22

**write**
68:23

**writing**
86:11,12,14

**wrote**
55:25

---

**Y**

---

**years**
91:25

**York**
103:8

**You'll**
59:23

**you're**
56:13 72:21 101:3

**you've**
54:10 56:3,4 82:18